EXHIBIT No.  5

DAPHNE E. BARBEE     2911
Attorney & Counselor at Law
Century Square, Suite 1909
1188 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 533-0275

Attorney for Plaintiff

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 0 8 2006

at _____ o'clock and _____ min. ___ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | | |
|---|---|---|
| RAYMOND WARE, | ) | CIVIL NO. 04-00671 HG/LEK |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S SUPPLEMENTAL** |
| | ) | **AUTHORITY IN SUPPORT OF** |
| vs. | ) | **PLAINTIFF'S SECOND MOTION TO** |
| | ) | **COMPEL DISCOVERY; EXHIBITS "8"-** |
| SIDNEY HAYAKAWA, Director of | ) | **"10"; CERTIFICATE OF SERVICE** |
| Transportation Security Administration - | ) | |
| Honolulu, KEN KAMAHELE, Deputy | ) | |
| Director, Transportation Security | ) | |
| Administration–Honolulu; | ) | |
| TRANSPORTATION SECURITY | ) | **DATE:     May 15, 2006** |
| ADMINISTRATION; THOMAS J. | ) | |
| RIDGE, Secretary, Department of | ) | **TIME:     9:30 a.m.** |
| Homeland Security, DEPARTMENT OF | ) | |
| HOMELAND SECURITY; JOHN DOES | ) | **JUDGE:   Mag. Leslie E. Kobayashi** |
| 2-5, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S SUPPLEMENTAL AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY**

Plaintiff RAYMOND WARE by and through his Attorney Daphne E. Barbee and

submits the following supplemental authorities in support of Plaintiff's Second Motion to Compel

Discovery:

**Exhibit 8**: Government Accountability Office Audit, evaluation and investigative arm of Congress Report concerning TSA, "Clear Policies and Oversight Needed for Designation of Sensitive Security Information" dated June 29,2005.  GAO Findings conclude TSA does not have adequate guidance, procedures, policies and internal controls on  criteria for determining what constitutes SSI , training for persons making SSI decisions and internal controls to ensure SSI designation process is consistently applied.

**Exhibit 9**: In Re September 11 Litigation (S.D.N.Y. 2006)(March 31, 2006).  This order concerns defendant TSA's assertion that deponents did not have to answer questions in pretrial depositions concerning matters they felt were SSI.  The Court ruled the depositions should proceed with complete answers, and then later, if TSA attorneys concluded the answers contained SSI, that portion of the deposition would be redacted and sent to the Court of Appeals for a decision.  This way, court can proceed.    As stated by the Court "...creation of the TSA did not divest the District Courts of their inherent authority to regulate pre-trial  and trial procedures in cases over which they preside and to create a proper record of these proceedings for appellate review of their final and in some cases, interlocutory orders." Id. page 13.

**Exhbit10:** Washington Post article demonstrating the changes in TSA screening in 2005 allowing sharp objects such as scissors and changes in the screening standards.

DATED: Honolulu, Hawaii, _____5-8-06_____.

_____

DAPHNE E. BARBEE
Attorney for Plaintiff

Exhibit No. 8



**G A O**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-GAO-05-677, a report to congressional requesters

**June 2005**

# TRANSPORTATION SECURITY ADMINISTRATION

## Clear Policies and Oversight Needed for Designation of Sensitive Security Information

### Why GAO Did This Study

Concerns have arisen about whether the Transportation Security Administration (TSA) is applying the Sensitive Security Information (SSI) designation consistently and appropriately. SSI is one category of "sensitive but unclassified" information— information generally restricted from public disclosure but that is not classified. GAO determined (1) TSA's SSI designation and removal procedures, (2) TSA's internal control procedures in place to ensure that it consistently complies with laws and regulations governing the SSI process and oversight thereof, and (3) TSA's training to its staff that designate SSI.

### What GAO Recommends

GAO recommends that the Secretary of Homeland Security direct TSA to establish clear guidance and procedures for using the TSA regulations to determine what constitutes SSI; establish clear responsibility for the identification and designation of SSI information; establish internal controls monitoring compliance with its SSI regulations, policies, and procedures, and communicate that responsibility for implementing the controls throughout TSA; and provide specialized training to those making SSI designations on how information is to be identified and evaluated for SSI status. The Department of Homeland Security generally concurred with our recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-677.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Laurie E. Ekstrand at (202) 512-8777 or ekstrandl@gao.gov.

### What GAO Found

TSA does not have guidance and procedures, beyond its SSI regulations, providing criteria for determining what constitutes SSI or who can make the designation. Such guidance is required under GAO's standards for internal controls. In addition, TSA has no policies on accounting for or tracking documents designated as SSI. As a result, TSA was unable to determine either the number of TSA employees actually designating information as SSI or the number of documents designated SSI. Further, apart from Freedom of Information Act (FOIA) requests or other requests for disclosure outside of TSA, there are no written policies and procedures or systematic reviews for determining if and when an SSI designation should be removed.

TSA also lacks adequate internal controls to provide reasonable assurance that its SSI designation process is being consistently applied across TSA. Specifically, TSA has not established and documented policies and internal control procedures for monitoring compliance with the regulations, policies, and procedures governing its SSI designation process, including ongoing monitoring of the process. TSA officials told us that its new SSI Program Office will ultimately be responsible for ensuring that staff are consistently applying SSI designations. This office, which was established in February 2005, will also develop and implement all TSA policy concerning SSI handling, training, and protection. More detailed information on how this office's activities will be operationalized was not yet available. Specifically, TSA officials provided no written policies formalizing the office's role, responsibilities, and authority.

TSA has not developed policies and procedures for providing specialized training for all of its employees making SSI designations on how information is identified and evaluated for protected status. Development of such training for SSI designations is needed to help ensure consistent implementation of the designation authority across TSA. While TSA has provided a training briefing on SSI regulations to certain staff, such as the FOIA staff, it does not have specialized training in place to instruct employees on how to consistently designate information as SSI. In addition, TSA has no written policies identifying who is responsible for ensuring that employees comply with SSI training requirements.



**GAO**
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

June 29, 2005

The Honorable David Obey
Ranking Minority Member
Committee on Appropriations
House of Representatives

The Honorable Martin Olav Sabo
Ranking Minority Member
Subcommittee on Homeland Security
Committee on Appropriations
House of Representatives

The security of our transportation system is of vital importance to the
nation. In line with keeping our transportation safe, some information that
is related to threats to or protection of the transportation system must be
held out of the public domain. On the other hand, the government must
always be mindful of the public's legitimate interest in, and need to know,
information related to threats to the transportation system and associated
vulnerabilities.

Sensitive Security Information (SSI) is a specific category of information
related to transportation security that is deemed to require protection
against public disclosure. Although it is not classified national security
information, SSI is a category of sensitive but unclassified information
that, along with protected critical infrastructure information, is specifically
exempted by statute from release under the Freedom of Information Act
(FOIA), and that it is to be disclosed only to covered persons on a need to
know basis. While the Transportation Security Administration (TSA),
through its SSI authority, may share SSI with regulated entities, it
generally prohibits the public disclosure of information obtained or
developed in the conduct of security activities, which would constitute an
unwarranted invasion of privacy, reveal trade secrets or privileged or
confidential commercial or financial information, or be detrimental to the
security of transportation.

Questions have been raised about TSA's practices and procedures for
determining whether information should be protected as SSI. For example,
certain written responses to questions submitted by TSA to the House
Appropriations Homeland Security Subcommittee were designated as SSI.
However, 1 month earlier, the agency had not treated this same

information as sensitive. Further, in an October 2004 memorandum, TSA itself recognized that the handling and identification of SSI had become problematic.

In response to your request concerning TSA's handling of SSI, we are reporting on (1) TSA's procedures for determining whether information should be protected under the SSI designation, as well as procedures for determining if and when the designation should be removed, (2) internal control procedures in place to ensure that TSA consistently complies with laws and regulations governing the designation of information as SSI and how TSA oversees the procedures to ensure that they are consistently applied, and (3) TSA's training to its staff who designate SSI.

