EXHIBIT **5**

To: Johnalyn Abreu, Admin Officer

From: Raymond Ware

Re: Meeting On October 2, 2003

Ms Abreu,

Thank you for responding to my request for my personnel file, however, I still have not received a copy of the file in which Mr. Ken Kamahele referred to during our meeting. I also appreciate the copy you forwarded to me of the minutes of our meeting. I would appreciate you amending your minutes to include the following omissions and observations.

1) Neither you nor Mr. Kamahele called the meeting. The meeting came about after I spoke with FSD Mr. Sidney Hayakawa. He informed me that he was unable to answer any of my questions as the decisions of all of the promotions were made by Mr. Kamahele.. Mr. Hayakawa then suggested I speak with Mr. Kamahele. After numerous attempts to make an appointment with Mr. Kamahele, I then informed Mr. Hayakawa of my plight. He then contacted you and requested that you make an appointment including the three of us.

2) One of my concerns was not that I believed promotions should be based solely on qualifications, it was that my qualifications were overlooked numerous times. If you will recall, when I asked Mr. Kamahele if he was aware that I was a Screening Manager, a Checkpoint Supervisor and A Mobile Screener prior to arriving here at HNL, Mr. Kamahele turned to you and stated that he lost my Resume probably when he moved from the seventh floor to the third floor. Obviously, my concern was justified. Also Mr. Kamahele seemed to scoff at the idea of Mobile Screeners stating that "we (Mobile Screeners) do things differently then the way he wants things done here at HNL". He then went on to state that "those mobile screeners who adhered to his way of doing things were still here and those who didn't, aren't".

3) At no time did any incident Mr. Kamahele mentioned during our meeting reflect badly upon my performance. Mr. Kamahele inquired about several passenger complaints. The complaints were statements made by irate passengers. I was never made aware of any of the complaints. I briefly explained away the complaints and asked Mr. Kamahele why they had not been brought to my attention. Some of the complaints were over 1 year old. If Mr. Kamahele believed

-2-

that the complaints were of any merit, he should have had them investigated and then discussed with me. This never occurred.

4) I did not acknowledge that I was aware that Mr. Kamahele,s decision was based on my performance, I informed him that, if the reason that I had never been given the opportunity for promotion (even at the interim level) was because of passenger complaints which were never investigated or brought to my attention or because of innuendos, false statements or unsubstantiated hearsay, which was never documented, then that could be the reason I have never been given the chance to demonstrate my ablility. Mr. Kamahele stated that what it sounded to him was that there could be a "conspiracy" going on because he had been told by his screening managers a completely different story about me, then what we discussed. He then said that he would investigate the entire matter and get back to me. We then ended the meeting.

Cc: AFSD Mr. Ken Kamahele

DATE: OCTOBER 3, 2003

TO: KEN KAHAMELE

FROM: RAYMOND E WARE

RE: MEETING ON OCTOBER 2, 2003


DEAR MR KAMAHELE,

    I respectfully request a copy of the file you referred to in our meeting on October 2, 2003. I also request a copy of my personnel file.

cc: Administrative Officer JOHNALYN ABREU

# TSA-HONOLULU
## INTER OFFICE MEMORANDUM

SOO: 03.354
DATE: 09/11/03

TO: L. Ventura
FROM: L. Kaonohi
SUBJECT: Supporting Documentation For Ray Ware

Please provide the purpose for you initiating Ray Ware's expectations. Give examples according to 9. DATE AND SUMMARY OF COUNSELING. In your General Counseling Form you did not state why your expectations were given.

Due: Friday, 9/12/03

*[handwritten notes, illegible]*

# Inter-Office Memorandum

Date:      September 10, 2003

TO:        Lance Kaonohi (SOO)
FROM:      Leo Ventura (IIT PM SM)
RE:        RAY WARE- INITIAL COUNSELING

As requested, here is Raymond Ware's initial counseling. If you should have any questions, you can contact me at 216-9017.



United States Department of Transportation
TRANSPORTATION SECURITY ADMINISTRATION

300 Rodgers Blvd., #45
Honolulu, HI  96819-1897
Telephone: (808) 836-8403
Fax. No. (808) 833-7687

## INTER-OFFICE MEMORANDUM

Date:      9/11/03

To:        Kenneth Kamahele

From:      Lizette Haneberg

Subject:   Raymond Ware

---

I have not worked with Raymond Ware for quite awhile since he is PM and I am AM. When we did work together I found Raymond did not have common sense. This is a huge disadvantage in the Security Industry. Here are some examples of verbal counseling I gave Raymond in the beginning of the year.

