IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RAYMOND WARE, | ) | CIVIL NO. 04-00671 HG-LEK |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL CHERTOFF, Secretary, | ) | |
| Department of Homeland | ) | |
| Security; John Does 2-5, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S SECOND
MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

This is a Title VII race discrimination and retaliation in
employment case against Defendant Michael Chertoff, Secretary of
the Department of Homeland Security.  Plaintiff Raymond Ware, an
African-American male, worked as a Transportation Security
Administration security screening supervisor at the Honolulu
International Airport.  Plaintiff claims that Defendant
discriminated against him on the basis of his race by not
selecting him for screening manager positions and in ultimately
terminating him.

For the reasons set forth below, the Court finds that some
of Plaintiff's claims are time barred or otherwise fail to

1

survive summary judgment, but that there are genuine issues of
material fact as to his discrimination and retaliation claims for
failure to promote in September 2003 and as to his November 2003
unlawful termination claim.

For the reasons set forth below, Defendant's second motion
to dismiss and for summary judgment is GRANTED AND PART AND
DENIED IN PART.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine
issue as to any material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  There must
be sufficient evidence that a reasonable jury could return a
verdict for the nonmoving party.  Nidds v. Schindler Elevator
Corp., 113 F.3d 912, 916 (9th Cir. 1996).

The moving party has the initial burden of "identifying for
the court the portions of the materials on file that it believes
demonstrate the absence of any genuine issue of material fact."
T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809
F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986)).  The moving party, however, has no
burden to negate or disprove matters on which the opponent will
have the burden of proof at trial.  The moving party need not
produce any evidence at all on matters for which it does not have
the burden of proof.  Celotex, 477 U.S. at 325.  The moving party

2

must show, however, that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law.  That burden is met simply by pointing out to the district court that there is an absence of evidence to support the nonmovant's case.  <u>Id.</u>

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of probative evidence tending to support its legal theory. <u>Commodity Futures Trading Comm'n v. Savage</u>, 611 F.2d 270, 282 (9th Cir. 1979).  The opposing party must present admissible evidence showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); <u>Brinson v. Linda Rose Joint Venture</u>, 53 F.3d 1044, 1049 (9th Cir. 1995).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Nidds</u>, 113 F.3d at 916 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)).

The court views the facts in the light most favorable to the non-moving party.  <u>State Farm Fire & Casualty Co. v. Martin</u>, 872 F.2d 319, 320 (9th Cir. 1989).

Opposition evidence may consist of declarations, admissions, evidence obtained through discovery, and matters judicially noticed.  Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324.  The opposing party cannot, however, stand on its pleadings or simply assert that it will be able to discredit the movant's evidence at

3

trial.  Fed. R. Civ. P. 56(e); T.W. Elec. Serv., 809 F.2d at 630.
The opposing party cannot rest on mere allegations or denials.
Fed. R. Civ. P. 56(e); Gasaway v. Northwestern Mut. Life Ins.
Co., 26 F.3d 957, 959-60 (9th Cir. 1994).  Nor can the opposing
party rest on conclusory statements.  National Steel Corp. v.
Golden Eagle Ins. Co., 121 F.3d 496, 502 (9th Cir. 1997).

**LEGAL FRAMEWORK**

**A.    Title VII Disparate Treatment Claim**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
2000e-2(a)(1), makes it an unlawful employment practice for an
employer "to fail or refuse to hire or to discharge any
individual, or otherwise to discriminate against any individual
with respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's race,
color, religion, sex, or national origin".

"A person suffers disparate treatment in his employment when
he or she is singled out and treated less favorably than others
similarly situated on account of a protected characteristic."
Cornwell v. Elctra Cent. Credit Union, 439 F.3d 1018, 1028 (9th
Cir. 2006).  To prevail on a disparate treatment claim, a
plaintiff must "prove that the employer acted with conscious
intent to discriminate."  Costa v. Desert Palace, Inc., 299 F.3d
838, 854 (9th Cir. 2002).

When a defendant moves for summary judgment on a Title VII
discrimination claim, the plaintiff alleging disparate treatment

may respond in one of two ways:

> when responding to a summary judgment motion, the
> plaintiff is presented with a choice regarding how to
> establish his or her case. [The plaintiff] may proceed by
> using the McDonnell Douglas framework, or alternatively,
> may simply produce direct or circumstantial evidence
> demonstrating that a discriminatory reason more likely
> than not motivated [the defendant].

McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).

