EDWARD H. KUBO, JR.   2499
United States Attorney
District of Hawaii

THOMAS A. HELPER      5676
Room 6-100, PJKK Federal Bldg.
Assistant U.S. Attorney
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
E-mail: tom.helper@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RAYMOND WARE, | ) | CIVIL NO. 04-00671 HG LEK |
| | ) | |
| Plaintiff, | ) | TRIAL BRIEF OF DEFENDANT |
| | ) | MICHAEL CHERTOFF; CERTIFICATE |
| v. | ) | OF SERVICE |
| | ) | |
| MICHAEL CHERTOFF, Secretary, | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

TRIAL BRIEF OF DEFENDANT MICHAEL CHERTOFF

Plaintiff Raymond Ware alleges that defendant discriminated

against him in connection with his employment as a screener

supervisor for the Transportation Security Administration

("TSA").  He brings this action pursuant to Title VII, 42 U.S.C.

§ 2000e-16, alleging race and retaliation discrimination.  His

First Amended Complaint ("Complaint") claims, among other things,

that he filed an EEO complaint alleging that TSA discriminated

against him on the basis of his race by not selecting him for a screening manager position in June 2003. After he filed an EEO complaint about these decisions in August 2003, he complains TSA discriminated against him on the basis of race and protected activity in a decision not to select him for a screening manager position later in August 2003. Assistant Federal Security Director (AFSD) Kenneth Kamahele decided to promote of three other screening supervisors instead of plaintiff. Federal Security Director Sidney Hayakawa concurred in the decision.

The evidence will show, in brief, that Kamahele did not promote plaintiff to screening manager because Kamahele believed that three other applicants had stronger records of supervisory experience, both prior to working at TSA and at TSA. In addition, Kamahele was aware that, unlike the successful applicants, plaintiff had a history of counselings, disciplinary reports and negative reports from supervisors. A screening manager is a position of considerable importance; the manager is responsible for running virtually all of TSA's security operations at the airport, including passenger screening, baggage screening, and liaison with state and private entities at the airport. All the counselings and reports concerned Ware's judgment and ability to work independently, crucial attributes for a screening manager.

Ware apparently will simply flatly deny that he was ever counseled by anyone about performance issues. Four individual managers, however, will testify with considerable specificity to such counselings.

STATEMENT OF FACTS

I.   THE TRANSPORTATION SECURITY ADMINISTRATION

In order to improve the security of the nation's aviation system following September 11, 2001, Congress passed the Aviation and Transportation Security Act, by which it created TSA and charged it with oversight of the nation's aviation security system. See Pub. L. No. 107-71, § 101, 115 Stat. 597, 597-604 (2001). Subsequently, Congress transferred TSA to the newly created United States Department of Homeland Security ("DHS"), whose primary mission is to "prevent terrorist attacks within the United States, . . . [and] reduce the vulnerability of the United States to terrorism." Homeland Security Act of 2002, Pub. L. 107-296, § 101(6)(1), 116 Stat. 2135, 2142 (2002).

Prior to the establishment of TSA, airport security was handled by a variety of contractor, airport and airline personnel. TSA began taking over (also called "federalizing" or "rolling out") airports across the country starting on April 30, 2002. TSA moved from east to west, starting with Baltimore-Washington International Airport. As the state farthest west, Hawaii's airports were among the last to be federalized.

TSA took two steps to control the federalization of hundreds of airports. First, TSA contracted with a corporation called NCS Pearson to test and hire new screeners and supervisors. Pearson accepted on-line applications, administered computerized tests to determine what job a given applicant was qualified for, and provided preliminary training. Second, TSA established a Mobile Screening Force (MSF; also called the National Screening Force), a group of trained screeners and supervisors. The MSF screeners provided both formal and on-the-job training and supervision to new screeners and supervisors.

