Exhibit   No.   3



U.S. Department of
Homeland Security

Transportation
Security
Administration

Date:     July 26, 2006

To:       Kenneth Kamahele
          Assistant Federal Security Director (Screening)
          Honolulu International Airport

From:     Dennis Clark
          Western Area Director

Subject:  Decision on Notice of Proposed Removal

Ref:      601320/WE/HNL/JP

On April 6, 2006, the Transportation Security Administration (TSA) Professional Review Board (PRB) issued you a notice of proposed removal from the federal service. You provided a written reply to the proposal dated May 10, 2006. I considered all the information of record in this matter, including your written reply. Based on my review, I have decided to sustain the proposed removal to promote the efficiency of the service.

My findings on the reasons and specifications set forth in your proposal notice are as follows:

**Reason 1: Inappropriate Conduct Towards TSA Employees**

> Specification 1: The Management Inquiry[1] (MI) Report, dated October 21, 2005, contains witness information that you possessed a supply of "Jack-in-the-Box" job application forms to be offered to Honolulu International Airport (HNL) screeners who raised issues or concerns related to their TSA employment.
>
> During the inquiry, when asked about the "Jack-in-the-Box" applications, you denied ever having them or suggesting that employees seek a job at a fast food restaurant if they did not like their TSA job. You added that you recalled seeing "Jack-in-the-Box" applications in office space on the 7th floor of the administration building in a section occupied by U.S. Customs.

---

[1] Interviews for the Management Inquiry conducted at Honolulu, Hawaii were held during the summer and fall of 2005.

EXHIBIT
4(B)

1

EXHIBIT
47

In your written reply, you stated that these applications were discussed in Screening Managers' meetings in a joking manner, and that they were in a pile of papers on a table in your work area. You contended that the table with the applications was not assigned to you and that it was away from your workstation. You accused witnesses Program Analyst Cheryl Enoka and Screening Manager (SM) Christi Cagasan of lying about you having the Jack-in-the-Box applications, and claimed these incidents happened three years ago. You questioned why they were being raised now, and argued that, since no one had raised any concerns in the interim that the obvious answer was that they never happened.

You provided no basis for your accusation that Ms. Enoka or Ms. Cagasan would lie about your possession of the applications. You also failed to address the testimony of the other witnesses who stated that you possessed and used the Jack-in-the-Box applications to threaten and intimidate subordinates. Offering Jack-in-the-Box applications to employees who came forward to raise concerns completely contradicts TSA's vision of a model workplace. You argued that prior to the MI, no one ever complained about this conduct; therefore the events must not have occurred. I believe that this behavior only came to light during the MI, as your intimidation of HNL employees would have had a chilling effect on anyone coming forward, unsolicited, to complain about your behavior. Further, while the applications may have been on an unassigned table, you stated in your reply that they were among a pile of papers that included all of your correspondence, mail, hard copy emails, etc. It is clear that they were included with documents that belonged to you, and were, therefore, in your possession. Equally convincing is that in your written reply you stated that you were given the Jack-in-the-Box applications by SM Kaonohi; therefore it is clear that you had them in your possession and you admitted to referencing the applications during discussions with subordinates about personnel problems.

Based upon the above, Reason 1, Specification 1 is sustained.

Specification 2: While conducting a staff meeting in late 2003 which included Screening Managers and Acting Screening Managers, you stated that if things didn't "start improving here, I know who to get rid of." While making this statement, you pointed your finger at various individuals in a manner simulating a gun. Your statements were heard by SM Lance Kaonohi.

Specification 3: LTSS Earl Yamasaki and former TSS Lauren McMillan have stated that you used your hand to simulate a gun and that you made statements such as "I will pick off those of you that are becoming a problem," and "I'm loading bullets into a gun, and when I fire, I want to make sure they all come out." These actions and statements were made in various meetings at various times.

You denied ever using your finger and hand to simulate a gun.

In your written response, you addressed both of these specifications concurrently. You claimed that you only pointed your right index finger at an employee to give him or

2

her the floor during your meetings with Screening Managers. You accused Mr. Kaonohi of lying, stating that he had a grudge against you because you had demoted him.

In your reply to Reason 3, Specification 3, you referred to the statements of Mr. Yamasaki or Ms. McMillan concerning your actions in simulating a gun with your hand. You questioned their accounts for, among other things, the lack of a sworn statement. I understand that it is your assertion that your habit of pointing at meeting participants to give them the floor was misinterpreted. Based on the witness statements that link the alleged intimidating gesture with intimidating statements, I do not find that argument credible.

Based upon the above, Reason 1, Specifications 2 and 3 are sustained.