To address our objectives, we reviewed applicable federal laws and regulations, Department of Homeland Security (DHS) and TSA policies and procedures, and other documents related to the SSI designation, and oversight and training processes. We also interviewed TSA and DHS officials involved in the SSI designation, oversight and training processes. GAO's *Standards for Internal Control in the Federal Government* provided benchmarks and standards against which we assessed TSA's SSI designation policies and procedures.[1] Our work was conducted from January 2005 through April 2005 in accordance with generally accepted government auditing standards.

On April 29, 2005, we provided your offices a briefing on the results of our work. The briefing slides are included in appendix I.

## Background

In the aftermath of the terrorist attacks of September 11, 2001, TSA was created to take responsibility for the security of all modes of public transportation. Included in the responsibilities of this new agency was the authority to designate information as SSI. Originally housed in the Department of Transportation, TSA was transferred to DHS as a result of the Homeland Security Act of 2002.[2]

---

[1]GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: November 1999).

[2]The Homeland Security Act of 2002 established 49 U.S.C. § 114(s) as TSA's SSI authority. TSA codified its SSI regulations at 49 C.F.R. part 1520.

According to TSA officials, SSI designated information is created by TSA and by airports, aircraft operators, and other regulated parties when they are establishing or implementing security programs or documentation to address security requirements. Information that is designated SSI can be shared with those who have a need to know in order to participate in or oversee the protection of the nation's transportation system. Those with a need to know can include persons outside of TSA, such as airport operators, aircraft operators, foreign vessel owners, and other persons. SSI cannot be shared with the general public, and it is exempt from disclosure under FOIA.

There are 16 categories of SSI. TSA has distinguished these 16 categories into 3 types of SSI. Four categories are termed "categorical" and automatically designated SSI. Eleven categories require a judgment or analysis to determine if the SSI designation is warranted. One category requires a written determination by an office with determination authority to be deemed SSI. This category is "other information," which is a catchall exemption for information that TSA may wish to designate SSI that does not fit into the other 15 categories.[5]

Additional background information on the SSI regulatory authority, including a list of the 16 categories, is included in appendix I.

## Results

TSA does not have written policies and procedures, beyond its SSI regulations, providing criteria for determining what constitutes SSI. Written guidance for decision making such as this is a key element included in GAO's *Standards for Internal Control in the Federal Government*. Lack of such guidance could result in errors and inconsistencies in determining the SSI designation. Indeed, in October 2004, TSA's Internal Security Policy Board concluded that TSA must establish a framework to identify, control, and protect SSI. The board concluded that essential elements of the framework should include, among other things,

". . . exacting specificity with respect to what information is covered and what is not covered. This specificity could be documented in a classification guide type format because imprecision in this area causes a significant impediment to determining SSI. Experience

---

[5]A subset of one of the judgment categories, 49 C.F.R. § 1520.5(9)(iii), also falls within this determination category.

has shown that employees unsure as to what constitutes SSI may err on the side of caution and improperly and unnecessarily restrict information, or may err inappropriately and potentially disastrously on the side of public disclosure."

In addition to lacking written guidance concerning SSI designation, TSA has no policies and procedures specifying clear responsibilities for officials who can designate SSI.[4] TSA's regulations allow anyone within TSA to designate information SSI. Further, TSA has no policies on accounting for or tracking documents designated as SSI. While TSA officials told us that only a limited number of employees routinely make SSI designations, they were unable to provide documentation to confirm this. One consequence of a lack of control of personnel able to designate documents as SSI is that TSA is unable to determine the number of employees designating information as SSI or the volume of documents designated SSI.

Once a document is designated SSI, it can remain designated as SSI in perpetuity unless a FOIA request or other request for disclosure outside of TSA results in removal of its SSI status. If a FOIA request is received for an SSI designated document, or a document that contains some SSI designated material, the SSI Program Office works in conjunction with the FOIA Office to review its initial designation. If TSA officials determine that the document should no longer be considered SSI, it can be released to the FOIA requester. If TSA officials feel that the SSI designation should remain but some portions of the document are not SSI, the FOIA Office can determine whether it is appropriate to release the document without the SSI material, or not to release the document at all.[5] Other than the FOIA process, no procedures exist for the review of allegations that a document has been erroneously designated as SSI. If there is no FOIA request for a particular document, according to TSA, documents marked as SSI are reviewed for continued applicability upon any request for disclosure outside of TSA. However, TSA officials provided us with no information

---

[4]TSA identified two categories of information—§§ 1520.5(b)(9)(iii) and 1520.5(b)(16)—that require a written determination by an office with determination authority to be designated SSI.

[5] According to a TSA official, TSA processed 99 FOIA requests involving or related to SSI in 2003 and 129 requests in 2004. The TSA official said that, of the total requests processed in 2003, no requests were granted in whole, 63 requests were granted in part, and 36 requests were denied in full. The official also said that, of those 129 requests processed in 2004, no requests were granted in whole, 92 requests were granted in part, and 37 requests were denied in full.

on the number of documents released as a result of these requests for public disclosure. TSA's SSI regulations indicate that TSA may determine in writing that information should no longer be designated as SSI because it no longer meets SSI criteria, but TSA has not done this to date.

TSA lacks adequate internal controls to provide reasonable assurance that its SSI designation process is being consistently applied across TSA and for monitoring compliance with the regulations governing the SSI designation process, including ongoing monitoring of the process. GAO's Standards for Internal Control call for (1) areas of authority and responsibility to be clearly defined and appropriate lines of reporting established, (2) transactions and other significant events to be documented clearly and documentation to be readily available for examination, and (3) controls generally to be designed to ensure that ongoing monitoring occurs in the course of normal operations. In addition, the standards also require that information be communicated within an organization to enable individuals to carry out their internal control responsibilities. However, our review of TSA's oversight activities noted weaknesses in each of these areas.

First, TSA has not clearly defined responsibility for monitoring compliance with regulations, policies and procedures governing the SSI designation process and communicated that responsibility throughout TSA. Without clearly identifying the responsibility for monitoring compliance with regulations governing its SSI designation, this function may not receive adequate attention, leaving TSA unable to provide reasonable assurance that those making SSI designations within TSA are designating documents properly.

In an October 14, 2004, memorandum designed to centralize the administration of SSI within the agency, TSA's Internal Security Policy Board recognized that the handling and identification of SSI had become problematic:

"Lacking a central policy program office for SSI has led to confusion and unnecessary classification of some materials as SSI. Adherence to handling requirements within TSA has been inconsistent, and there have been instances where SSI has been mishandled outside of TSA. Identification of SSI has often appeared to be ad-hoc, marked by confusion and disagreement depending on the viewpoint, experience, and training of the identifier. Strictures on the release of SSI and other SSI policy or handling–related problems have occasionally frustrated industry stakeholders, Congress, the media, and our own employees trying to work within the confines of the restrictions. Significant time and effort

has been devoted to SSI issues, and it is not likely that the current approach to addressing such issues can be sustained."

TSA officials told us that its new SSI Program Office will ultimately be responsible for ensuring that staff are consistently applying SSI designations. This office, which was established in February 2005, will also develop and implement all TSA policies concerning SSI handling, training, and protection. Officials said that TSA is also currently drafting a summary that provides a definition and brief overview of the SSI authority and is designing materials that will further educate all TSA employees on policies, procedures, responsibilities, and guidance for identifying and designating SSI. More detailed information on how this office's activities will be operationalized was not yet available. Specifically, TSA currently does not have written policies formalizing the office's role, responsibilities, and authority.

Second, TSA has not yet established policies and procedures for how it will monitor compliance with the regulations governing the SSI designation process. Without written policies and procedures documenting how it plans to monitor compliance with the regulations governing the SSI designation process, TSA is unable to demonstrate evidence of its monitoring activities.