I had a passenger complain to me that Raymond had made her put her diabetic syringes in her checked baggage because he said they were prohibited through the checkpoint. She explained to him that she could die without her medication. He still refused. I spoke with many of the screeners that worked that day and they verified this story. When questioned, Mr. Ware told me it never happened. I counseled him on knowing his SOP.

Another time I saw Mr. Ware attempting to resolve an ETD alarm of a laptop. I watched him sample the computer numerous times. I finally went over to him and asked him what he was doing. He told me it was ok, he had finally resolved the alarm. When I questioned how he resolved it he explained that he swiped it quite a few times and it finally didn't alarm. I had the laptop physically searched (as SOP). I asked him if reswiping was the protocol in the SOP and flow chart. He did not know what a flow chart was. I had the laptop physically searched and cleared. I was in the same ETD Alarm Resolution Class as Mr. Ware so I know we were taught how to resolve alarms properly using the tools at hand. (SOP and Flow Charts). On other occasions he has seemed very unsure of resolving alarms properly.

While at checkpoint 5 Mr. Ware had to be counseled concerning prohibited items. He took away small travel irons because he said they could be used as a weapon. These are not prohibited and should not have been taken. Another instance he took away a GI Joe toy gun from a small child because he said they were replica weapons. They were about two inches long and made of green plastic. No one would have mistaken these tiny toys for real weapons. These are cases of Mr. Ware not having common sense.

Just last week Mr. Ware called the SM's office to let his manager know he did not have enough people to keep two lanes open and what he should do. I went out to the Hawaiian Lobby and there was not a single passenger there. Normally the protocol is to find out from the flight schedules (on the FIDS board) what flights are coming in and you can gauge how busy you will be. He did not need two lanes during this time and he had more screeners scheduled to arrive within 30 mins. Most Supervisors coordinate with each other to move manpower and don't call the managers for assistance. They do though call a Manager to inform them of a lane closure.

In Mr. Ware's defense though, he is a very pleasant and soft spoken gentleman. I personally feel though that he does not have the decision making qualities to even be a Supervisor in the security field, much less a Manager.

Lizette Haneberg
IIT Screening Manager



# Transportation Security Administration

## GENERAL COUNSELING FORM

PRINCIPAL PURPOSE: To record data pertaining to employees.
ROUTINE USES: Prerequisite counseling for substandard job performance. May also be used to document failures of rehabilitation efforts in administrative releases procedures.
DISCLOSURE: Disclosure is voluntary, but failure to provide the information may result in recording a negative counseling session indicative of the subordinate's lack of desire to solve his or her problem.

### PART I – BASIC DATA

| 1. NAME (Last, First MI) | 2. SOCIAL SEC. NO. | 3. TITLE | 4. SEX |
|---|---|---|---|
| Ware, Raymond | | Supervisor | Male |

| 5. AIRPORT | 6. SHIFT | 7. PERFORMANCE LEVEL |
|---|---|---|
| Honolulu | PM IIT | N/A  HIGH ___ MEDIUM ___ LOW ___ |

### PART II – OBSERVATIONS

8. DATE AND CIRCUMSTANCES

On July 13, 2003, you were reassigned from CP 5 to CP HA at IIT terminal on the PM shift.
As of today, you never received initial counseling from any SM concerning their expectations, issues and concerns, internal policies, supervisor's responsibilities and areas that need to be addressed. Hopefully, this will eliminate any confusion between you and the SM.

9. DATE AND SUMMARY OF COUNSELING

On September 10, 2003, you were initially counseled of the followings:
1. Screening Managers expectations and internal policies governing:
   a. Work ethics
   b. Sound decisions
   c. Chain of Command
   d. Professionalism
   e. Performance
   f. Leadership
   g. HRM Letter NO. 735.1
2. CP supervisor's responsibilities according to:
   a. CP SOP supervisory duties (3.3.1)
   b. Read Files
   c. Briefings
   d. Training
3. Knowledge on CP procedures and operations.
4. Maintaining and testing equipment
5. Counseling

*This paragraph does not pertain to this counseling session*

You are hereby counseled for the above indicated misconduct and/or unsatisfactory job performance. Continued behavior of this kind may result in additional counseling which may also result in the initiation of the separation action to remove you from your current position as an employee with the Transportation Security Administration. Any further act of misconduct or unsatisfactory performance may cause you to be released without further counseling.