"Under the McDonnell Douglas burden shifting framework, a

plaintiff must first establish a prima facie case of unlawful

discrimination," which requires the plaintiff to show that "(1)

he belongs to a protected class; (2) he was qualified for the

position; (3) he was subject to an adverse employment action; and

(4) similarly situated individuals outside his protected class

were treated more favorably."  Id. at 1122 n. 16 (citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973));

Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123

(9th Cir. 2000). "The burden then shifts to the employer to

articulate a legitimate, nondiscriminatory reason for the action.

If the employer does so, the plaintiff must show that the

articulated reason is pretextual."  McGinest, 360 F.3d at 1122 n.

16.

**B.    Title VII Retaliation Claim**

Title VII also prohibits retaliation:

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees ...
> because he has opposed any practice made an unlawful
> employment practice by this subchapter, or because he has

5

made a charge, testified, assisted, or participated in
any manner in an investigation, proceeding, or hearing
under this subchapter.

42 U.S.C. § 2000e-3(a).  "This section protects an employee or

former employee from retaliation for engaging in a protected

activity, such as opposing any practice made an unlawful

employment practice by Title VII, or participating in any manner

in an investigation, proceeding, or hearing under Title VII."

Rhodes v. Electronic Data Systems Corp., 2007 WL 1988750, at *6

(E.D. Cal. July 3, 2007) (citing Stegall v. Citadel Broad. Co.,

350 F.3d 1061, 1065 (9th Cir. 2003)).

    To establish a claim of retaliation, a plaintiff must prove

that (1) the plaintiff engaged in a protected activity, (2) the

plaintiff suffered an adverse employment action, and (3) there

was a causal link between the plaintiff's protected activity and

the adverse employment action.  Poland v. Chertoff, __ F.3d __ ,

2007 WL 2069651, at *4 (9th Cir. July 20, 2007).

    If plaintiff makes this initial showing, then the burden

shifts to the employer to articulate a legitimate reason for the

adverse action.  Rhodes, 2007 WL 1988750, at *7.  Once the

employer carries this burden, plaintiff must demonstrate a

genuine issue of material fact as to whether the reason advanced

by the employer was a pretext.  Id. (citing Brooks v. City of San

Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  "Only then does the

case proceed beyond the summary judgment stage." Id. (citing

<u>Brooks</u>, 229 F.3d at 928).

## **BACKGROUND**

The Transportation Security Administration ("TSA") employed Plaintiff Raymond Ware ("Plaintiff"), an African-American male, as a checkpoint security screening supervisor at the Honolulu International Airport ("HNL") from September 2002 until it terminated his employment in November 2003.  Prior to working at HNL, Plaintiff worked as a mobile screening supervisor for TSA in Washington, D.C.  (Plaintiff's Separate Concise Statement of Facts ("Pl. SCSF") at Declaration of Raymond Ware (hereinafter "Ware Decl.") at ¶ 1.)

Kenneth Kamahele had been the Assistant Federal Security Director for Screening at HNL for the TSA since August 2002. Kamahele supervised screening managers who, in turn, supervised screening supervisors, including Plaintiff.  (Defendant's Separate Concise Statement of Facts ("Def.'s SCSF") at ¶ 1.) Kamahele worked under TSA Security Director Sidney Hayakawa.

Plaintiff wanted to be promoted from his screening supervisor position to the position of screening manager.  On several occasions Defendant did not promote him or allow him to fill the rotating screening manager position.  In particular, Kamahele:  (1) did not select Plaintiff for rotation into several short-term screening manager positions between November 2002 and September 2003; (2) did not select Plaintiff for a vacant screening manager position in June 2003; and (3) did not select

Plaintiff for a vacant screening manager position in September 2003.  (Def. SCSF at ¶ 2.)  Plaintiff contends that Defendant discriminated against him on the basis of his race by not promoting him to the screening manager position at any of these times.

In November 2003, TSA in conjunction with Lockheed Martin and its subcontractors, administered a re-certification test for security screeners.  Under TSA rules, security screeners who initially failed the re-certification test were given an opportunity to complete remedial training.  (Def. SCSF at ¶ 10.) If the screener again failed, TSA rules required his removal. (Id.)  According to the TSA database, on November 6, 2003, Plaintiff failed a portion of the re-certification test.  (Id. at ¶ 13.)  After a second attempt, on November 7, 2007, Plaintiff again failed a portion of the re-certification test and Defendant terminated him.  (Id.)

Plaintiff claims that he passed the test.  (Pl. SCSF at ¶ 13.)  Plaintiff questions the test results, but Defendant has been unable to identify who administered the test.  (Pl. SCSF at ¶¶ 12-13, 28-29.)  Plaintiff also presents evidence that other non-African-American screeners were allowed to remain employed and were given the opportunity to take the test multiple times until they passed.  (Pl. SCSF at ¶ 31.)