II.  HONOLULU INTERNATIONAL AIRPORT

A.  Roll Out.

Honolulu International Airport (commonly referred to by its airport code, HNL) was federalized in September, 2002. Prior to that date, Akal Security company handled passenger screening at HNL. At midnight on the date of transfer, control of passenger screening shifted to the new TSA workforce. Hundreds of new TSA employees, most of whom had never worked together before, were required to get the airport up and running in time to process thousands of passengers over the course of the day.

The roll-out was initially a process of barely controlled chaos. Passenger wait times stretched to over an hour in the first week. Tempers frayed and stress was high. Supervisors worked long hours with no days off. Although over the course of

4

the first year of federalization management gradually brought
things under control, for the year prior to the nonpromotion
decision, TSA management had a challenging job coping with new
employees, systems and procedures, all in the atmosphere of
pressure and anxiety in wake of the September 11, 2001 terrorist
attacks.

      B.   <u>Chain of Command</u>.

      The chain of command at Honolulu started with Federal
Security Director (FSD) Sidney Hayakawa.  Below him was Assistant
FSD Kamahele.  Below the AFSD was the screening managers.  The
screening managers oversaw the screening supervisor's running of
the checkpoint, but is also responsible for numerous other TSA
functions at the airport, including at the gates, exit lanes,
baggage check-in and baggage claim, and for liaison with the
state (which owns the airport), the airlines, and airport law
enforcement.  Beneath the screening managers were the screening
supervisors, responsible for the minute by minute operation of
the checkpoint, including opening and closing.  Under the
screening supervisors came several dozen lead screeners, and
under them several hundred screeners.  In 2003 there were six
checkpoints at the airport: three in the overseas terminal, two
in the inter-island terminal, and one in the commuter terminal.

C.   <u>Ware's Career at TSA</u>.

Prior to joining TSA, Ware had limited supervisory experience.  He was a low-ranking police officer for a few years in Detroit and Texas, then spent three years as a screening supervisor for a private firm in Detroit before joining TSA's Mobile Screening Force.  He came to HNL in September of 2002 to help with the roll-out.

Ware began his career at HNL assigned to the commuter terminal, where he was supervised on occasion by Screening Manager Lizette Haneberg.  After a few months he was assigned to Checkpoint 5 in the Overseas terminal, where he was supervised by Screening Manager Robin Wong.  In July 2003 he was reassigned again, this time to the Hawaiian Checkpoint in the Interisland Terminal, where he was supervised first by acting Screening Manager Leo Ventura, then by Screening Manager Jose Abrante.[1]

All four of these screening managers expressed similar concerns about Ware's work.  Essentially, their concerns centered on his ability to make independent, common-sense decisions without need for help from screening managers.  Screening Manager Lizette Haneberg had raised numerous questions about his judgment

---

[1]   Ware will apparently contend that the original assignment to the commuter terminal and the two subsequent reassignments were made because he was black or because he complained about TSA decisions, and that each of the checkpoints was unsatisfactory for various reasons.  The evidence will show, however, that management reassigned him (as it did other supervisors) based on changing needs and in response to other personnel moves.

after incidents in which he had confiscated toy guns and other clearly non-threatening items despite being counseled by Haneberg and others that TSA policy did not require confiscation.  Other supervisors had virtually identical conversations with him about such items.  Jose Abrante also counseled Ware about his confiscation practices.  Screening Manager Ventura (who was an acting Screening Manager before being promoted in August 2003) counseled him about indecisiveness; Ware repeatedly called Ventura for advice about confiscating items on which TSA policy was clear.  Wong counseled Ware about at least two incidents.  In one, another screener accused Ware of taking a sweater. Defendant has never contended that plaintiff actually stole the sweater (he would have been fired if he had).  Rather, screening manager Wong will testify that Ware himself reported to Wong an allegation from screener Talbot that Ware had stolen a sweater. Ware told Wong that the sweater had been left at the checkpoint, that a law enforcement officer who he tried to give the sweater to would not take it to lost and found, and that he therefore left the sweater in the men's bathroom.  Talbot never pursued his allegation that Ware stole the sweater, and neither Wong nor any other manager made any finding against Ware or took any action against him for theft.  Wong will testify, however, that Ware admitted responsibility for making an incorrect decision.