> Specification 4: According to Lead TSS (LTSS) Janet Thompson, just before the start of her May 2005 panel interview for a STSS position, you entered the interview room and stated that you would be observing her interview and that your presence would have no effect on the interview. You then remained behind her for about ten (10) minutes before leaving the room. You were not a member of the panel, and your presence made LTSS Thompson very nervous. LTSS Thompson spoke with Deputy Assistant Federal Security Director for Screening (DAFSD-S) William Gulledge approximately two (2) weeks after her interview and told him how she felt. DAFSD Gulledge then informed LTSS Thompson that she would get another interview.

In your written response, you stated that you are a large Polynesian man, and that your "race, physical stature and demeanor may form the perception in some that he is intimidating." You further stated that the use of these factors by TSA would be legally impermissible, and argued that these factors formed the core of this specification.

Your conduct was the basis for the specification. I believe that you raised the issue of race to deflect attention from your behavior. A panel was conducting interviews for a STSS position. You were not a member of the panel and had no official reason to be in the room while the process was underway. You were only present for the interview of one employee, LTSS Thompson. Even if you had a reason to be present, you should not have positioned yourself behind the employee as you did. You stated that you left the room because you "felt uncomfortable," however you also stated that you "did not feel as though the candidate was intimidated." Even so, you "instructed DAFSD-S Gulledge to give the candidate another interview, another chance." You failed to explain why you gave this direction to Mr. Gulledge if you thought that you had not intimidated Ms. Thompson. While allowing the employee to have another interview was a positive act, your actions in the interview room were contrary to TSA model workplace values and will not be condoned.

Reason 1, Specification 4 is sustained.

3

> Specification 5: On or about July 7, 2005, you counseled TSS Melvin Ross, along with another employee, for allegedly bullying a fellow screener. According to TSS Ross, during that meeting you referred to him by several derogatory terms, including "punk," "bully" and "scum." He also said that you indicated that if you had a chance, you would put him in a Federal prison. Additionally, he said that when he tried to explain himself to you, all you did was pretend to play an air violin, cut him off, and tell him that you had heard it all before.

In your written response you stated that you require strict adherence to the rules. You claimed that under Hawaiian law, battery is punishable by a fine and/or imprisonment, and that Mr. Ross had committed battery to a fellow employee. You alleged that the battery was part of a pattern and practice of harassment by Mr. Ross. You maintain that you handled the situation properly and would have been entirely justified in imposing "far more severe sanctions than the tongue lashing" you administered.

There is no argument that corrective action was appropriate in the situation involving TSS Ross. The problem was the way you administered the corrective action. You were threatening, derogatory, dismissive and rude. Your statement confirms the basic facts of the incident.

Based upon the above, Reason 1, Specification 5 is sustained. Therefore, I find that Reason 1 in its entirety is sustained by a preponderance of the evidence.

Reason 2: Poor Judgment

> Specification 1: In June 2005, you told Administrative Officer (AO) Christine Hansen a story about a practice used by members of organized crime in Hawaii. According to AO Hansen, you told her that they would murder their adversaries and snitches and then feed the body parts to local pigs. You told her that based on your knowledge of this practice you never eat pork, because you never know whether the pig ate a human before being slaughter for food. At the time you told this story, AO Hansen was eating a pork sandwich for lunch.

In your statement you indicated that you remembered saying, in passing, that there was a story in the local news indicating that an owner of a pig farm was arrested for feeding human body parts to the pigs. You denied that you had a reason to tell the story or that you spoke with AO Hansen about it the following day. The preponderance of the evidence supports that you told some version of the story to AO Hansen. I believe telling the story to someone eating pork was distasteful, but I do not find that your actions constitute poor judgment requiring corrective action. Therefore, I am not sustaining Specification 1 of Reason 2.

4

Specification 2: In 2003, you were authorized to hire six (6) SMs on temporary two (2) year not to exceed (NTE) appointments. You filled the positions from outside TSA. You recruited individuals who were previously employed with either the Police Department or the local airport security authority (AKAL), both places that you had been employed. No current TSA employees were considered for the positions.

In your written response you stated that at the time these positions were filled there was a critical need. You stated that the decision to fill them with two year not-to-exceed appointments was an approach offered and used by Headquarters. You also stated that you did not make the hiring decisions on your own, and that your supervisors agreed with this approach.

The ability for an airport to use two-year NTE appointments to fill critical need positions was not in dispute. The conduct at issue was your decision to not allow anyone in the TSA workforce the opportunity to compete for the positions. In the MI you stated that "you did not feel that an individual who had a permanent position would be interested in a NTE appointment." When asked if that was a decision that should be left to the individual, you stated "[i]n retrospect, yes" but at that time it had not entered your mind. I agree that current employees should be given the opportunity to apply for any position they are qualified to fill, even if the position is on a time limited appointment. However, since your supervisors were aware of and appear to have condoned your actions, I am not sustaining Reason 2, Specification 2.