Third, TSA has no formally defined policies or procedures for ongoing monitoring reviews to assess compliance with the laws and regulations governing the process for designating information as SSI. Without clearly defined policies and procedures for conducting periodic internal monitoring to assess compliance with the regulations governing the SSI designation process, TSA lacks structure to support continuous assurance that those employees making SSI designations within TSA are designating documents properly.

TSA has not developed policies and procedures for providing specialized training for all of its employees making SSI designations on how information is to be identified and evaluated for protected status. Development of specialized training for SSI designations must be preceded by the establishment of guidance and associated policies and procedures so that an adequate training curriculum can be developed. It should also include written policies defining who is responsible for ensuring that employees comply with SSI training requirements. While TSA has provided a training briefing on SSI regulations to certain staff such as the FOIA staff and other units within TSA, it does not have specialized training in place to instruct employees on how to consistently designate information as SSI.

## Conclusions

In order for TSA's SSI designation process to work effectively, there must be clarity, structure, and accountability to help ensure that information is not improperly and unnecessarily restricted or inappropriately disclosed, and that the SSI designation process is being applied consistently across TSA. The lack of clear and documented policies and procedures for determining what constitutes SSI and specifying who may make the designation could cause confusion and uncertainty for staff who must administer the SSI designation process without written guidance. Further, internal control policies and procedures for monitoring the compliance with regulations governing the SSI designation process, including internal controls for ongoing monitoring, communicated to all staff, would help ensure accountability and consistency in the implementation of TSA's SSI regulations. Specialized training designed to familiarize those who are making SSI designations on how information is to be identified and evaluated would reduce the likelihood that employees improperly exempt information from public disclosure or inappropriately disclose sensitive security information.

## Recommendations

To help bring clarity, structure, and accountability to TSA's SSI designation process, we recommend that the Secretary of the Department of Homeland Security direct the Administrator of the Transportation Security Administration to take the following four actions

- establish clear guidance and procedures for using the TSA regulations to determine what constitutes SSI,

- establish clear responsibility for the identification and designation of information that warrants SSI protection,

- establish internal controls that clearly define responsibility for monitoring compliance with regulations, policies, and procedures governing the SSI designation process and communicate that responsibility throughout TSA, and

- establish policies and procedures within TSA for providing specialized training to those making SSI designations on how information is to be identified and evaluated for protected status.

## Agency Comments and Our Evaluation

We obtained written comments on a draft of this report from the Department of Homeland Security. We have included a copy of the

comments in their entirety in appendix II. In addition, DHS provided technical comments, which we incorporated as appropriate.

In its June 14, 2005, comments, DHS generally concurred with our recommendations and stated that they are consistent with ongoing TSA efforts to improve sensitive security information program processes. In its comments, DHS discussed the actions it has already taken and will implement in response to the recommendations, including developing internal controls and audit functions, which will define responsibility for monitoring compliance with regulations, policies, and procedures governing the SSI designation process, and which will be communicated throughout TSA. However, as discussed below, DHS took exception to the report's analyses and conclusions. While we disagree with the thrust of DHS's comments, we believe we fairly and accurately characterize the implementation and monitoring of SSI at DHS. We made clarifying changes where appropriate.

DHS said that our report mischaracterized the nature of SSI by incorrectly applying concepts associated with classified information management to SSI information, which falls within a sensitive but unclassified information category. DHS said that this construct may lead the reader to fundamental misunderstandings regarding the issues surrounding SSI. Although mentioned as a basis for comparison, neither the GAO review nor its report was intended to apply concepts associated with classified information management to SSI. Rather, our analyses were intended to provide a factual summary of the key similarities and differences in the classified information and SSI processes. We compare the two processes only to help clarify the distinctions that exist and thereby avoid any misunderstandings by readers who are familiar with the processes for classified information. We included additional language in the report clarifying that SSI is a form of sensitive but unclassified information, rather than classified national security information.

DHS also stated that SSI is the only practical means for sharing security information with regulated parties and that the absence of a robust SSI program would degrade both the prompt distribution of security information to persons with a need to know and the free exchange of ideas. We agree that SSI is a practical means for sharing security information with regulated parties. In fact, the findings and recommendations in this report should help DHS improve the SSI process. That is, providing specific procedures and guidelines on how individual employees are to identify and evaluate information for SSI protected status is an intrinsic part of DHS's responsibility for effectively managing

its SSI process and should provide both DHS and the regulated parties with confidence that information is given the proper protective status.

DHS said that if a TSA employee incorrectly designates a document as SSI while it remains within TSA, there is no impact on the public's right to access because the FOIA review process will always result in an independent determination regarding the SSI designation and that TSA and DHS are committed to releasing as much information as possible. We view the management improvements discussed in this report as helping to ensure that information that should be withheld from the public is protected as well as helping to ensure that other information is available to the public. In addition, the fact that an incorrectly designated SSI document remains within TSA does not obviate the fact it is wrongfully exempted from disclosure. The potential lack of visibility to the public that SSI documents exist and the time and expense to the public and TSA involved in seeking disclosure of an SSI document through FOIA could inhibit the release of information that could and possibly should have been in the public domain but for an incorrect application of SSI.

DHS also states that we make no distinction between the obligation to "mark" information as SSI, held by all TSA employees, and the authority to "designate," held by only a very few high-level employees. It explains that all employees can "mark" documents that fall within 15 categories as SSI but only the high-level employees can "designate" the 16th category of "other information" by documenting the designation as SSI. As we point out in this report, the responsibility of all TSA employees goes beyond just marking a document as SSI and includes making judgments about what information should be marked as SSI. As we state on page 3, while TSA requires a written determination by an office with determination authority for information deemed SSI for 1 of its 16 SSI categories, according to TSA, only 4 of the remaining 15 categories automatically becomes SSI because of the type of document. The other 11 require a judgment or analysis to be made to determine if the SSI designation is warranted by any TSA employee. Therefore, we continue to believe that appropriate guidance and controls are needed to effectively manage the process.

In addition, DHS said that its SSI designation processes are consistent with every sensitive but unclassified system in the federal government. While we did not review these other systems, we believe that the management principles and controls discussed in this report are appropriate for the TSA system and would be appropriate for similar systems elsewhere.

DHS said that we made an implied suggestion to quantify and identify all documents that have been marked as SSI, and to identify all personnel who have marked such documents. We did note in our discussion of internal controls that TSA has no policies on accounting for or tracking documents designated as SSI. As DHS notes, we did not recommend that TSA provide an inventory of the titles or numbers of SSI documents. In terms of identifying staff that designate documents as SSI, since we are recommending training for all those who designate SSI, identification of all personnel who are going to be applying this designation would be needed to ensure that all are trained.

Further, DHS states that we obliquely criticize TSA's ability to protect SSI without a date by which the document automatically loses its SSI status based on time duration requirements similar to those applicable to classified information. We did not recommend that TSA should implement time limits for SSI information. Our review showed that TSA has no written policies and procedures or systematic reviews for determining if and when an SSI designation should be removed. Moreover, other than the FOIA request process and other requests for disclosure outside of TSA, no procedures exist for a review to determine whether a document has been appropriately designated as SSI. Such procedures would allow TSA to periodically review SSI designations and identify and correct erroneously marked SSI documents while still protecting those with valid reasons.

In commenting on our recommendation that DHS establish clear guidance and procedures for using the TSA regulations to determine what constitutes SSI, DHS said that TSA's SSI Program Office has already taken some steps in line with our recommendation by developing internal guidance that expands on the SSI regulation structure to provide examples of the types of information that should fall within each SSI category. It expects to publish the guidance for general use by TSA employees and regulated parties in identifying and handling SSI.

In commenting on our recommendation that DHS establish clear responsibility for the identification and designation of information that warrants SSI protection, DHS stated that limiting the number of individuals who may designate a document as SSI would lead to operational bottlenecks, could lead to inappropriate release of security information, and would not be operationally feasible. If it is properly done, we do not see how establishing clear responsibility for performing a governmental task would lead to these effects. We wish to make a distinction between a set of personnel who would have responsibility for SSI and a potentially much larger set of employees who would be able to

designate documents SSI. Those responsible for SSI would be accountable for ensuring that those in their domain of responsibility have appropriate training and are applying SSI appropriately. DHS would then be in a much better position to ensure that those responsible for SSI are held accountable, have appropriate training, and are applying SSI appropriately.