THIS FORM WILL BE DESTROYED UPON REASSIGNMENT OR TERMINATION

| PART III – AUTHENICATION | |
|---|---|
| 10. NAME, TITLE, SIGNATURE OF COUNSELOR<br>Leonard Ventura, Screening Manager, *[signature]* | DATE<br>September 10, 2003 |
| 11. I acknowledge having been counseled by the above individual and understand the reason for this counseling session. I concur/nonconcur that the information above accurately reflects this counseling session. I nonconcur for the following reasons:<br><br>It is my understanding that this form is for the expectations and initial counselling only. | |
| 12. NAME, TITLE, SIGNATURE OF INDIVIDUAL COUNSELED<br>Ray Ware, Supervisor CP HA, *[signature]* | DATE<br>September 10, 2003 |
| 13. IF COUNSELED INDIVIDUAL REFUSES TO SIGN, COUNSELOR WILL INITIAL HERE _____ | |

| PART IV – REHABILITATION | |
|---|---|
| 14. REHABILITATION RESULTS/ COMMENTS | |
| 15. NAME, TITLE, SIGNATURE OF INDIVIDUAL COUNSELED | DATE |
| 16. NAME, TITLE, SIGNATURE OF COUNSELOR | DATE |
| 17. COUNSELORS RECOMMENDATIONS | |
| 18. NAME, TITLE, SIGNATURE OF COUNSELOR | DATE |



United States Department of Transportation
TRANSPORTATION SECURITY ADMINISTRATION

300 Rodgers Blvd., #45
Honolulu, HI 96819-1897
Telephone: (808) 836-8403
Fax No. (808) 833-7687

Date: March 26, 2003

TO: Ken Kamahele – AFSD Screening

FROM: Robin-Ann K. Wong – Screening Manager

RE: MISSING SWEATER CHECKPOINT 5 – B. TALBOT/R. WARE

On the evening of Tuesday, March 25, 2003, I was informed by checkpoint 5 supervisor WARE/Raymond of a statement made by checkpoint 5 supervisor TALBOT/Brent. Mr. TALBOT made a statement to screener DRAKE/Milagros that Mr. WARE had stolen a jacket and that he (Mr. WARE) always takes things home that has been confiscated.

Mr. WARE advised me he does not know where Mr. TALBOT is coming from in making such a statement. Mr. WARE informed me there was an unclaimed jacket at the checkpoint, however when he turned it over to the LEO, the LEO refused to turn it in as lost and found property. Mr. WARE made the decision to leave the jacket in the men's restroom rather than turning it in to a Screening Manager. He felt by leaving the jacket in the restroom a custodian would find it and turn it in as Lost and Found property.

I inquired with Mr. WARE if there was an incident report or a report of any kind made in regards to this jacket. His advised me there was no report made as he had left the jacket in the men's restroom. I advised Mr. WARE in the future if the LEO does not wish to take possession of the item it must be turned into a Screening Manager and it will then be forwarded to Lost and Found.

Mr. WARE acknowledges responsibility for making an incorrect decision, but informed me at the moment he was not sure what to do.

I requested Mr. WARE provide me with a statement to explain his actions. (see statement attached)

The following day, Wednesday, March 26, 2003, at approximately 1430 hrs, I was advised by CAGASAN/Cristi that she had just spoken with a screener (no name mentioned) regarding WARE/Ray stealing a sweater. I verified with Ms. CAGASAN if the person that made that statement to her was Mr. TALBOT. She confirmed it was Mr. TALBOT. I informed Ms. CAGASAN I was notified of this allegation last evening by Mr. WARE who in turn was advised by a screener. Ms. CAGASAN continued to advise me that Mr. TALBOT requested Ms. CAGASAN pull the video for the checkpoint. Ms. CAGASAN asked Mr. TALBOT if he completed an incident report, his reply was "no". I advised Ms. CAGASAN that I would speak with Mr. KAONOHI before pulling any video.

Shortly, thereafter both Ms. CAGASAN and myself had an opportunity to speak with Mr. KAONOHI about this incident. We were then and advised Mr. KAONOHI that until Mr. TALBOT can provide something in writing stating his allegations there will be no action taken to pull the video.

Mr. KAONOHI then advised both of us that he would go down and speak with Mr. TALBOT directly regarding this incident.