**Plaintiff's EEO complaints**

Plaintiff filed two Equal Employment Opportunity (EEO)

8

complaints.  Plaintiff first contacted an EEO counselor on June 23, 2003.  (Def. SCSF at ¶ 14.)

### August 2003 EEO complaint

On August 19, 2003, Plaintiff filed an EEO complaint alleging that Defendant failed to promote him because of his race.  (Pl. SCSF at Exh. 2.)  Plaintiff's August 2003 EEO complaint alleged that Defendant planned to rotate security screeners into the security manager position so that each security screener could fill the manager position for one month and Defendant could then select the best qualified screener for the manager position.  Plaintiff was not rotated into the screening manager position.  On June 13, 2003, Plaintiff learned that others, and not him, were selected for the screening manager position.  The others selected for the screening manager position were of Hawaiian or Asian decent.

Plaintiff also complained that Defendant assigned him a high volume security checkpoint, with no assistance, upon his arrival at HNL.  Subsequently, on July 11, 2003, Defendant involuntary reassigned Plaintiff to another security checkpoint which, he contends, was in retaliation in anticipation of his filing an EEO complaint.

### September 2003 EEO complaint

On September 5, 2003, Plaintiff filed another EEO complaint. (Pl. SCSF at Exh. 3.)  Plaintiff alleged that on August 1, 2003,

he again applied for promotion to the screening manager position in response to three additional vacancies for the position, but that Defendant did not promote him to the position because of his race and in retaliation for the filing of his August 2003 EEO complaint.

## ANALYSIS

### A.    Allegedly discriminatory acts at issue

Plaintiff claims that Defendant discriminated or retaliated against him on the basis of his race by:

(1)  not rotating him into screening manager positions between October 2002 and February 2003;

(2)  not selecting him for a screening manager position in June 2003;

(3)  not selecting him for a screening manager position in September 2003; and

(4)  terminating his employment in November 2003.

### B.    Plaintiff's hostile work environment claim

Plaintiff's Amended Complaint also suggests a hostile work environment claim, but in opposing Defendant's motion for summary judgment, Plaintiff concedes that such claim is part of his retaliation claim and that he is not pursuing a separate hostile work environment claim. (Pl. Opp. at 26.)  Plaintiff does not put forth any evidence to support a hostile work environment claim. Nor, as Plaintiff concedes, do Plaintiff's EEO complaints allege hostile work environment.  (Pl. SCSF at 15.)  Defendant's motion

for summary judgment as to any claim by Plaintiff for hostile
work environment is granted.

**C.    Time barred claims**

Plaintiff's failure to promote claims for the time period
between October 2002 through February 2003 are time barred.  To
pursue a claim to a federal employer under Title VII of the Civil
Rights Act, an employee must exhaust his administrative remedies
by contacting an Equal Employment Opportunity (EEO) counselor
"within 45 days of the date of the matter alleged to be
discrimination or . . . within 45 days of the effective date of
the [personnel] action."  29 C.F.R. § 1614.105(a)(1).  The 45 day
time requirement functions as a "statute of limitations for
filing suit."  Johnson v. United States Treasury Dep't, 27 F.3d
415, 416 (9th Cir. 1994).

Plaintiff did not contact an EEO counselor until June 23,
2003.  (Def. SCSF at ¶ 14; Pl. SCSF at Exh. 2.)  In Ledbetter v.
Goodyear Tire & Rubber Co., 127 S.Ct. 2162 (2007), the United
States Supreme Court reiterated "the need to identify with care
the specific employment practice that is at issue" when
determining whether a claim has been timely presented to the
administrative agency.  Ledbetter, 127 S.Ct. at 2167.  "The EEOC
charging period is triggered when a discrete unlawful practice
takes place."  Id. at 2169.  The failure to promote is an example
of a discrete act.  Id.  The Title VII plaintiff must identify a
discrete act that occurred within the appropriate period of time.

11

<u>Id</u>.

In this case, the employment practice at issue was Defendant's alleged failure to rotate Plaintiff into the screening manager position.  Defendant's allegedly discriminatory conduct in failing to promote plaintiff between October 2002 and February 2003 (<u>see</u> Amended Compl. ¶ 15) did not occur during the charging period (45 days prior to June 23, 2003).  None of the equitable exceptions to an untimely filing apply.  Plaintiff, for instance, does not claim that he was somehow unaware of Defendant's failure to promote him during this time period.

Plaintiff's failure to promote claims for the period between October 2002 and February 2003 are dismissed as time barred.