The second incident in which Wong counseled Ware concerned a complaint from an Akal Security dispatcher, Johnelle Chun, about Ware's handling of a report of an abandoned bag at baggage claim. Chun (who will also testify) says that Ware seemed unaware of the proper procedures, seemed flustered, and treated her rudely in the course of the incident.[2]

None of these incidents, in isolation, was particularly serious. Taken together, however, they formed enough of a pattern to give rise to concerns on the part of Kamahele and others regarding his judgment and his readiness to take on more responsibility.

Ware was by no means a poor employee. Many of his supervisors thought well of many of his skills, particularly his reliability and his leadership of screeners. Jose Abrante wrote a very favorable evaluation of Ware in October 2003 (after the promotion decision) reflecting these opinions.

---

[2]  Plaintiff will apparently make much of the fact that many of the counselings were oral, not written, and that they were not reduced to writing until after he accused management of racism in connection with the nonpromotion. Plaintiff himself concedes, however, that there is nothing wrong with oral counselings for relatively minor performance problems. There was no reason to document the counseling until Ware accused his superiors of wrongdoing. The documentation that was created at that point was clearly and accurately dated to reflect that the counseling had occurred weeks or months before.

D.    <u>The June Non-Promotion Decision</u>.

Kamahele did not select Mr. Ware for a Screening Manager position in June 2003 because Kamahele did not consider any full-time TSA employee for the June 2003 vacancies. Kamahele did not believe that any full-time TSA employee would want to sacrifice their career position for a temporary position that could have been eliminated at any time. Because Mr. Ware was a full-time TSA employee and a supervisor, Kamahele did not consider him for filling any of the temporary positions in June 2003. The court has granted summary judgment to defendant on this issue, finding no evidence of discriminatory intent. At trial of this matter the court should allow limited evidence -- the fact that Ware was not promoted, the fact that Kamahele did not consider any current employee, and the fact that Ware filed an EEO complaint – but should not allow a full mini-trial on the issue.

E.    <u>The August 2003 Nonpromotion Decision</u>.

The Screening Manager positions that Kamahele filled in August 2003 were full-time career positions. Kamahele considered Mr. Ware for these positions, but did not select him for any of the vacancies because Kamahele did not consider him among the most qualified applicants for the position. Kamahele based his decision upon his review of each application and his knowledge of each applicant's work history with TSA. Kamahele's review of Ware's disciplinary record and work performance indicated that

Mr. Ware was not prepared to become a Screening Manager.  At the time that Kamahele made his decision, Kamahele was aware that several of Mr. Ware's supervisors believed he exhibited poor decision making and that he had a weak grasp of standard operating procedures.  None of the individuals selected for the Screening Manager position – Jose Abrante, Charles DuBoyce, and Leo Ventura – had a similar history of supervisor concerns and write-ups.  All three had more impressive backgrounds than Ware.  Abrante had been a criminal investigator supervisor (E-7) for the Marine Corps for twenty years, including several years at Kaneohe Marine Corps Base in Hawaii where he had extensive supervisory experience.  DuBoyce had been with the Honolulu Police Department for 25 years, rising to sergeant, before taking a position with Akal Security overseeing security at HNL.  Ventura was a command sergeant major in the National Guard; he had also managed a cargo shipping firm before joining TSA.  On joining the TSA Mobile Screening Force he had helped roll out operations in Baltimore, LaGuardia, Atlanta, Chicago, and Missoula before returning to Hawaii.

Although Kamahele did think that Mr. Ware was African-American, it did not influence his decision making.  Indeed, at the time that Kamahele made these selections, Kamahele thought that one of the selected candidates, Jose Abrante, was African-American.  It was only later that Kamahele came to understand

10

that Mr. Abrante was Hispanic, not African-American.  Plaintiff
also believed Abrante to be African-American.

    The fact that Ware had mailed an EEO complaint to TSA on the
mainland on August 19, 2003, played no role in the nonpromotion
decision.  Kamahele was unaware of the complaint at the time he
made the decision later in the month.  Management's first
awareness of any protected activity arose when Ware spoke to
Hayakawa after he learned of the nonpromotion and said that he
thought the decision was racially motivated.