I find that Reason 2 is not sustained.

Reason 3: Lack of Candor During a Management Inquiry

Specification 1: During the course of the Management Inquiry, the team learned that "Screener Inquiry" forms were the primary mechanism used by the screening workforce to communicate concerns and requests. You advised the Inquiry Team that you had the primary responsibility to review these forms and did so routinely. When questioned, you stated that you were not aware of any concerns of your staff regarding scheduling or promotions. That was puzzling in that the Inquiry Team determined that 41 percent of their communications with the screening workforce involved complaints about scheduling, including allegations of favoritism and retaliation. The complaints shared with the inquiry team relating to the promotion processes totaled 39 percent. Despite your assertion that you reviewed all Screener Inquiry forms twice a week and resolved or had some degree of closure in a timely manner to the issues raised, it is evident that you failed to be responsive to a significant number of concerns.

In your written response you claimed that the management inquiry report specifically stated that you delegated review of the screener inquiry forms to the "various departments including, but not limited to, Scheduling, Human Resources, and Screening." You further stated that you did not personally review the forms on a routine

5

basis. I believe that your statements on this matter are, at a minimum, inconsistent. However, since documentary evidence in the form of copies of the Screener Inquiry forms was not a part of the information relied upon in the proposal; I am not sustaining Reason 3, Specification 1.

> Specification 2: Several witness including Aviation Security Inspector (ASI) Joseph Collins, Supervisory Transportation Security Screener Elaine Matsuda, and Program Analyst (PA) Cheryl Enoka stated that they had seen "Jack-in-the-Box" applications on your desk. Additionally, ASI Collins stated that he had witnessed you on multiple occasions telling Screening Managers (SM) that if they had a problem with a screener they should give them one of the "Jack-in-the-Box" applications. In her August 17, 2005 MI interview, SM Christi Cagasan stated that she once overhead you "tell a screener to write down their concern on a Jack-in-the-Box application." Cargo ASI Mitchell Monez told the MI team that when he was a SM he saw the Jack-in-the-Box applications on the corner of your desk and that in meetings with the SMs you told everyone that if a screener brought up a screening issue that employee should be brought to your office for a Jack-in-the-Box application. PA Enoka, in her August 26, 2005 interview, indicated that she had witnessed you tell screeners with complaints, "If you don't like it, then here" while handing them a "Jack-in-the-Box" application.

In the MI you denied ever having the "Jack-in-the-Box applications or suggesting that employees seek a job at a fast food restaurant if they did not like their TSA job. You added that you recalled seeing the "Jack-in-the-Box" applications in office space on the 7th floor of the administration building in a section occupied by U.S. Customs. In your written response to the proposed removal, you argued that you answered truthfully in the negative when asked if you had the Jack-in-the-Box applications in your possession. You stated that only two witness statements conflicted with your testimony. The evidence is that there were more than two witnesses who stated that you had the applications and made references to using them. You contended that other witnesses may have misinterpreted your jokes about the applications, or their testimony was misinterpreted by the investigators.

In your written reply, you also admitted that you had these applications in a stack of papers in your work area. Although you claimed that the table on which they were located was not assigned to you, you stated that the applications were included with documents that were clearly yours. Additionally, you stated that SM Kaonohi gave you the Jack-in-the-Box applications and that when you moved office space from the 7th floor to the 4th floor you went through a pile of paperwork on the table and "found the applications and tore them up and threw them away." This contradicts your assertion that you answered truthfully when you claimed that you did not possess the applications. According to the MI summary of your interview, you were asked if you "ever kept" applications for employment at "Jack-in-the-Box" in your office desk. You therefore knew, or should have known, that you were not being asked if you possessed any applications only at the time of the interview. I find your selective response to the questions demonstrates a lack of candor. The preponderance of the evidence establishes

6

that you had these applications in your possession while you were serving as the AFSD-S, and that you knew or should have known that the management inquiry team's question was not limited to the day of the interview. Your initial response is also inconsistent with the information in your reply indicating that you did have the applications.

Based upon the above, Specification 2 is sustained.

> Specification 3: LTSS Earl Yamasaki and former TSS Lauren McMillan have stated that you used your hand to simulate a gun and that you made statements such as "I will pick off those of you that are becoming a problem," and "I'm loading bullets into a gun, and when I fire, I want to make sure they all come out." These actions and statements were made in various meetings at various times.
>
> Your statement denying that you ever used your finger and hand to simulate firing a gun at your subordinates lacks candor.