DHS agreed with our recommendation for DHS to establish internal controls that clearly define responsibility for monitoring compliance with regulations, policies, and procedures governing the SSI designation process and communicate that responsibility throughout TSA. DHS said it had already undertaken action to develop internal controls, including audit functions, which will define responsibility for monitoring compliance with regulations, policies, and procedures governing the SSI designation process and will communicate that responsibility throughout TSA.

In commenting on our recommendation that DHS establish policies and procedures within TSA for providing specialized training to those making SSI designations on how information is to be identified and evaluated for protected status, DHS said that it conducts specialized SSI training for the SSI Program Office and FOIA staff, and other TSA offices making SSI designations. In addition, it is expanding specialized training to those offices within the agency that create the majority of SSI. This is a good first step in addressing our recommendation, but falls short of its overall intent because SSI regulations extend the SSI designation authority to all TSA employees and does so without giving them specific procedures and guidance, beyond the regulations, upon which to base their judgments. Thus, policies and procedures for providing specialized training to all TSA employees authorized to make an SSI designation will still be needed. In this regard, in our report, we quote an October 14, 2004, TSA memorandum that says in part, "identification of SSI has often appeared to be ad-hoc, marked by confusion and disagreement depending on the viewpoint, experience, and training of the identifier." We believe this statement speaks to the need for specialized training for all those who designate materials as SSI.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to other interested congressional committees and to the Secretary of the Department of Homeland Security and the Administrator of the Transportation Security Administration. We will also make copies

available to others upon request. In addition, the report will be available at no charge on GAO's Web site at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or EkstrandL@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Key contributors to this report were Glenn G. Davis, Vickie Miller, R. Rochelle Burns, Julian King, Thomas Lombardi, David Hooper, David Plocher, Dolores McGhee, Nikki Clowers, Kim Gianopoulos, Davi D'Agostino, Ann Borseth, William Cawood, Casey Keplinger, David Alexander, Katherine Davis, and Larry Harrell.

Laurie E. Ekstrand, Director
Homeland Security and Justice Issues

Exhibit  No.  9

**Loislaw Federal District Court Opinions**

IN RE SEPTEMBER 11 LITIGATION, (S.D.N.Y. 2006)

  IN RE SEPTEMBER 11 LITIGATION.

  21 MC 97 (AKH), 21 MC 101 (AKH).

United States District Court, S.D. New York.

        March 31, 2006


## OPINION AND ORDER REGULATING TESTIMONY AT DEPOSITIONS ANSWERS MIGHT CONTAIN SSI

ALVIN HELLERSTEIN, District Judge

   I write to rule on a strange and significant phenomenon. T
Transportation Security Administration ("TSA"), having first
intervened in these actions to protect Sensitive Security
Information ("SSI"), declines to attend noticed depositions
the airline defendants, where testimony is likely to contair
information. Instead, TSA seeks to impose on defendants' cou
the obligation to object and prevent answers that might disc
SSI. Counsel for defendants, believing that their clients'
interests are best advanced by answering the questions put t
their witnesses and that the applicability of SSI to conditi
of airline security five years earlier might not be easy to
discern, object to the TSA proposal. Defense counsel also ex
concern about exposure to civil penalties if they and their
witnesses fail to protect SSI. Plaintiffs press to proceed,
citing lengthy delays, and pointing out that many of their
counsel — all those who would be taking the depositions — we
cleared by TSA to obtain access to SSI pending TSA authoriza
of such disclosure. Plaintiffs contend that the procedure
recommended by the TSA, that they could put questions to
witnesses but not hear answers until final determinations by
that the answers could be given, would make the role of cour
Page 2
entirely ineffective, and cancel the very right of the clier
seek a relief specifically acknowledged by Act of Congress.

Judicial intervention to regulate the impasse is imperativ avoid further and unnecessary delay in the progress of these cases and to relieve counsel of the inherent conflicts and artificial roles that TSA's position would create for them. the reasons stated in this opinion, I hold that there are reasonable and appropriate ways to allow the depositions to proceed by normal procedures, without compromising SSI or th jurisdiction of TSA to determine SSI.

## I. CHRONOLOGICAL BACKGROUND

The terrorist-related aircraft crashes of September 11, 20 shocked America by the number of deaths and the scope of in that directly resulted, and in many indirect ways. One part consequence was the threat to the American airline industry. airline executives represented to Congress, the lawsuits tha were expected to follow could cripple the American aviation industry, causing extensive and dangerous consequences to th entire nation.

Congress responded quickly, passing eleven days later the Transportation Safety and System Stabilization Act ("ATSSSA' ATSSSA, Pub.L. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §§ 40101 note). Recoveries against the airlines were to be limited to their insurance coverage. ATSSSA § 408(a). All cl "resulting from or relating to the terrorist-related aircraf crashes of September 11, 2001" "including any claim for loss property, personal injury, or death" were to be brought exclusively in the United States District Court for the Sout District of New York. ATSSSA § 408(b)(3). And most uniquely, injured and the representatives of those

Page 3

who had died were given an alternative to a lawsuit: a Victi Compensation Fund specially established and funded to provid quick, economical and final tax-free relief to those who mig wish to apply. ATSSSA § 405.

The story of the Victim Compensation Fund is the subject o report of its brilliant, energetic and empathetic Special Ma Kenneth Feinberg. See Kenneth R. Feinberg et al., U.S. Dept. Justice, Final Report of the Special Master for the Septembe

11th Victim Compensation Fund of 2001. Of those who lost family members, 2,880, representing 97 percent, elected to a An additional 2,680 individuals who sustained injuries on September 11 or during the rescue efforts also elected to ap Total recoveries were $7.049 billion, amounting to an averag $2 million awarded to family members of the deceased and $40 awarded to those who sustained physical injury. But for the Victim Compensation Fund, all or most of the claimants would filed suit in this court.

As the judge who drew the assignment to preside over all t September 11-related liability lawsuits, my first efforts we preserve the alternative conferred by Congress in the ATSSSA file a claim with the Victim Compensation Fund, or to file a lawsuit. My initial decisions preserved both options. Compar Colaio v. Feinberg, 262 F. Supp. 2d 273 (S.D.N.Y. 2003), aff'd, 345 F.3d 135 (2d Cir. 2003) (**upholding** validity of Victim Compensation Fund), **with** In re September 11 Litigation, 280 F. Supp. 2d 279 (S.D.N.Y. 2003) (holding tha defendants have duty to ground victims, as well as passenger for negligently caused death and injury). Thus, the injured, the representatives of those who died, were entitled to seek relief, either "by filing claims with [the] Special Master," "in the traditional manner, by alleging and proving their
**Page 4**
claims in lawsuits[.]" In re September 11 Litigation, 280 F. Supp. 2d at 286. But these were alternatives; a clain not first file with the Victim Compensation Fund, and then, second thought, file a lawsuit. See Virgilio v. Motorola, 2004 WL 433789 (S.D.N.Y. March 10, 2004), aff'd, 407 F.3d 105 (2d Cir. 2005).

The time provided by Congress for filing with the Victim Compensation Fund drew to a close on December 22, 2003. The officially closed June 15, 2004. Remaining for determination were the lawsuits filed in this court.