At approximately 1700hrs, myself along with Screening Manager VENTURA/Leonard spoke with Mr. TALBOT regarding another incident, but I also asked him about this specific incident regarding the sweater. Mr. TALBOT stated, "He observed Mr. WARE pick up the sweater (?) and walk into the men's restroom. However, when Mr. WARE exited the men's restroom he did not have the sweater in his

possession. I asked Mr. TALBOT if there was an incident report completed and why was a Screening Manager not informed of this immediately. He stated that he did not want to speak with me about this as he feels that Mr. WARE and myself have tight relationship and I cannot be trusted. I advised him there is more than one Screening Manager on duty (COLLINS/Joseph) of whom he can speak with. I also advised him that my relationship with Mr. WARE is the same as any other supervisor, lead or screener.

I continued to tell him that we are all a family here and everyone should feel they are able to speak with either myself or any other Screening Manager regarding any and all issues and concerns. I advised him it is unfortunate that he feels that way, however, something of this nature should be reported immediately. He understands that he made the wrong decision in not reporting it. I then requested he submit a report regarding this incident. He advised me he would complete a report and submit it.

He also stated that Mr. KAONOHI also requested he submit a written report regarding this incident.

Attached is the original copy of the statement submitted by Mr. WARE. Statement from Mr. TALBOT is still pending upon his return to work. Mr. TALBOT requested to leave early on this day, Wednesday, March 26, 2003, left at 1800 hrs.

Attachments

cc:    L. Kaonohi



# INCIDENT REPORT

Date: 032603   Time: 1655   ☐ am ☒ pm   Airport: HNL
Screener: M. DRAKE   Checkpoint Supervisor: R. WARE   Checkpoint Manager: R. WONG

Passenger Name: _____   Phone: _____   DOB: _____

Address: _____   City: _____   State: _____   Zip Code: _____

FLIGHT INFORMATION

Air Carrier: _____   Flight No. _____   Dest: _____   ETD: _____   Gate: _____

TYPE OF INCIDENT

☐ Weapon   ☐ Unauthorized Access   ☐ Unruly Passenger   ☐ Missing Item   ☐ Damaged Item   ☒ Other

Other (please describe): _____

Weapon information (if applicable):

Type _____   Make/Model: _____   Serial No: _____   ___ loaded / ___ unloaded

Ammunition available: ___ no   ___ yes (if yes, number of rounds) _____

Reason for carrying weapon: _____

Detail of Incident:

ON MONDAY 032403 AT ABOUT 1350, SCREENER DRAKE APPROACHED ME AND TOLD ME THAT I NEEDED TO BE CAREFULL. I ASKED HER WHY? DRAKE STATED THAT CSS TOLBOT TOLD HER ON SATURDAY (3-22) THAT I STOLE A JACKET, AND THAT I ALWAYS TAKE THINGS HOME THAT HAVE BEEN CONFISCATED. HE FURTHER STATED THAT HE WAS GOING TO "WATCH MY BUTT." I HAVE NOT INQUIRED OF TALBOT AS TO WHETHER HE SAID THOSE THINGS OR NOT. I HAVE CAUTIONED MY SCREENERS NOT TO

Detail of Incident (continued):

REMOVE ITEMS WHICH HAVE BEEN CONFISCATED AND IT WOULD SET A BAD EXAMPLE TO DO SO.

_____
_____
_____
_____
_____
_____
_____              *Raynard E. Hare*
_____

Date: _____

Name of Witness (print clearly): _____    Signature: _____

Name of Witness (print clearly): _____    Signature: _____

Name of Witness (print clearly): _____    Signature: _____



# INCIDENT REPORT

Date: **061203**  Time: **2130**  ☐ am ☒ pm  Airport: **HNL**

Screener: **AKIZAKI**  Checkpoint Supervisor: **WARE**  Checkpoint Manager: **WONG**

Passenger Name: _____  Phone: _____  DOB: _____

Address: _____  City: _____  State: _____  Zip Code: _____

FLIGHT INFORMATION

Air Carrier: _____  Flight No. _____  Dest: _____  ETD: _____  Gate: _____

TYPE OF INCIDENT

  Weapon    Unauthorized Access    Unruly Passenger    Missing Item    Damaged Item    (Other)

Other (please describe): **ABANDONED BAG**

Weapon information (if applicable):

Type _____  Make/Model: _____  Serial No: _____  ___ loaded  ___ unloaded

Ammunition available: ___ no  ___ yes (if yes, number of rounds) _____

Reason for carrying weapon: _____

Detail of Incident: **VERBAL WARNING.**

Incident Report for 061203
Approximate Time 2130 hrs.