**D.    Defendant's proffered legitimate non-discriminatory reasons**

Defendant does not argue that Plaintiff failed to establish a prima facie case.  Rather, Defendant proffers what it contends are legitimate non-discriminatory reasons for not promoting, and for eventually terminating, Plaintiff.

**1.    Defendant's proffered legitimate non-discriminatory reasons for not promoting Plaintiff**

Defendant has proffered reasons for each of its decisions not to promote Plaintiff.

**a.    *Plaintiff's June 2003 failure to promote based discrimination claim***

In June 2003, TSA opened positions for six additional

12

screening managers.[1]  (Pl. SCSF at Exh. 26 (Deposition of Kenneth
Kamahele) ("Kamahele Depo." at 32.)  Plaintiff did not apply for
the June 2003 screening manager position.  (Pl. Opp. at 14.)
Because Plaintiff was not made aware of the screening manager
positions, this is not dispositive of Plaintiff's June 2003
failure to promote claim.  (Kamahele Depo. at 45-46).  Kamahele
was aware that Plaintiff wanted to be promoted to the screening
manager position.  (Id. at 56); see Allen v. Tobacco Superstore,
Inc., 475 F.3d 931, 937 (8th Cir. 2007) ("Failure to formally
apply for a management position does not bar a plaintiff from
establishing a prima facie claim, as long as the plaintiff "made
every reasonable attempt to convey [her] interest in the job to
the employer.") (citation omitted).

     The six screening manager positions opened in June 2003 were
not, initially, permanent positions.  (Kamahele Depo. at 34.)  To
fill the positions, Kamahele contacted "several people within the
airlines and law enforcement and asked them to submit their
resumes through NCS Pearson [a human resources firm] to see if
they could get themselves qualified." (Id. at 34.)  NCS Pearson
determined that the individuals contacted by Kamahele were

_____

     [1] Kamahele had previously (between November 2002 and April
2003) filled six other TSA screening manager positions with
former airport security inspectors with the Federal Aviation
Administration. (Def. SCSF at Declaration of Kenneth Kamahele
("Kamahele Decl." at ¶ 5.) Plaintiff's non-promotion claims
during this time period are time barred, so the Court does not
address the merits of these claims.

qualified.  (Id.)  Most of the individuals contacted by Kamahele
to fill the temporary screening manager positions had worked with
Kamahele at the airport for Akal Security.  (Id. at 35-36.)  The
individuals hired did not have security screening experience
(id.), but managers are not required to be certified screeners.
(Id. at 37.)  None of the individuals hired was African-American.
(Id. at 38-39.)

       In reviewing Defendant's proffered reason, the Court starts
with the general proposition that it does not sit as a super-
personnel department and second-guess an employer's decisions.
See Green v. Maricopa County Community College School Dist., 265
F.Supp. 2d 1110, 1128 (D. Ariz. 2003) ("The focus of a pretext
inquiry is whether the employer's stated reason was honest, not
whether it was accurate, wise, or well-considered. We do not sit
as a superpersonnel department that reexamines an entity's
business decision and reviews the propriety of the that
decision.") (citing Stewart v. Henderson, 207 F.3d 374, 378 (7th
Cir. 2000) (citations omitted). See also Simms v. Oklahoma, 165
F.3d 1321, 1330 (10th Cir. 1999) ("Our role is to prevent
unlawful hiring practices, not to act as a 'super personnel
department' that second guesses employers' business judgments.")
(citations omitted)).

       Defendant has proffered legitimate non-discriminatory
reasons for its decision not to hire Plaintiff for a screening
manager position in June 2003.  Kamahele did not consider any

14

full time TSA employee for the June 2003 vacancies. (Kamahele
Decl. at ¶ 6.) He did not consider any full time TSA employees
because he believed that a full time TSA employee would not want
to sacrifice his career position for a temporary one. (Id.)
Kamahele explains that he did not consider Plaintiff for any of
the temporary positions in June 2003 because he was a full time
TSA employee. (Id.) In other words, Plaintiff excluded all full
time employees, not just Plaintiff, regardless of race.

Plaintiff has failed to show the reason proffered by
Defendant is pretextual. See Godwin v. Hunt Wesson, Inc., 150
F.3d 1217, 1220-22 (9th Cir. 1998) (plaintiff can prove pretext
either "(1) indirectly, by showing that the employer's proffered
explanation is unworthy of credence because it is internally
inconsistent or otherwise not believable, or (2) directly, by
showing that unlawful discrimination more likely motivated the
employer"). Plaintiff does not put forth any evidence to rebut
Defendant's proffered legitimate non-discriminatory reasons.
Because Kamahele did not consider any full time TSA employees for
the screening manager positions in June 2003, including
Plaintiff, Plaintiff cannot show that he was treated differently
than other full time TSA employees.