                          LEGAL STANDARDS

    The Title VII provision applicable to federal employees
provides that "[a]ll personnel actions affecting employees ...
shall be made free from any discrimination based on race, color,
religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).
"Liability in a disparate treatment case 'depends on whether the
protected trait [national origin, race, and gender] actually
motivated the employer's decision.'"  Raytheon Company v.
Hernandez, 124 S.Ct. 513, (2003) (quoting Hazen Paper Co. v.
Biggins, 507 U.S. 604, 610 (1993).  Accordingly, this race and
national-origin termination claim can be analyzed with the three
part burden shifting scheme first enunciated in McDonnell Douglas
v. Green, 411 U.S. 792 (1973).  In keeping with this scheme,
plaintiff has the initial burden to establish a prima facie case
of discrimination.  Id.  The plaintiff can satisfy his initial

                               11

burden by "presenting facts which, if unexplained, reasonably give rise to an inference of discrimination." <u>Petty</u> at 22.  In a retaliation case, to establish a <u>prima facie</u> case, a plaintiff must show that the defendants knew of his protected activity in order show causation.  <u>Raad v. Fairbanks N. Star Borough Sch. Dist.</u>, 323 F.3d 1185, 1197 (9th Cir. 2003).  Without such evidence, plaintiff could not create a genuine issue of material fact to prevent the issuance of summary judgment.  <u>Id.</u>  This court cited to <u>Raad</u> in <u>Sherrell v. Navy</u>, 2007 WL 61058 (D. Haw. Jan. 8, 2007), and also held that there must be evidence that the alleged discriminating officials had knowledge of the plaintiff's prior EEO activity in order to set forth a prima facie case of retaliation.

If plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for taking the action.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  The burden on the employer is one of production rather than proof or persuasion.  <u>Burdine</u>, 450 U.S. at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons").

If a defendant successfully provides a nondiscriminatory reason for an employment action, the presumption of discrimination disappears and the plaintiff must show that the

12

articulated nondiscriminatory rationale is pretext.  This means the plaintiff must show by a preponderance of the evidence that the proffered explanation is false and that "discrimination was the real reason" for the adverse employment action.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).  Plaintiff's evidence "must be both specific and substantial." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054 at 1062 (9th Cir. 2002) citing Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998).  Under McDonnell Douglas, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  Id. citing Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 142-43 (2000).  The trier of fact cannot find that an employer has discriminated against an employee merely because the employer or an adjudicator would have preferred that the employer conduct its business differently.  Furnco Construction Corp. v. Waters, 438 U.S. 567, 580 (1978).  To determine whether a proffered explanation for a personnel action is a pretext for discrimination, the jury should not inquire into whether the explanation was objectively incorrect, but whether an employer honestly believed its reasons for its actions, "even if its reason is 'foolish or trivial or even baseless.'"  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002).  In short, the defendant may make its decision for a good reason, a

13

bad reason, or for no reason at all, as long as its actions are not taken for discriminatory reasons.  See Local 28, Sheet Metal Workers v. EEOC, 478 U.S. 421, 462 (1980).

Where the plaintiff contends that discriminatory intent is apparent from his assertion that he was more qualified than the person selected for hiring or promotion, he must present objective evidence of clearly superior qualifications.  "The closer the qualifications of the candidates, the less weight the court should give to perceived differences in qualifications in deciding whether the proffered explanations were pretextual." Odima v. Westin Tucson Hotel Co.,991 F.2d 595, 602 (9th Cir. 1993).  Plaintiff's own assertion of superior qualifications is insufficient without additional evidence.  Blue v. Widnall, 162 F.3d 541, 546 (9th Cir. 1998).