In your written response you again claimed that two witnesses were not telling the truth. You questioned how they could recall gestures that were made more than two years ago, and attributed your denial to your belief that you were being asked about misconduct that occurred during a recent town hall meeting. You challenged the validity of the witness statements because they were not sworn to under oath. Finally, you argued that the management inquiry report was false, unsupported and resulted from a biased and improperly conducted investigation.

I note that you repeated your denial of making the gesture with your fingers and hand, but you were silent regarding the comments that accompanied your gestures. I do not find it implausible that witnesses would be able to recall such vivid images as much as two years later, nor do I find their statements less credible merely because they were not made under oath. I believe the evidence supports a conclusion that your behavior was of such a nature that the statements and gestures attributed to you are accurate. I also believe you were well aware of your actions and the impact they had on those to whom they were addressed.

Based upon the above, Specification 3 is sustained. I find that Reason 3, by Specifications 1 and 3, is sustained by a preponderance of the evidence.

Misconduct as described in the Reasons and Specifications above is serious and will not be tolerated. TSA is committed to establishing and promoting a model workplace that values communication, mutual respect, team building and trust so that we can provide excellence in customer service and security. This commitment must be demonstrated by our managers promoting and modeling these values. Your intimidating and demeaning behavior toward other TSA employees is not the standard of conduct TSA expects from its managerial staff, particularly its senior management at the airport. Your conduct has created an atmosphere at HNL completely contrary to the model workplace values TSA is striving to instill in all its employees.

7

Your conduct violates the basic standards for employee behavior contained in Human Resources Management (HRM) Letter 735-1, TSA's Interim Policy on Employee Responsibilities and Conduct. For example, HRM Letter 735-1 states that all TSA employees must "[e]xercise courtesy and tact in dealing with fellow workers, supervisors, contract personnel and the public" and "[s]upport and assist in creating a productive and hospitable model work environment." HRM 735-1, Section 2(d). Additionally, Section 2.h. requires all employees to "[o]bserve and abide by all laws, rules, regulations and other authoritative policies and guidance, written and unwritten." As a supervisor you have the added responsibility to "[p]rovide positive leadership and serve as a role model for subordinates by demonstrating a commitment and sense of responsibility to your position and loyalty to the organization," and to "treat employees with dignity and respect" and communicate to your staff that even the appearance of harassment will not be tolerated. Sections 3.d. and 3.e. Section 17.b. stated that "[m]anagers and supervisors are responsible for ensuring a hospitable workplace free of discrimination, intimidation, and other offensive behaviors." Your actions were contrary to those standards of conduct and demonstrate a lack of professionalism and disregard for your responsibility as a manager to set a positive example for your subordinates.

In determining an appropriate penalty, I considered a number of factors including the nature and seriousness of the offenses, the nature of your position, the length of your federal service, your past disciplinary record and your ability to be rehabilitated. As a senior management official, you are held to a high standard of conduct. You are expected to proactively and effectively lead the workforce in accomplishing TSA's mission. You are required to ensure that TSA policies and directives are being followed and that you are serving as a positive example for your staff. Overall, you have failed to demonstrate the positive leadership qualities (skills) that are essential to your position. Your management style and behavior have resulted in a fearful and intimidated workforce. You have shown little or no remorse for your behavior. Your conduct as a manager is totally unacceptable and I no longer trust that you can satisfactorily perform the duties of your position. You do not understand the importance of your position in the organization or the impact of your behavior on your subordinates.

Your behavior as sustained in either Reason 1 or Reason 3 standing on its own is sufficient to warrant your removal. The fact that you failed to take responsibility for your demeaning and intimidating behavior, and attempted to cover it up or to minimize it, further bolsters my determination that you cannot successfully carry out your TSA duties and that a lesser penalty would not result in your being rehabilitated.

This is a final decision. Your removal will be effective August 2, 2006. You have the right to appeal this decision to the Merit Systems Protection Board (MSPB). If you elect to file an appeal with the MSPB, your appeal must be filed within thirty (30) days of the effective date of this action or within thirty (30) days of the date of this letter, whichever is later. The MSPB regulations are available on its website, www.MSPB.gov. You may

use the appeal form attached to this letter, or file on-line. Your appeal should be sent to the following address:

> Amy Dunning
> Regional Director and
> Chief Administrative Judge
> 250 Montgomery Street
> Suite 400, 4th Floor
> San Francisco, CA 94104-3401
>
> (415) 705-2935
> FAX (415) 705-2945
> sanfrancisco@mspb.gov

Please sign the acknowledgement of receipt below. Your signature does not indicate agreement with this action; it only represents receipt of this notice on the date signed.

_____   7/26/06
Dennis Clark                Date
Western Area Director


Acknowledgment of Receipt:

_____   7-31-06
Kenneth Kamahele            Date:


Delivery Information:

_____   7/31/06
Hand Delivered By (name/signature)   Date

9