By companion Orders of July 24, 2002 and November 1, 2002, ordered the consolidation of all actions for wrongful death, personal injury, and property damage or business loss under master docket 21 MC 97.[fn1] (See Order dated July 24, 2002; Order dated Nov. 1, 2002.) TSA intervened in order to

protect against unauthorized disclosure of information deeme
TSA to constitute SSI. (See Order to Show Cause, dated June
2002.) In setting forth its approach to disclosure of SSI
information for purposes of the instant litigation, TSA init
took the position that all SSI-related discovery requests sh
be stayed pending narrowing of the issues relevant to the
September 11 litigation by motion practice. (See Decl. of
Stephen McHale ("McHale Decl. I"), dated Sept. 12, 2002 at ¶
17.) Following such narrowing of the potential scope of
SSI-related discovery, TSA proposed to provide counsel "SSI
substitutes" consisting of appropriately redacted documents
perhaps supplemented by a "general summary of SSI, and/or a
declaration that supports certain material facts that relate
the particular SSI at issue." (Id. at ¶ 19.) As an alternati
to provision of "SSI substitutes," TSA also proposed to esta
a clearance procedure for a limited number of attorneys

**Page 5**

and litigation support staff whereby such individuals would
granted conditional access to material deemed to constitute
(Id. at ¶¶ 20, 21.) Further to the TSA representations, thir
of plaintiffs' lawyers in fact obtained the needed security
clearance. (See TSA Letter, dated Dec. 2, 2003; see also
McHale Decl. I at ¶¶ 20, 21.)

Plaintiffs then propounded interrogatories and document
requests relevant to the basic issues of the litigation, nam
the screening and security measures in effect at the nation'
airports in the months before September 2001. In keeping wit
assertions that all documents responsive to plaintiffs' disc
requests should be submitted for its initial review, (see De
of Stephen McHale ("McHale Decl. II"), dated Feb. 5, 2004, a
15) defendants turned over relevant documents to TSA in thre
separate waves beginning in late 2003. Although documents we
released by TSA for production on a rolling basis following
review and appropriate redaction, the process was a slow one
TSA did not complete its review of the first and second wave
documents until late 2005.

Subsequent to the commencement of document review by TSA,
two years after its intervention in this litigation, the TSA
retreated from its initial position and determined that it w
not allow for conditional disclosure of material containing

to the small group of cleared plaintiffs' attorneys. (See De
of Stephen McHale ("McHale Decl. II"), dated Feb. 5, 2004, a
12-15.) Thus, although defendants' attorneys were privy to S
coming from their respective clients' files, and perhaps fro
co-defendants' files, plaintiffs' attorneys were barred from
seeing or hearing information deemed to constitute SSI and
thereby, despite representing people whom Congress had
**Page 6**
acknowledged as having the right to sue, became ineligible
effectively to represent their clients in such suits.

As the litigation lurched past the three-year mark with no
discernable progress being made, I directed the parties to
develop a joint protocol that would allow for needed discove
and depositions to proceed while protecting against unauthor
disclosure of SSI. (See Order dated Sept. 28, 2005, at 9.) T
parties, however, remained unable to reach a resolution and,
lieu of such a joint determination, I urged that TSA issue f
orders as to the scope and manner of its SSI determinations
that these determinations could be applied or appealed.[fn2]
TSA, although not adverse to the issuance of final orders,
objected to plaintiffs' request that TSA provide specific
responses to each redaction in the documents already proffer
for TSA review and urged that the parties engage in a furthe
period of limited negotiation.

At the case management conference of November 18, 2005, I
expressed displeasure with the absence of progress in the
continuing negotiations for a protocol, noting that four yea
had passed since September 11, 2001, without visible progres
the lawsuits brought by the families of those who had lost t
lives. I noted further that, without progress in this most k
part of the September 11 litigation, none of the other lawsu
could meaningfully progress.[fn3] Framing the critical issue,
namely the right of plaintiffs to pursue a course of action
expressly acknowledged by Congress, I observed:
**Page 7**

September 11, 2001 occurred more than four years ago.
While we are playing, people are still absorbed with
the tragedy that occurred in their lives. What right
do we have to indulge ourselves in the normal

bureaucracy of discovery proceedings while people are
waiting for a final decision. Do they have a right or
do they not have a right to what they feel is their
damage. That is the burning issue. That is the issue
all of us are engaged in advancing.

(See Transcript of Nov. 18, 2005 ("Nov. 18 Transcript") at
33:5-13.) Finding that further delay was not tolerable, I
suggested to plaintiffs that they notice depositions, forcir
to make its orders in the forms of directions to witnesses t
answer, and expressed the belief that a deposition procedure
could create a better record of plaintiffs' need to know, ir
context of discovery relevant to the issues of the underlyir
lawsuits.

  TSA issued the first of three planned final orders on Febr
7, 2006, almost four years after TSA's intervention. (See Fi
Order of Requests for Conditional Disclosure of SSI ("Final
I"), dated February 7, 2006.) The first final order sets out
TSA's determination that conditional disclosure of SSI is
unwarranted and **reaffirms** TSA's position that all documents
responsive to discovery requests should be subject to its re
before any disclosure. TSA issued its second final order on
17, 2006, setting out its determinations as to what informat
constitutes SSI and providing that "only if a security
countermeasure is obsolete, in that it will not be revived a
therefore reveals nothing about current or future security
countermeasures, or if security intelligence is taken over k
events, will information lose its SSI protection and be rele
publicly." (Final Order II, dated March 17, 2006 ("Final Orc
II") at 2.) Both
Page 8
plaintiffs and defendants are in the process of filing Petit
for Review of the two final orders.

  Meanwhile, pursuant to my direction, plaintiffs have serve
defendants with 30(b)(6) notices wherein plaintiffs seek to
elicit testimony as to four critical areas necessary to both
prosecution and defense of the lawsuits: 1) "the warnings ar
information supplied to the U.S. carriers by the Federal Avi
Administration ("FAA") about the threat of hijackings, inclu
terrorist hijackings, prior to 9/11"; 2) "all airport passer

screening procedures which were utilized, including checkpoi
screening procedures prior to and after 9/11"; 3) "the so-ca
`common strategy' in the event of a threatened hijacking"; a
"the identity of documents submitted to the TSA to determine
whether they contain Sensitive Security Information." (Trans
of March 3, 2006 Conference ("March 3 Transcript") at 37-38.
depositions are scheduled to commence during the first week
April 2006.

Defendants caution that, in light of TSA's Final Orders, t
answers elicited by these areas of inquiry will necessarily
implicate SSI and therefore will trigger the obligation impo
on defense counsel by TSA regulations to protect against
unauthorized disclosure. Such an obligation to protect again
disclosure, urges defense counsel, places them in conflict,
between enforcing government regulations that seem to prohib
disclosure, and the best interests of their clients requirir
disclosure. As defense counsel state, "much of what the TSA
identified as SSI is directly relevant to the exclusive star
of care governing their conduct on September 11, 2001 and is
the heart of their defense." (See Joint Letter, dated March
2006 ("March 9 Joint Letter") at 2.) Plaintiffs argue that 1
should be deemed to have waived any objections to the
Page 9
disclosure of SSI if it refuses to attend depositions. Howev
TSA insists that counsel for defendants bear the responsibil
of preventing unauthorized disclosure of SSI, and that TSA's
lawyers do not have to be present.

## II. DISCUSSION

A. *Applicable Law and the Conflicting Obligations of Defer
Counsel*

1. The Obligations Imposed by TSA Regulations

Created by enactment of the Aviation and Transportation
Security Act ("ATSA") in the weeks following September 11, 1
charged with promulgating the Transportation Security Regul
("TSRs") which contain rules governing the security of air,
and maritime transportation. ATSA, Pub.L. 107-71, 115 Stat. 59
(2001) (codified at 49 U.S.C. §§ 40101 note). The TSRs

specifically regulate the maintenance and safeguarding of SS
See 49 C.F.R. Part 1520.

SSI is defined, broadly, as "information obtained or devel
in the conduct of security activities, including research ar
development, the disclosure of which the TSA has determined
. . . be detrimental to the security of transportation."
49 C.F.R. § 1520.5(a)(3). By regulations, sixteen specific
categories relating to transportation security are deemed
automatically to constitute SSI with no specific determinati
TSA required. 49 C.F.R. § 1520.5(b). Information deemed to
constitute SSI, either by regulation or TSA determination, c
not lose its protection as such unless the information is
"obsolete," in the sense that it "will not be revived:"

> only if a security countermeasure is obsolete, in
> that it will not be revived and therefore reveals
> nothing about current of future security
> countermeasures, or if security intelligence is
> overtaken by events, will information lose its SSI
> protection and be released publicly.