I received a pax call from Akal stating that there was an abandon bag located at baggage claim H by United. I informed the unknown caller that I would contact checkpoint 4 and have them respond. This is the process I have used for about 7 months. I contacted Supervisor Maureen just as I had done many, many times. Maureen began telling me how to proceed to swipe the bag and what to do afterward. I informed her that we have never done that before and reminded her that either she or Matt Hacker had always done it before. Maureen ignored my statement and continued to tell me how to proceed. It became clear to me that she was not going to send anyone to investigate the bag. I informed Maureen that I had no idea as to what to do, but I would attempt to resolve the problem. I sent screener Brian Akizaki along with a walkie talkie to area H and instructed him to attempt to locate the problem area and bag. In the meantime I received another call from the female Akal representative. She asked me again if I was going to sent anyone. I told her that I was in the process of doing just that. She then asked me if I was going to send anyone. I replied that I was in the process of doing just that. Once again she asked if I was going to send anyone because she needed to know. I informed her that of course I would send someone. She then decided to argue semantics with me by stating that it was not what I had said before. I told her it was. She then started yelling in the phone, continuing to argue semantics. I determined that I was not going to solve the abandoned bag problem by talking to her so I ended the conversation. I called Maureen on the radio to inquire as to whom the screening manager was for today. Maureen answered and stated that she was on the phone with Akal and did not answer the radio again. Before I could I could call anyone else, the pax line rang. It was the female representative again. She asked me who my supervisor was. I told her that I did not know and that I was trying to find out. She then stated that she would find out and that they (the supervisor) would let me know. I tried to reach both Joe Collins and Robin Wong by cell phone. I received voice mail for each. I then contacted Robin by radio and she contacted me by phone. I informed Robin about the problem with the abandoned bag and told her that I had no idea what the correct process was. She began to tell me how to proceed. Just about then screener Akizaki returned with the swipe and an Akal officer. Brian placed the swipe in the machine. It didn't alarm. I informed Robin the process was complete.

    Prior to today, I had never been informed that my checkpoint was responsible for responding to, and swiping abandoned bags. I was never told the correct way to handle the situation.

    Later tonight, I met with Robin and discussed with her that I was never advised what to do in this situation, but now because of the experience I just described, I am fully aware of what my responsibilities are in this type of situation. Robin requested that I write an incident report.

*Raymond E. Lace* (signature)



Honolulu International Airport
300 Rodgers Blvd. #12
Honolulu, Hawaii 96819
808-834-6051
Fax 808-834-6865

TO: Robyn (Screener Duty Manager)
FROM: Johnelle Chan (Akal Dispatch)
DATE: June 12, 2003
SUBJECT:

On June 12, 2003 at approximately 2436 hrs. I called Checkpoint 5 CBS (Ray) to ask to have someone go to Baggage Claim H at Carousel H-4 to swipe an unattended bag. The CBS at Checkpoint 5 said he would call Checkpoint 4. I then informed him that the bag was at United. He said he knew but he didn't know how to do that and was not taught and they usually send someone from Checkpoint 4. After a short while I called Checkpoint 4 and spoke with the CBS (Maureen). She informed me that the supervisor from Checkpoint 5 said he didn't know where to go or who called and that he didn't know how to do that. She explained to him and he told her that telling him how to do it was like telling him how to fix a car. She then asked me to call him to see if he was sending someone and if not to call her back and she would send someone herself. At this point I called him back, identified myself and asked if someone would be going to Baggage Claim H. His response was "We're working on it."



Honolulu International Airport
300 Rodgers Blvd. #12
Honolulu, Hawaii 96879
808-834-6057
Fax 808-834-6865

Continuation Page,

I THEN ASKED "DOES THAT MEAN SOMEONE WILL BE GOING OR NOT?" HIS RESPONSE WAS "THAT MEANS WE'RE WORKING ON IT." BEFORE I COULD ASK WHO THE SCREENER DUTY MANAGER WAS HE HUNG UP ON ME. WHEN I CALLED THE CHECKPOINT BACK AND ASKED WHO THE MANAGER WAS, HE SAID "THAT'S WHAT I'M TRYING TO FIND OUT, BUT I CAN'T IF YOU'RE ON THE PHONE." I THEN CALLED UPSTAIRS TO LOUIS AND ASKED HER TO HAVE A SCREENER DUTY MANAGER RETURN MY CALL. AT 2153 HRS. ROBYN RETURNED MY CALL AND ASKED ME TO GENERATE THIS STATEMENT.