The fact that Kamahele was later the subject of an
independent investigation into his hiring and promotion practices
is not circumstantial evidence of discrimination against
Plaintiff. Although Kamahele's indiscretions bring his

15

credibility into question, the fact that Kamahele was later
investigated regarding his hiring and promotion practices
unrelated to race, also cuts against Plaintiff's race
discrimination claim.  While Kamahele may have shown favoritism
to certain employees because of his prior relationships with
them, Title VII only prohibits employment discrimination based on
a protected class.  The fact that Kamahele's selection process
may have been unfair does not, in and of itself, support a Title
VII discrimination claim based on race.

Because Defendant has proffered a legitimate non-
discriminatory reason and Plaintiff has failed to show pretext,
Defendant's second motion for summary judgment is granted as to
Plaintiff's June 2003 failure to promote claim.

**b.    *Plaintiff's September 2003 failure to promote based discrimination claim***

In August 2003, the opportunity for current screeners to be
promoted to screening managers, on a full time basis, became
available.  Prior to that time, Kamahele testified that the
competition to be promoted to screening manager had not been
opened.  (Kamahele Depo. at 42.)  In August 2003, Plaintiff
applied to be promoted to the screening manager position.  (Id.
at 47.)  Kamahele did not interview Plaintiff for the position.
On or about September 4, 2003, Plaintiff was not selected.
(Kamahele Decl. ¶ 8; Ware Decl. at ¶ 11.)  On September 5, 2003,
Plaintiff filed his EEO complaint regarding Defendant's failure

16

to promote him to a screening manager position or place him in a rotating screening manager position. (Pl. SCSF at Exh. 3.) Plaintiff claims that he was again passed over for a rotating screening manager position on September 6, 2003. (Id.)

Defendant does not argue that Plaintiff has failed to state a prima facie case. Rather, Defendant proffers reasons for its decision not to hire Plaintiff. Kamahele states that he did not select Plaintiff because he did not consider him the most qualified applicant for the position. (Kamahele Decl. at 7-8.) Kamahele states that he based this decision on Plaintiff's disciplinary record, work performance, and information from Plaintiff's supervisors. (Id. at 8.)

Kamahele provides only a few specific examples of Plaintiff's allegedly unsatisfactory work performance. Kamahele states that on June 12, 2003, Johnell Chun, an employee of a private security contractor at HNL, complained in writing about Plaintiff's handling of her report about an abandoned bag. (Id. at 8.) Kamahele claims that he "knew that Screening Manager Leo Ventura also had concerns about Mr. Ware's performance, including his indecisiveness regarding whether certain items were prohibited." (Id.) Kamahele also recounts an incident involving Plaintiff's handling of an unclaimed jacket that had been left behind at a checkpoint. (Id. at 4.) Kamahele states that "[n]one of the individuals selected for the screening manager position had a similar history of supervisor concerns and write-

17

ups."  (<u>Id</u>. at 9.)

Plaintiff has put forth evidence to show that the reasons proffered by Defendant for not promoting him to the screening manager position in September 2003 are pretextual.  Plaintiff met with Kamahele on October 2, 2003 to discuss Plaintiff's concerns regarding Defendant's failure to promote him to a screening manager position.  Prior to the October 2003 meeting, Defendant had not communicated any concerns to Plaintiff about his work performance. (Kamahele Depo. at 65.)  Plaintiff was not aware of any complaints until after his meeting with Kamahele in October 2003.  (Pl. Opp. at 17; Pl. SCSF at ¶ 6.)  Kamahele also admitted that he misplaced Plaintiff's resume, suggesting that Defendant did not give Plaintiff's application equal consideration. (Kamahele Depo. at 69.)

Plaintiff puts forth evidence that contradicts the statements made by Kamahele.  In his Declaration, Kamahele stated that he relied on input from Plaintiff's supervisor, Leo Ventura, in deciding not to hire Plaintiff for the position.  (Kamahele Decl. at 8.)  Yet, during his deposition, Kamahele admitted that Ventura did not say anything negative about Plaintiff in his written evaluation.  (Kamahele Depo. at 66-67.)  This is supported by a review of Ventura's written evaluation which is included in the record evidence. (Pl. SCSF at Exh. 4 at p. 7, "General Counseling Form", dated Sept. 10, 2003.)