## PROBABLE OUTCOME OF TRIAL

Here, plaintiff will be unable to set forth a prima facie case of discrimination.  Plaintiff will be unable to show substantial evidence of discriminatory motive in race or in retaliation for the nonpromotion decision.  Kamahele promoted one candidate he and plaintiff both thought to be African-American, and he was unaware of plaintiff's EEO complaint when he made his decision.  Accordingly, defendant will be entitled to a directed verdict.

14

If plaintiff does succeed in getting on or the other claim to the jury,[3] he is unlikely to prevail under the facts set forth above.  Defendant's witnesses will present a credible, consistent and coherent account of the reasons for the nonpromotion. Accordingly, one way or another, a defense verdict is the likely outcome of this matter.

POTENTIAL LEGAL AND EVIDENTIARY ISSUES

A.    Admissibility of Out of Court Statements in a
      Discrimination Action.

Defendant's decision not to promote plaintiff, as described in the Statement of Facts above, was a collaborative effort, involving input from a variety of managers.  The key issue in a discrimination case is whether these decision-makers were motivated by a discriminatory animus.  The inquiry into the state of mind of these decision-makers requires the trier of fact to consider out-of-court statements made to them.  This issue is the subject of a separate motion in limine filed by plaintiff.

Conversely, the state of mind of the plaintiff is irrelevant to any matter at issue in this case.  Many discrimination plaintiffs seem tempted to go well outside their personal

---

[3]  The McDonnell-Douglas test is not part of the jury's charge or the verdict form.  Costa v. Desert Palace, Inc., 299 F.3d 838, 855 (9th Cir.2002) (en banc), aff'd by 539 U.S. 90 (2003) ("It is not normally appropriate to introduce the McDonnell Douglas burden-shifting framework to the jury").  Instead, the jury should consider only the ultimate issue of whether plaintiff has proven discriminatory intent.

knowledge to testify about personnel matters in which they were
not involved, or to speculate about the motivations and states of
mind of the decision-makers.[4]  Appropriate hearsay objections or
other foundational objections to such testimony should be
sustained.

B.    <u>Plaintiff's Assertions Regarding Other
      Personnel Actions or Evidence Covered by Rule
      608</u>

Defendant has filed a motion <u>in limine</u> regarding any attempt
plaintiff may make to introduce evidence regarding personnel
actions that did not involve him, and regarding collateral
attacks on the credibility and character of government decision-
makers.  As set forth in that motion, at this point defendant
does not seek to exclude such evidence, because defendant has no
way of knowing what evidence plaintiff may attempt to introduce
along these lines.  Rather, defendant seeks a detailed proffer
from plaintiff so that defendant and the court may conduct the
appropriate analysis under Rules 401 through 403 and 608 of the
Federal Rules of Evidence.

<u>CONCLUSION</u>

Defendant will show that its supervisors were motivated by a
desire to protect the flying public and to serve the country, not

---

[4]  The question "Why do you think you were discriminated
against?", for example, is a broad invitation to plaintiff to
present hearsay, speculation and other matters outside his
personal knowledge.

16

to indulge in personal vendettas against African Americans or persons who filed EEO complaints.  Defendant fully expects that either the court will direct a defense verdict at the close of plaintiff's case, or that the jury will return a defense verdict on plaintiff's race and color discrimination claims.

        DATED: January 23, 2008, at Honolulu, Hawaii.

                                EDWARD H. KUBO, JR.
                                United States Attorney
                                District of Hawaii


                                    /s/ Thomas A. Helper
                                By _____
                                    THOMAS A. HELPER
                                    Assistant U.S. Attorney

                                Attorneys for Defendant

17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RAYMOND WARE, | ) | CIVIL NO. 04-00671 HG LEK |
| | ) | |
| Plaintiff, | ) | CERTIFICATE OF SERVICE |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL CHERTOFF, Secretary, | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that, on the date and by the method of
service noted below, a true and correct copy of the foregoing was
served on the following at their last known address:

        Served Electronically through CM/ECF:

        Daphne E. Barbee                January 23, 2008
        desekmet@aloha.net

    DATED: January 23, 2008, at Honolulu, Hawaii.


                                /s/ Coleen Tasaka-Shoda
                                _____