Page 10

(Final Order II at 2.)

Only persons with a "need to know," or granted conditional
access by the TSA pursuant to § 1520.15, are allowed access
SSI. 49 C.F.R. § 1520.5(a), (b). Persons have a need to know
when, by virtue of their position, access to SSI is required

> (1) to carry out transportation security activities
> that are government-approved, -accepted, -funded,
> -recommended, or -directed, including for purposes of
> training on, and supervision of, such activities; (2)
> to provide legal or technical advice to airport
> operators, air carriers or their employees regarding
> security-related requirements; or (3) to represent
> airport operators, air carriers or their employees in
> judicial or administrative proceedings regarding
> security-related requirements."

TSA Final Order I at 2; see also 49 C.F.R. § 1520.11(a).

Persons without a need to know may be granted conditional ac
to SSI if TSA determines "that disclosure of such records or
information, subject to such limitations and restrictions as
may prescribe, would not be detrimental to transportation
security." 49 C.F.R. § 1520.15 (e). However, in the wake of
September 11, "it has been the consistent policy of TSA that
present and continuing threat of terrorist attacks against
aviation interests requires that the number of persons havir
access to SSI be significantly and continually decreased, ra
than increased." (Final Order I at 3.) Thus, TSA has adoptec
position of non-disclosure of SSI to litigants in civil case
do not otherwise have a statutorily defined need to know. (F
Order I at 4.)

    A person granted access to SSI assumes an obligation to "|
reasonable steps to safeguard SSI in that person's possessic
control from unauthorized disclosure." 49 C.F.R. § 1520.9.
Violation of the obligation to protect SSI against unauthori
disclosure "is grounds for a civil penalty or other enforcen
or corrective action by [Department of Homeland Security]."
enforcement or
**Page 11**
corrective actions may include "issuance of an order requiri
retrieval of SSI to remedy unauthorized disclosure or an orc
cease future unauthorized disclosure." 49 C.F.R. § 1520.17.

## 2. Obligations of Counsel to Clients

    Under the New York Code of Professional Responsibility, a
lawyer assumes the absolute duty to represent his or her cli
"zealously within the bounds of the law." See N.Y. Code of
Prof. Resp. EC 7-1. Such obligation stems from the fundament
premise that "[i]n our government of laws and not of individ
each member of our society is entitled to have his or her co
judged and regulated in accordance with the law; to seek any
lawful objective through legally permissible means; and to
present for adjudication any lawful claim, issue or defense.
Id. (emphasis added). Thus, in undertaking to represent a
client zealously, the lawyer must not intentionally "[p]reju
or damage the client during the course of the professional
relationship[.]" N.Y. Code of Prof. Resp. DR 7-101,
22 NYCRR § 1200.32. The lawyer's obligations run directly to

of his client, and it is the client who serves as the lawyer
master throughout the course of the professional relationshi
lawyer who is concerned with the potential legal consequence
him of serving his client zealously is in a position of conf

*B. The Parties' Positions as to a Protocol for Depositions*

## 1. The Plaintiffs' Position

Plaintiffs argue that depositions should proceed pursuant
the procedures set forth in Rule 30(c), Fed.R.Civ.P. (See
Joint Letter, dated March 9, 2006 ("March 9 Joint Letter").)
Under this approach, plaintiffs propose to ask the witness
questions and

**Page 12**
expect the witness to answer unless instructed otherwise by
defense counsel. Once an objection has been raised, pursuant
Rule 30(c), the questioner may cure the objection by rephras
the question and the witness may proceed to answer.
Fed.R.Civ.P. 30(c). In light of the special concerns presente
disclosure of SSI, plaintiffs propose that if the objection
coupled with an instruction by defense counsel that the witr
should not answer because the answer may implicate SSI, the
questioner would move on to the next question without respor
from the witness. All objections and exceptions to questions
would be deemed preserved. Plaintiffs would then determine
whether to seek a ruling on the objections.

Plaintiffs, recognizing that the categorization of answers
including SSI might be uncertain, propose that defense couns
should not have to guess. Plaintiffs acknowledge that "it wo
be an unconstitutional burden to impose upon counsel the
responsibility to `guess' what answers might involve disclos
of SSI at the risk of statutory and regulatory penalties." (
9 Joint Letter at 3.) Plaintiffs propose that if TSA decline
attend depositions, it should be deemed to have waived any
objections to witnesses' oral answers. Thus, under plaintiff
proposal "the only SSI in this litigation is in documents th
TSA has vetted." (Id.)

## 2. Defendants' Position

Defendants assert that TSA's position, that defense counse
an absolute obligation to protect SSI, directly conflicts wi
their "duty of zealous advocacy and . . . obligation to ensu
that the record reflects the most accurate, complete and
persuasive account of their clients' actions," (March 9 Joir
Letter at 2) and contend that the protocol proposed by plair
does not alleviate their concerns about the conflicting
**Page 13**
position in which they are placed. (See id.) Thus, in
defendants' view, "the proposed protocol does nothing to res
the untenable position in which defense counsel would find
themselves if they attend a deposition both as enforcers of
government policy on the non-disclosure of SSI and as attorr
providing effective representation to their clients, who wou
otherwise be entitled to have their counsel elicit favorable
testimony." (Id.)

As to non-party witnesses, defense counsel object that TSA
position would impose on them an obligation to prevent discl
without the ability to carry out the obligation, for "a lawy
cannot compel a non-client to heed instructions not to answe
(Id.) Defense counsel note further that, since questions ask
of a non-party witness could potentially elicit SSI, they wo
be forced to formulate questions in a manner that would not
elicit SSI and thus would not be acting in the best interest
their client.

3. TSA's Position

TSA asserts that "[i]t is counsel's role, rather than the
TSA's, to object to questions and advise witnesses as to how
avoid disclosure of potentially privileged materials in the
deposition." (TSA Letter, dated March 1, 2006 ("March 1 Lett
at 2; see also TSA Letter, dated March 17, 2006 ("March 17
Letter"), at 1.) TSA notes that the regulations expressly pr
that those in possession of SSI are obligated to "safeguard
from unauthorized disclosure," 49 C.F.R. § 1520.9 (a), and
contends that this obligation extends to depositions, imposi
absolute obligation on defense counsel to protect against
unwarranted disclosure. Under TSA's proposal, therefore, def
counsel, relying on their knowledge of prior TSA determinati
of SSI in various documents, should raise objections to ques

likely to implicate SSI material.
Page 14
To the extent that counsel has any doubt as to whether a
particular question will elicit SSI, the obligation of defer
counsel "is to say that there is an SSI objection." (March 3
Transcript at 52.)

Given the absolute obligation assumed by defense counsel,
posits that its participation in the depositions would be ne
necessary nor meaningful and, as such, has taken the positio
that it will not be present at the depositions in this case.
Noting that it would be impossible for TSA to do "immediate,
real-time SSI review because of the need for careful and det
examination and analysis of the material in consideration of
numerous other documents and information," TSA proposes inst
that that its "role is to review the transcripts once they a
created to make a final determination as to what is and is r
SSI and to redact any SSI from the transcripts." (Id.)

TSA's proposal would require depositions to proceed, not i
normal question-answer manner provided by Rule 30,
Fed.R.Civ.P., and customary to depositions, with the reporte
counsel having been cleared in advance by TSA, but by writte
questions submitted in advance pursuant to Rule 31,
Fed.R.Civ.P., or, alternatively, with plaintiffs' counsel as
stepping out of the room in order not to hear answers that
potentially could implicate SSI, and then returning (without
benefit of hearing the witness' answers), to propound furthe
questions. Both plaintiffs and defendants object to TSA's
proposal.