The record evidence does not support Kamahele's assertion

that Plaintiff had a history of "supervisor concerns and write-
ups."  The report from the screening manager, Ms. Robin-Ann K.
Wong, who investigated the incident regarding the unclaimed
jacket, indicates that it was Plaintiff who informed Ms. Wong
about the incident involving the unclaimed jacket.  Plaintiff had
heard that another screening supervisor had accused Plaintiff of
stealing the jacket.  Ms. Wong's investigation revealed that
Plaintiff had left the unclaimed jacket in the men's bathroom,
believing that a restroom custodian would turn it in as lost and
found property.  Ms. Wong counseled Plaintiff that in the future
he should turn abandoned items into the screening manager.
Plaintiff was not disciplined for this incident.

The report by Lizette Hameberg, dated September 11, 2003,
describes some incidents which occurred prior to Plaintiff's
application to be promoted to the screening manager position, but
was not prepared until *after* Defendant decided not to hire
Plaintiff for the position.  (Pl. SCSF at Exh. 4.)  There is
nothing inherently wrong with an employer soliciting reviews of
an employee's performance after the adverse employment action.
But, under the facts of this case, a jury may find that Ms.
Hameberg's memorandum submitted to Kamahele does not support
Defendant's position, but rather, is, as Plaintiff contends,
evidence of Defendant's after the fact attempt to justify a
discriminatory employment decision.

Kamahele also relies on the fact that on June 12, 2003,

19

Johnell Chun, an employee of Akal Security, a private security contractor at HNL, made a written report to Plaintiff's supervisor, screening manager Ms. Robyn Wong, in which she complained about Plaintiff's handling of her report about an abandoned bag. (Id. at 8.)  At Ms. Wong's request, Plaintiff prepared an incident report, recounting his rendition of the events surrounding the abandoned bag.  (Pl. SCSF at 4.)  There is no evidence that Plaintiff was disciplined or otherwise reprimanded for this incident.

Plaintiff's only work performance evaluation, prepared by his supervisor, Screening Manager Jose M. Abrante, and dated October 25, 2003, was that he was a "superb supervisor". (Pl. SCSF at Exh. 8.)  According to Mr. Abrante, Plaintiff:

> consistently demonstrates attention to detail, he is a leader and he completes required tasks with little to no supervision.  Mr. Ware has worked in numerous checkpoints achieving success in training screeners and ensuring procedures and current directives are enforced.  Raymond Ware has far exceeded all performance expectations for this period of evaluation.

(Id.)

While Mr. Abrante's evaluation post-dates Defendant's September 2003 decision not to promote Plaintiff, it is nonetheless probative of how at least one of Plaintiff's supervisors viewed his work and goes directly to the issue of whether Defendant's proffered reasons for terminating Plaintiff are credible.

Plaintiff has put forth sufficient evidence to raise a genuine issue of material fact as to whether Defendant decided not to promote Plaintiff in September 2003 because of his race or for legitimate non-discriminatory reasons.

### c.   Plaintiff's September 2003 retaliation based failure to promote claim

Plaintiff also claims that Defendant did not promote him to the manager position on or about September 4, 2003, and again on September 6, 2003, in retaliation for his complaints that he was not being promoted because of his race.  Plaintiff satisfies the first two elements of a retaliation claim.  Plaintiff engaged in protected activity by filing an EEO complaint and by meeting with his superiors to complain about race discrimination.  Plaintiff suffered an adverse employment action in not being promoted to the screening manager position.  The remaining issue is whether Plaintiff has put forth sufficient evidence to survive the third element of a retaliation claim by showing that there is a causal link between his filing of the EEO complaint, and otherwise complaining about discrimination, and Defendant's decision not to promote him.

In this regard, Defendant contends that Kamahele was unaware of Plaintiff's EEO complaint when deciding not to promote him to a screening manager position between November 2002 and September 2003. (Def. SCSF at ¶ 2; Kamahele Decl. at ¶ 3.) Plaintiff disputes this.  (Pl. SCSF at ¶ 2, citing Ware Decl at ¶

21

15 ("Both Mr. Kamahele and Mr. Hayakawa were aware of my EEO complaint and had received a copy of it in August 2003 by the time I was not promoted in September 2003".)