*C. The Conduct of Depositions*

The tension that is at the heart of the parties' dispute i
questions central to our justice system. If the parties who
elected to proceed by litigation are to
Page 15
have their day in court, they must have the right to litigat
be represented effectively by their counsel. Congress recogr
as much by preserving specifically their right to sue in the
Transportation Safety and System Stabilization Act. ATSSSA §
408(b). Defendants also must have the ability and right to c

themselves effectively by their counsel. At the same time, t
government has the overriding duty to protect and ensure the
safety of its citizens, including the duty and right to clas
information the disclosure of which might be harmful to the
public. As the court charged with presiding over the litigat
arising from the terrible events of September 11, my duty is
navigate these competing concerns, all within the limits of
jurisdiction.

   The United States District Court for the Southern District
New York was given "original and exclusive jurisdiction over
actions brought for any claim (including any claim for loss
property, personal injury, or death) resulting from or relat
to the terrorist-related aircraft crashes of September 11, 2
ATSSSA § 408(b)(3). One of the inherent aspects of that excl
jurisdictional grant is the right and duty of the court to
regulate the proceedings and the counsel who come before it
the aim of advancing the fundamental right under our Constit
of equal justice under the law and the litigants' valid inte
in prompt determination of their cases and controversies. Ir
it is in keeping with my obligation to advance these importe
interests that I have endeavored to regulate the instant
proceedings in such a way as to not render the right of
litigation acknowledged by Act of Congress a legal fiction.

   My jurisdictional grant, however, is not without bounds ar
am ever mindful of the important security concerns that have
loomed over this litigation from its inception. TSA is charg
with maintaining and safeguarding SSI and I do not seek to
**Page 16**
intrude on its jurisdiction or review the wisdom of its
determinations. As with administrative agencies generally,
petitions for review of TSA's final orders are filed in the
Courts of Appeals. 49 U.S.C. § 46110. I have no jurisdiction to
review TSA's final orders; and petitions for review of TSA's
final orders have, or soon will be, submitted to the appropr
Court of Appeals. But creation of the TSA did not divest the
District Courts of their inherent authority to regulate pre-
and trial procedures in the cases over which they preside, a
create a proper record of those proceedings for appellate re
of their final and, in some cases, interlocutory orders.

The questions presented by the instant litigation sound in
negligence and require a determination of whether defendants
failed to exercise reasonable care to those whom they owed a
to exercise such care. See In re September 11 Litigation,
280 F. Supp. 2d 279. By my prior Opinion, I determined that
aviation defendants were in the "best position to provide
reasonable protection against hijackings and the dangers the
presented, not only to the crew and passengers, but also to
ground victims," id. at 294, and thus owed a duty both to th
who boarded their planes and to those on the ground. Plainti
must now show that the duty owed them was breached. Such pro
however, will elude plaintiffs absent an open and dynamic
protocol for depositions whereby questions are propounded ar
answers provided. TSA's proposed alternatives, allowing for
depositions only by written interrogatory or by a procedure
requiring plaintiffs to **remove** themselves from the depositic
while responses to their questions are provided, fail to all
plaintiffs to engage in the back and forth so essential to
establishing a claim in negligence. Indeed, to bar plaintiff
from conducting live

**Page 17**

depositions is to thwart the very intent and purpose of the
that I am charged with enforcing, and over which I have excl
jurisdiction.

TSA urges that it does not wish to bar plaintiffs from
conducting live depositions, but cautions that, in the conte
such depositions, the onus is on defense counsel to protect
against unauthorized disclosure of SSI. Such proposal, howev
fails to adequately protect the interests of defense counsel
their clients in the conduct of depositions. A lawyer cannot
both as an advocate charged with representing his client's b
interests and as an enforcer of government policies, particu
if civil penalties may be imposed if he fails to give preced
to the government's interests.[fn4] The presence in the
deposition room of government lawyers having sole duty to
represent TSA is critical. It is they, and not defense couns
who should have primary obligation to defend and to instruct
witnesses possessing potential SSI. Defense counsel's paramo
obligation is to his client, and the client in particular ar
legal system in general have the right to expect that the la
will represent the client "zealously within the bounds of th

law." N.Y. Code of Prof. Resp. EC 7-1. One of defense counse
obligations is to "[t]ake reasonable steps to safeguard SSI
[his or his client's] possession or control from unauthorize
disclosure," 49 C.F.R. § 1520.9 (a), but that obligation is to be
carried out in the best interests of his client, and not as
enforcer of government policy. Given the uncertainty of what
properly classifiable as SSI, and TSA's own changes of attit
regarding prior classifications, the task of objecting and
**Page 18**
instructing is beyond the jurisdictional competence of defer
counsel, particularly in light of the client's interests in
responding to proper questions. [fn5] Thus, the only lawyers
who have the obligation to act as enforcer's of TSA's polici
are TSA's own lawyers, and it is they, and no one else, who
the responsibility to object and to instruct whenever they,
good faith, believe that SSI may be implicated in a questior
an answer. Their attendance at depositions is critical. That
the very reason that they moved to intervene in the case, ar
reason that I granted TSA's motion to intervene.

In accordance with the foregoing, and mindful of the impor
security concerns expressed by TSA, I hold that the depositi
should proceed as follows:

1. Plaintiffs' counsel who have clearance from TSA
may propound questions to the witness, in the fashion
normal to depositions. The witness shall be defended
by counsel entitled to read and hear SSI, either
pursuant to applicable regulations,
49 C.F.R. § 1520.11, or by special clearance. Other parties
potentially affected may also attend, and object and
cross-examine, as provided by Rule 30(c),
Fed.R.Civ.P., provided that they are cleared as well.
Counsel for TSA may also attend, and object and
cross-examine. None others may attend.

2. The deposition shall be recorded by a certified
stenographic reporter who is a member of the pool of
reporters in the United States District
**Page 19**
Court for the Southern District of New York, and who
has been cleared to transcribe depositions

potentially containing SSI.

3. The Reporter shall transcribe only two copies of
the deposition, and furnish the same to counsel for
the TSA. TSA, within 30 days from receipt, or such
longer time as it may reasonably request during said
30-day period, shall determine, and identify on one
of the copies of the transcript, which of the answers
are SSI. Those answers shall be redacted on the
second copy of the transcript, and that redacted copy
shall be furnished to the counsel who propounded the
questions to the witness, to be served and filed in
the manner provided by Rule 30(f), Fed.R.Civ.P.

4. The first copy of the transcript, reflecting TSA's
determinations of SSI, shall be considered its final
determinations, subject to appeal to the Courts of
Appeals as provided by 49 U.S.C. § 46110. A copy
shall be filed under seal in the District Court.

The protocol for depositions having been established by this
Opinion, the depositions slated to commence the first week of
April are stayed to begin May 1, 2006, subject to revision b
agreement of the parties. If, before then, TSA or any party
wishes to seek appellate review, that party may move for a s
or other appropriate relief.

## III. CONCLUSION

Through express acknowledgement by Congress, those who
sustained injuries as a result of the September 11 attacks h
the right to seek compensation for their injuries in this co
ATSSSA § 408(b). Litigation, by its very nature, bears a hig
Page 20
degree of risk. Cases do not always survive to have their da
court and may be subject to **dismissal** on any number of proce
or substantive grounds. By opting out of the Victim Compensa
Fund, the litigants currently before me have necessarily ass
the risks inherent in litigation. But they could not reasona
have foreseen that they might be barred by administrative fi
The task of TSA is formidable, but the severity of the task
not serve as an excuse for barring plaintiffs from asserting

claims allowed them by law.

The court wishes all to understand that it is time,
four-and-a-half years after the terrible events of Septembe
2001, that the parties progress to their day in court. As th
Special Master brought a final conclusion to those who ente
the Victim Compensation Fund, so is the court required to b:
final conclusion to the matters before it. Without such fin;
conclusions, the wounds so grievously opened on that infamou
cannot be bound up.

SO ORDERED.

[fn1] By Order of March 10, 2005, I directed that all cases
concerning property damage and business loss arising out of
September 11, 2001 be transferred and consolidated under a r
master docket, 21 MC 101. (See Order dated March 10, 2005.)