The record evidence lends support to Plaintiff's position. Defendant has failed to identify evidence that contradicts Plaintiff's assertion that Mr. Kamahele and Mr. Hayakawa were aware, and received a copy, of Plaintiff's August 2003 EEO complaint at the time Plaintiff was not promoted in September 2003. Even if Kamahele had not received a copy, Plaintiff has presented evidence that Kamahele was aware of Plaintiff's concerns about not being promoted to the screening manager position. (Pl. SCSF at ¶ 5.) On or about September 3, 2003, Plaintiff met with Hayakawa to discuss his concerns of race discrimination. Plaintiff subsequently made efforts to meet with Kamahele, sometime prior to September 8, 2003, to discuss these same concerns. (Pl. SCSF at ¶ 6.) There is also evidence to support Plaintiff's contention that Defendant made an effort to introduce negative written comments about Plaintiff into his personnel file after its decision not to promote him in September 2003. Based on this evidence, a jury may find that Kamahele knew of Plaintiff's EEO complaints and concerns that he was not being promoted because of his race, and that Defendant retaliated against Plaintiff by not promoting him. See Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493, 506 (9th Cir. 2000) (plaintiff presented evidence of retaliation where her

22

complaints affected a performance review she received and resulted in decreased job responsibilities).

Defendant's motion for summary judgment as to Plaintiff's retaliation claim for failure to promote him in September 2003 is denied.

### 2.    There is a genuine issue of material fact as to Plaintiff's November 2003 termination claim

Defendant contends that it properly terminated Plaintiff for failing TSA's re-certification test.  As part of the test, passenger screeners, like Plaintiff, are required to pass three modules.  (Def. SCSF at Declaration of Pete Marecello, hereafter "Marcello Decl.", at ¶ 4.)  Module 1 was a job knowledge, occupation specific (depending on whether employee was a baggage or passenger screener) multiple choice test that assessed a screener's knowledge of the standard operating procedures.  (Id.) Module 2, (for passenger screeners only) measured a screener's skill and ability in the detection of threat/prohibited items within x-ray images of baggage.  (Id.)  Module 3 was an occupation specific (depending on whether employee was a baggage or passenger screener) practical skills or hands-on skills demonstration, used to evaluate a screener's knowledge, skill and ability when performing specific screener tasks.  (Id.)

A TSA employee administered Modules 1 and 2.  Plaintiff passed Modules 1 and 2.  (Marcello Decl. at ¶ 5.)  Employees or subcontractors of Lockheed Martin administered Module 3.  (Id.)

23

The Lockheed Martin employee or subcontractor would observe the screeners performing the tasks on Module 3 and mark results on a checklist which was a handheld electronic device. (Id.)  Lockheed then linked the device to a laptop computer and transmitted the re-certification test results to the TSA.  (Id.)

Module 3 has six discrete sections.  (Id. at ¶ 6.)  In order to pass the test and remain employed, TSA required the screeners to pass each discrete section with a score of 80% or higher. (Id. at ¶ 6-7.)  On November 6, 2003, Plaintiff failed four sections of Module 3.  (Id. at 6; Def. SCSF at Declaration of Thomas A. Helper, hereinafter "Helper Decl." at Exh. B ("Test results for Mr. Raymond Ware".)  On November 7, 2003, Plaintiff had a second opportunity to pass the four sections of Module 3 that he initially failed.  (Marcello Decl. at ¶ 6.)  On the retest, Plaintiff failed three sections of Module 3.  (Id.)

Pete Marcello, Program Manager for re-certification in the Office of Human Capital for the TSA, testifies that screeners who initially fail the re-certification process are provided an opportunity to complete remedial training, but if the screener again fails the re-certification process, the screener must be removed.  (Marcello Decl. at ¶ 2; Def. SCSF at Helper Decl. at Exh. A (TSA Management Directive No. 1900.4.).  This practice was in accordance with TSA rules in effect at the time Plaintiff took the test.  See 49 U.S.C. § 44935(f)(5).

Because Plaintiff still failed three sections of Module 3

24

after the retest, Defendant removed him from the screener position. (Marcello Decl. at ¶ 7.) Kamahele sent Plaintiff a "Notice of Proposed Removal for Failure to Re-Cerfity" on November 14, 2003 (Pl. SCSF at Exh. 9). Plaintiff responded by challenging the test results. (Id.) Following Plaintiff's response, TSA sent Plaintiff a "Letter of Decision on Removal", terminating Plaintiff's employment with the TSA effective November 25, 2003. (Pl. SCSF at Exh. 11.) The Letter of Decision on Removal explained that Plaintiff failed to pass certain portions of the Module 3 test, in particular, "the Handheld Metal Detector 2" and "Pat Down". (Id.)

Plaintiff's primary argument is that he did not, in fact, fail the test. (Pl. SCSF at ¶¶ 13, 29.) Defendant has provided Plaintiff with the test results showing that he failed. (Pl. SCSF at ¶ 33 and at Exh. 25.) Mr. Marcello, the Program Manager for re-certification in the Office of Human Capital for the TSA, has reviewed Plaintiff's scores and verified that he failed certain sections of the test.