[fn2] Pursuant to 49 U.S.C. § 46110, final orders of the TSA may
be reviewed by filing a petition for review in an appropriat
U.S. Court of Appeals.

[fn3] The September 11 cases consolidated before me, totalir
over 5,000 in number, have been organized under separate mas
dockets. Cases alleging personal injury and wrongful death
resulting from the attacks of September 11 have been consoli
under Master Docket 21 MC 97. All cases concerning property
damage and business loss arising out of September 11 are
consolidated under Master Docket 21 MC 101. Outside of the s
seeking relief for the destruction of life and property resu
directly from the attacks themselves, are the suits seeking
relief for respiratory injuries sustained by cleanup, recove
and rescue crews who worked at the World Trade Center site a
the surrounding areas in the weeks and months following Sept
11. Cases brought by workers who sustained respiratory injur
while working at the World Trade Center site have been
consolidated under Master Docket 21 MC 100. Cases brought by
workers who sustained respiratory injury while working in th
area surrounding the World Trade Center site have been
consolidated under Master Docket 21 MC 102. Also before me i
litigation concerning insurance obligations arising from the
destruction of property on September 11, docketed as 03 Civ.

00332.

[fn4] TSA argues that any alleged conflict is "belied by the
that, since discovery began in this case, counsel for the
Aviation Defendants have routinely asserted SSI objections t
document demands seeking documents containing SSI,
notwithstanding their own asserted desire to use such docume
in the litigation." (TSA March 17 Letter at 2.) The distinct
is obvious. In turning over documents for TSA review, defens
counsel is not charged with making individual SSI determinat
Such determination is instead left to TSA. As such, defense
counsel does not stand in the dual role of counsel and gover
enforcer.

[fn5] TSA represents that it "cannot do any immediate, real-
SSI review because of the need for careful and detailed
examination and analysis of the material in consideration of
numerous other documents and information[.]" (March 1 Letter
2.) Yet, it cannot expect defense counsel to do that which T
by admission, cannot do. TSA's effort to evade the quandary
directing defense counsel, in raising objections to depositi
questions and instructing witnesses accordingly, simply to r
on "documents that the TSA has now redacted" to ascertain wh
information will be deemed to constitute SSI (March 3 Transc
at 52:4-6), is simplistic, and inevitably will tend to shut
all answers, making a mockery of the deposition process.
Page 1

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

<u>**Exhibit  No.**</u> *1D*

# washingtonpost.com

NEWS | OPINIONS | SPORTS | ARTS & LIVING | Discussions | Photos & Video | City Guide | CLASSIFIEDS | JOBS | CARS | REAL E

# TSA Would Allow Sharp Objects on Airliners

## Screeners to Focus More on Bombs

By Sara Kehaulani Goo
Washington Post Staff Writer
Wednesday, November 30, 2005; A01





A new plan by the Transportation Security Administration would allow airline passengers to bring scissors and other sharp objects in their carry-on bags because the items no longer pose the greatest threat to airline security, according to sources familiar with the plans.

In a series of briefings this week, TSA Director Edmund S. "Kip" Hawley told aviation industry leaders that he plans to announce changes at airport security checkpoints that would allow scissors less than four inches long and tools, such as screwdrivers, less than seven inches long, according to people familiar with the TSA's plans. These people spoke on condition of anonymity because the TSA intends to make the plans public Friday.

"We'll be announcing a number of new initiatives that will have both a positive security and customer service impact," said TSA spokeswoman Yolanda Clark, who declined to comment on the details of the announcement. The plans must be approved by the Homeland Security Department and the Office of Management and Budget.

Faced with a tighter budget and morale problems among its workforce, the TSA says its new policy changes are aimed at making the best use of limited resources. Homeland Security Department officials are increasingly concerned about airports' vulnerability to suicide bomb attacks. TSA officials now want airport screeners to spend more of their time looking for improvised explosive

devices rather than sharp objects.

The TSA's internal studies show that carry-on-item screeners spend half of their screening time searching for cigarette lighters, a recently banned item, and that they open 1 out of every 4 bags to remove a pair of scissors, according to sources briefed by the agency. Officials believe that other security measures now in place, such as hardened cockpit doors, would prevent a terrorist from commandeering an aircraft with box cutters or scissors.

However, many flight attendants do not believe sharp objects should be allowed on board. They argue that even though such items would not enable another Sept. 11, 2001-style hijacking, the items could be used as weapons against passengers or flight-crew members. "TSA needs to take a moment to reflect on why they were created in the first place -- after the world had seen how ordinary household items could create such devastation," said Corey Caldwell, spokeswoman for the Association of Flight Attendants, which has more than 46,000 members. "When weapons are allowed back on board an aircraft, the pilots will be able to land the plane safety but the aisles will be running with blood."

Charles Slepian, an aviation security consultant based in New York, said the TSA's proposed changes fail to take into account the safety of passengers and cabin crew. "Whenever you are serving alcohol, you have a double duty to those who are present to protect them from someone who goes off the deep end," Slepian said. "If we allow people to carry things that are really deadly weapons on board airplanes, we're inviting trouble."

The TSA has been reviewing its list of prohibited items since last summer and has debated whether throwing stars (a martial-arts weapon), ice picks and knives should be allowed back on board, according to TSA documents. In past briefings with reporters, Hawley said the agency was considering other changes that would make the airline security system less predictable. For example, he said that he was unsure whether it makes sense for passengers to routinely remove their shoes at the security checkpoint. He said he also plans to incorporate more bomb-sniffing dogs in airports.

Other changes are aimed at improving morale among the agency's 43,000 employees, whose number has been cut from 55,000 three years ago. Screener

turnover has reached 23 percent and many employees who were recruited to the agency in the hopes of jump-starting a federal government career have not had a raise in three years.

Last month, the TSA changed the federal job classification of its airport screeners to "transportation security officers," a title that puts them more on par with customs or immigration officers, Clark said. Several aviation officials briefed by the TSA said the plan is to allow security screeners to eventually become federal air marshals, who are now part of the TSA. Clark declined to elaborate on those plans other than to say that "it opens up new career opportunities" for screeners.

© 2005 The Washington Post Company

Ads by Google

**Discount Flight Tricks?**
Insider Explains How To Save Up To 90% on Flights, Hotels & Cruises
www.info-broker.net/TravelSecrets

**Cheap Flight Tickets**
Find Airline Tickets & Reservations Low Airfares, Airlines Schedules
www.newair.com

**Flight Anxiety**
Anxiety Links and Information. Absolutely Free Anxiety Help.
www.EyeForHealth.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

RAYMOND WARE,                            )    CIVIL NO. 04-00671 HG LEK
                                         )
                    Plaintiff,           )    CERTIFICATE OF SERVICE
                                         )
         vs.                             )
                                         )
SIDNEY HAYAKAWA, Director of             )
Transportation Security Administration - )
Honolulu, KEN KAMAHELE, Deputy           )
Director, Transportation Security        )
Administration–Honolulu;                 )
TRANSPORTATION SECURITY                  )
ADMINISTRATION; THOMAS J.                )
RIDGE, Secretary, Department of          )
Homeland Security, DEPARTMENT OF         )
HOMELAND SECURITY; LOCKHEED-             )
MARTIN; JOHN DOES 2-5,                   )
                                         )
                    Defendants.          )
_____  )

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing document was duly served upon the

following parties at their last known addresses by means of hand delivery on this date.

         EDWARD H. KUBO, JR., ESQ.
         U.S. Attorney
         THOMAS A. HELPER, ESQ.
         Assistant U.S. Attorney
         Rm. 6-100, PJKK Federal Building
         300 Ala Moana Blvd.
         Honolulu, Hawaii  96850

         Attorneys for Federal Defendants

DATED:  Honolulu, Hawaii, _____5-9-06_____.

_____
DAPHNE E. BARBEE
Attorney for Plaintiff

2