Defendant concedes that it is unable to identify the individuals who actually administered the test. Defendant has also not provided Plaintiff with the grading criteria or otherwise explained the test results. (Pl. SCSF at ¶ 33.) While it is of concern that Defendant does not have information available as to who administered the test, Plaintiff has failed to link his allegation that he passed the test with any evidence

25

of discrimination.

The fact that a third-party subcontractor administered the test cuts against Plaintiff's discrimination claim against the TSA.  To support his discrimination claim, Plaintiff must show an adverse action by *Defendant*.  Plaintiff does contend that the test itself was written in a discriminatory manner.  Even if Lockhead Martin, improperly administered, or unfairly graded, the test (*e.g.*, Plaintiff actually found a knife during the screening test when the testers said that he did not), this is not evidence of discrimination by Defendant.  Indeed, Kamahele testified that he was not even present during the administration of the re-certification test and it is unclear whether any other TSA supervisors were present.  (Kamahele Depo. at 73-74.)  After administering the test, Lockheed Martin, or its subcontractors, would transmit the test results to TSA.

Putting aside Plaintiff's contention that he actually passed the test, Plaintiff has put forth evidence which creates an issue of fact as to whether Defendant treated him differently than other similarly situated employees.  Plaintiff presents evidence that, despite TSA rules, other security screeners were not terminated for failing the recertification test, but were given the test multiple times until they passed.  (Pl. SCSF at ¶ 31 and at Exh. 24 at Declaration of Milagros Drake ("Drake Decl.") at 9.)  Plaintiff relies on the Declaration of Milagros Drake.  Drake worked under Plaintiff as a passenger screener.  (Drake

Decl. ¶ 1.)  Drake states that almost all of the screeners failed
to pass the re-certification test.  (Drake Decl. at ¶ 4.)
According to Drake, screeners complained to Kamahele and Kamahele
ordered the re-certification test to be redone until all of the
screeners passed.  (Drake Decl. at ¶ 8.)  In particular, Drake
states:

> I was present when Mr. Kamahele became upset when
> the testers said everyone was failing and took them
> out of the screening line.  As a result, Mr.
> Kamahele ordered the screeners had to be retrained
> and retested until they passed.  TSA screeners
> retook the test several times, more than two times
> over until we passed.

(Drake at ¶ 8.)

Drake's understanding is that Plaintiff was the only person
terminated for failing the re-certification test.  (Drake at ¶
9.)  Moreover, it is undisputed that Kamahele knew of Plaintiff's
EEO complaints at the time Defendant terminated him in November
2003.  (Kamahele Depo. 64.)  Plaintiff sent letters to Hayakawa
in September 2003 regarding his race discrimination claims and
Kamahele received a copy of these letters prior to meeting with
Plaintiff in October 2003.  (Pl. SCSF at Exh. 5 and 6; Kamahele
Depo. at 64.)

At the hearing, Defendant conceded that if Drake's
statements are based on her personal knowledge, they would defeat
Defendant's motion for summary judgment as to Plaintiff's
termination claim.  Drake's statements are evidence that
Defendant treated Plaintiff differently than other screeners who

also took the re-certification test.  Defendant questioned

whether Drake's statements were based on her personal knowledge

since it is unclear how, in her position as screener, she would

know who was allowed to retake the test, under what

circumstances, and how many times.  Defense counsel indicated

that he intended to depose Drake to determine the basis for her

statements.  At the hearing, the Court extended the dispositive

motions deadline until October 15, 2007.

### CONCLUSION

For the foregoing reasons,

(1)   Defendant's Second Motion to Dismiss and for Summary

Judgment is **GRANTED IN PART AND DENIED IN PART.**

(2)   Defendant's motion is **GRANTED** with regard to

Plaintiff's claims for: (1) hostile work environment;

(2) failure to promote to rotating screening manager

position from October 2002 to February 2003; and (3)

failure to promote to temporary screening manager

position in June 2003; and

//

//

//

//

//

//

//

(3)    Defendant's motion is **DENIED** as to Plaintiff's claims
        for: (1) discrimination and retaliation in failing to
        hire Plaintiff for permanent screening manager position
        in September 2003; and (2) unlawful termination in
        November 2003.


IT IS SO ORDERED.

DATED: August 1, 2007, Honolulu, Hawaii.



_/s/ Helen Gillmor_____

Chief United States District Judge


Raymond Ware v. Michael Chertoff, in his official capacity as
Secretary of the Department of Homeland Security; Civ. No. 04-
00671 HG-LEK; **ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S SECOND MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**