# EXHIBIT "C"

107 LRP 55880

## Kenneth K. Kamahele, Appellant, v. Department of Homeland Security, Agency

### U.S. Merit Systems Protection Board, Western Regional Office

SF-0752-06-0866-I-1

### July 31, 2007

**Judge / Administrative Officer**

Craig A. Berg

## Full Text

APPEARANCES:

William McCorriston, Esquire, Honolulu, Hawaii, for the appellant.

Eileen Dizon Calaguas, Esquire, San Bruno, California, for the agency.

### Initial Decision

### Introduction

On August 29, 2006, the appellant filed a petition, through counsel, appealing the agency's action removing him from the position of Assistant Federal Security Director-Screening (AFSD-Screening), Honolulu International Airport (HNL), Transportation Security Administration (TSA), effective August 2, 2006. Initial Appeal File (IAF), Tab 1. The Board has jurisdiction over this appeal under the agency's modification to its personnel system in Management Directive No. 1100.75-3, Addressing Performance and Conduct Problems. *Id.,* Tab 5 (hereafter Agency File or AF), Subtab 4K; 49 U.S.C. § 40122(g)(2). A hearing was held in this appeal on February 15-16, and March 1-2, 2007.[1] For the reasons discussed below, the agency's action is MITIGATED to a 90-day suspension.

### Analysis and Findings

### Background

The appellant was employed as a Police Officer with the Honolulu Police Department from approximately 1968 to 1992. Subsequently, he was employed by contractors, including AKAL Security, who were tasked with security and screening at HNL. In August, 2002, after TSA was created, the appellant was hired as the AFSD-Screening. His first-level supervisor was Stanford Miyamoto, and his second-level supervisor was Sidney Hayakawa, Deputy FSD and FSD, respectively, at HNL. In descending order in the hierarchy, under the appellant were the Screening Managers, then Screening Supervisors, Lead Screeners, and Screeners. The appellant, and others hired by the agency at its inception, worked long hours to meet the December, 2002 deadline for TSA to take over security and screening functions at HNL. The appellant was responsible for hiring the work force and overseeing the screening operation.

In the middle of July, 2005, Hayakawa notified the TSA Office of Internal Affairs and Professional Responsibility (OIAPR) in San Bruno, California of a number of allegations of misconduct against TSA management at HNL, including claims of a hostile work environment and time and attendance issues. OIAPR informed Hayakawa that the matters did not warrant OIAPR involvement, and suggested that they be investigated by a management team. In mid-August, 2005, TSA formed a team and tasked it with performing a Management Assist (MA); the TSA managers and administrators who comprised the team went from their duty stations to HNL to conduct the MA. After several days, at the suggestion of the team members, management determined that a Management Inquiry (MI) was necessary, and an MI was conducted in late summer/early fall, 2005. The MI team conducted over 200 interviews and, at the conclusion of the inquiry, Lawrence Fetters, who was the MI team leader and held the position of FSD, Los Angeles International Airport, wrote an MI Report making findings with respect to a number of allegations of misconduct and also made a number of recommendations.

On April 6, 2006, Charles P. Kielkopf, the Board Chair of the TSA Professional Review Board (PRB),

EXHIBIT "C"

issued a letter on behalf of the PRB proposing the appellant's removal on three charges of misconduct, each with multiple specification. AF, Subtabs 4D (proposal), 4N (Management Directive establishing PRB). The appellant responded to the proposal in writing, *id.,* Subtab 4C, and on July 26, 2006, Dennis Clark, the Western Area Director, issued a decision sustaining two of the three charges and effecting the appellant's removal. *Id.,* Subtab 4B.[2] This appeal followed.

## The Charges

The agency has the burden to prove, by preponderant evidence, each of the two charges sustained by the deciding official. Proof of one specification under a given charge is sufficient to prove that charge. *See Crawford v. Department of the Treasury,* 56 M.S.P.R. 224, 231 (1994).

## Charge One: Inappropriate Conduct Towards TSA Employees

In order to prove Inappropriate Conduct Towards TSA Employees, the agency must prove that the conduct underlying each of the five specifications occurred, that the conduct was directed toward a TSA employee, and that the conduct was improper, unsuitable, or detracted from the appellant's reputation. AF, Subtab 4D; *see Otero v. U.S. Postal Service,* 73 M.S.P.R. 198, 201-205 (1997) (charge must be construed in light of accompanying specifications); *Miles v. Department of the Army,* 55 M.S.P.R. 633, 637 (1992) (discussing elements of a charge of conduct unbecoming a federal employee).[3]

## Specification One

In this specification, the agency charged the appellant with suggesting that Screening Managers offer employment applications to Jack-in-the-Box to screeners who complained or raised issues, and with offering such applications to screeners himself, under similar circumstances. AF, Subtab 4D.

At hearing, the agency called four witnesses in support of this specification, Cheryl Enoka, Elaine Matsuda, Laurie Provost, and Christi Cagasan, and

with the exception of Matsuda, the other three each testified in support of one specific incident in which the agency alleges that the appellant offered a Jack-in-the-Box application to an employee. Each of the three witnesses, however, testified about an incident distinct from the others, and Matsuda's testimony concerned the allegation that the appellant suggested to managers that Jack-in-the-Box applications be offered to screeners who complained.[4] In addition, a number of Screening Managers testified with respect to this specification.

## Evidence

Cheryl Enoka testified that she has been a Program Analyst for TSA at HNL for four years, and before that she worked for the Federal Aviation Administration. Feb 15 Tr. at 6. As Program Analyst, she is responsible for property, IT equipment, lease agreements, service contracts, government vehicles, and other programs. *Id.* In performing her duties, she was required to go to the 7th floor in the Main Terminal, which is the Command Post for emergencies. *Id.* at 7. Soon after TSA was created, they used some desk space on the 7th floor for several employees, including the appellant, Al Agor, and some schedulers. *Id.* at 7-8. She believes they were up there in 2003 and 2004, although she admitted that she rarely went up there. *Id.* at 8. Enoka recalled one occasion in March or April, 2003 when she was on the 7th floor to meet technicians who were installing telephone lines and the appellant was speaking to a Screener, also referred to as Transportation Security Officer (TSO). *Id.* at 9-10. As she approached the door, she heard the appellant say, If you don't like it, then just fill out one of these, and he motioned to a stack of papers next to him. *Id.* at 10-11. That was the only part of the discussion she heard, and she did not know the context of their discussion. *Id.* at 10-11.

Enoka testified that she was in the sliding doorway area at the time she heard the appellant's comment, and the appellant and Screener were not aware of her presence until she greeted them, at which point they acknowledged her and left. Feb. 16 Tr. at 12. Enoka described the room as containing long

Copyright © 2007 LRP Publications

*cyber*FEDS® Case Report

conference tables in the middle, with a table at the top forming a T. A work station with a cabinet and supplies is in the corner, a couple of feet from the T. *Id.* at 13-14. The appellant was sitting near the top of the T in a desk chair when he was talking to the Screener, and the Screener was standing to the appellant's left. *Id.* at 14-15. The only thing Enoka recalled about the Screener is that he was male. After the appellant and the Screener left, Enoka testified, she walked over to where the appellant had been sitting and saw that the paperwork the appellant had gestured toward was a stack of several employment applications to Jack-in-the-Box, on top of some other paperwork. *Id.* at 16-17. In her notes, Enoka wrote that the telephone lines on the 7th floor space, which is referred to as the Emergency Operations Center (EOC), were installed on April 25, 2003. *Id.* at 18-19; IAF, Tab 42, Exhibit 2. She confirmed that she was interviewed during the MI, and she noted that the Record of Interview memorializing that interview inaccurately indicates that she claimed the appellant had handed Jack-in-the-Box applications to multiple Screeners with complaints, when in fact she only saw the one incident with one Screener, and the appellant did not hand him the application, just pointed to it. *Id.* at 21; AF, Subtab 4H[5] at 125.

On cross-examination, Enoka testified that, after she was interviewed during the MI, she was not asked to review the statement she provided, nor was she given the chance to review its contents. Feb. 15 Tr. at 22. She may have touched the Jack-in-the-Box applications, but she did not pick them up. *Id.* at 23-24. She recalled that they were white, normal 8 by 11 sized. Enoka admitted that she was at the other end of the room when she heard the conversation, that there were three or four conference tables together between her and the appellant, that she was listening for about three seconds before she entered, and that the words were muffled. *Id.* at 26-28. She was not certain if the appellant picked up papers when he left. *Id.* at 28. She testified that there were other papers, possibly including TSA Management Directives and other forms used in screening operations on the same

table as the Jack-in-the-Box applications. *Id.* at 29-30. Enoka admitted that the appellant did not grab the Jack-in-the-Box applications at any time, that the Screener did not pick up the applications, and that she did not know if the other employee was an acting Screening Manager. *Id.* at 30.

Enoka further testified that, prior to her interview during the MI, someone else had talked to her about seeing Jack-in-the-Box applications, and although she could not recall anything specific, she did discuss the Jack-in-the-Box applications. Feb. 15 Tr. at 31. She was never told prior to her interview not to discuss the subject of the interview in the workplace, and she admitted she is not good with dimensions or dates. *Id.* at 31-32.

Elaine Matsuda testified that she is a Supervisor TSO, and that she reported to the appellant when she was an interim Screening Manager in March, 2003 for four months. Mar. 1 Tr. 53-54. During that period she attended meetings the appellant held every week at several different locations, including the 2nd and 7th floors, and the 3rd floor at the inter-island terminal. *Id.* at 54-55. She never heard the appellant make any references to Jack-in-the-Box applications at meetings on the 7th floor, nor did she see any applications there. *Id.* at 56. The appellant had an office on the 2nd floor, however, and she saw a pad of Jack-in-the-Box applications on the corner of his desk in that office. *Id.* at 68-69. She described the pad as white, thick, with glue that peels off at one end. *Id.* at 69. The appellant referred to them as applications for Jack-in-the-Box. *Id.* He would say that if the screeners were not happy with their job, or did not do as told, they could take one of those and go work at Jack-in-the-Box, while tapping the pad. *Id.* at 70. This occurred more than once, at screening meetings outside the appellant's 2nd floor office. *Id.* at 71-72. Matsuda testified that the appellant referred to Jack-in-the-Box verbally. The appellant made similar references at meetings on the 3rd floor of the inter-island terminal, while Matsuda was acting Screening Manager, after May, 2003. *Id.* at 74-75. When the appellant made these references, she did not

understand he was joking. *Id.* at 75-76. Matsuda wrote the letter contained in the MI, and she asserted that she had reviewed the Record of Conversation setting out her interview by the MI team, and she testified that it was accurate. *Id.* at 76; AF, Subtab 4H at 167, 811-814.

On cross-examination, Matsuda testified that, in 2003, if she witnessed inappropriate conduct, the only procedure for reporting it would be to verbally report it to her manager. Mar. 1 Tr. 78-79. She contended that she reported the appellant's references to Jack-in-the-Box applications to her manager, Miles Kasahara, and was unaware if he followed up. *Id.* at 81. Matsuda asserted that, after Kasahara did not do anything about it, she reported the appellant's actions to Mitch, another manager. *Id.* at 83-84. She did not further report the matter after Mitch failed to get back to her. *Id.* at 85.

Matsuda testified that she was interviewed by Alan Jones during the MI investigation on August 27, 2005, and that she told Jones that she saw the stack of applications on the appellant's desk in March, 2003. Mar. 1 Tr. 86. She believes she told Jones about the applications on the second floor, as they were having their meeting there in March, 2003. *Id.* at 86-87. During that time, there were meetings on the second and seventh floors in the overseas terminal. *Id.* at 88-89. Although she told the investigator that she saw the applications on the appellant's desk in March, 2003, she is positive that his desk was on the second floor at that time. *Id.* at 90-91. When the appellant pointed to the pad, he referred to it as Jack-in-the-Box applications, although she could not see them. *Id.* at 93-94. Matsuda initially denied it was done in a laughing manner, but then admitted that others laughed and she felt sort of pressured to laugh. *Id.* at 94-95. She continued to deny that she laughed at the appellant's reference to the Jack-in-the-Box applications, and although she admitted that she had written in her letter that we would laugh, she insisted she did not mean to include herself. *Id.* at 95-98; AF, Subtab 4H at 813. Matsuda testified that she took the appellant seriously when he suggested that they give

Jack-in-the-Box applications to Screeners, but she never gave any Screeners an application, and never would, nor was she aware of any other managers who gave employees the applications. *Id.* at 98-101. She never saw the appellant give any Screener or any Manager a Jack-in-the-Box application, nor did any Screener tell her that he or she had been given a Jack-in-the-Box application. *Id.* at 101.

Laurie Provost testified that she worked for TSA from 2002 to 2004 as a Mobile Screening Supervisor and an Acting Screening Supervisor, and that the appellant proposed her termination. Mar. 1 Tr. 125-26. In her Acting capacity, they held meetings that she attended about once a week, mostly on the seventh floor. *Id.* at 126. Provost testified that she recalls one occasion where the appellant made a reference to Jack-in-the-Box applications. She explained that she was at a meeting with other managers and a Filipino gentleman between 30 and 44 years old entered the room and was greeted by Christi Cagasan. *Id.* at 127. The man was tearful and agitated and Cagasan brought him over to the appellant, at which point the man asked for help with his scheduling, which he asserted was affecting his second job and his family. The appellant offered to help and asked the man to open a drawer in the corner of the room and remove a tablet. *Id.* at 127-28, 130. When the man did so, it was clear the tablet contained Jack-in-the-Box applications; the appellant told the man to fill one out and return it and he (the appellant) would turn it in for him. *Id.* at 128. Provost stated that she did not know who the man was, but he was a screener. *Id.* When she saw the pad, Provost was only two feet from it, and she clearly saw the Jack-in-the-Box logo. *Id.* at 131. The appellant was not laughing or joking at the time he told the man to fill out the application. *Id.* at 132. The man was embarrassed and then left the room. *Id.*

On cross-examination, Provost explained the circumstances of her removal, and admitted she felt she was unfairly treated by some TSA personnel. Mar. 1 Tr. at 133-36. Provost further admitted that she found out about the investigation after she left the

agency and offered to help by contacting an employee named Kathy Yee, and she sent an e-mail to Yee and Miyamoto making certain allegations and offering to provide additional information and evidence. *Id.* at 138-41; AF, Subtab 4H at 709 (August 16, 2005 e-mail). Her intention was to show that she had evidence of harassment and intimidation. Mar. 1 Tr. at 142-43. Provost admitted that she did not mention the incident in which the appellant allegedly offered the Jack-in-the-Box application to a screener in that e-mail. *Id.* at 144-45. She admitted that she had never made a written complaint about the incident prior to the time she was terminated, although she alleged that she discussed it with her peers. *Id.* at 149.

Provost testified that Screening Managers Lance Kaonohi, Lizette Haneberg, and an individual with the first name of Miles were at the meeting in question and were seated near the appellant. Mar. 1 Tr. at 149-50. She stated that the appellant, Kaonohi, Haneberg, and Miles should all recall the incident. *Id.* at 150. There was no one else at the meeting. *Id.* at 151. Provost explained that Cagasan was not in attendance at the meeting but was in the same room working in a cubicle when she brought the Screener over to the appellant. *Id.* at 152-53. Provost opined that Cagasan should recall the incident and she believes the incident occurred in 2003, in January or the first half of February. *Id.* at 154, 158. She never followed up or found out the name of the Screener, nor did she ask his supervisor, Miles, about the man's identity. *Id.* at 160.

Provost testified that she was interviewed during the MI by a woman, who was taking notes, and a man entered the room for part of the one hour interview. Mar. 1 Tr. at 161-62, 175-76. She claimed that she told the interviewers about the incident in which the appellant offered the Screener the Jack-in-the-Box applications, and she could not explain why her claim was not in their notes. *Id.* at 176-77, 182; *id.* at 172-74 (agency stipulation that the notes of the August 31, 2005 interview contain no reference to the incident); IAF, Tab 57 (appellant's amended exhibit HH). Provost stated that she spoke with Jones, the

investigator, subsequent to her interview and she mentioned that Mitch Vasquez was at the meeting, although she forgot to mention it previously while testifying. March 1 Tr. at 179-81. Provost stated that she was absolutely positive that the Jack-in-the-Box application during the incident in question was taken from a drawer. *Id.* at 185.

When asked why she did not complain about the incident at issue, Provost explained that she was newly assigned as an acting Manager at the time and did not want to make waves; she did not expect such conduct to occur on a continuous basis. Mar. 1 Tr. at 187.

The appellant testified that when he was hired, he had no dedicated office space, but then he was moved to an office on the 7th floor of the main terminal in October, 2002. Feb. 16 Tr. 156-57. It was a big room he shared with Al Agor, another employee. He described the room as 55 to 60 feet long and 20 to 25 feet wide. *Id.* at 158. He described the room and the furniture in it in detail, and drew a diagram. *Id.* at 158-59; IAF, Tab 53, Ex. TTT. At the bottom of the diagram is the glass door through which Enoka testified she entered, which was 12 to 25 feet from the first conference table, and was thick enough that one could not be heard through it. *Id.* at 160; Ex. TTT. The room was also the Emergency Operations Center for the state of Hawaii, and screener management meetings were held there on Wednesdays. Feb. 16 Tr. at 162.

Regarding the origins of the Jack-in-the-Box applications, the appellant testified that Kaonohi brought them to the 7th floor, and told the appellant he had obtained them from a Customs employee named Pat Burke. Feb. 16 Tr. at 162-63. The appellant put the applications on the T portion of the tables in the middle, and when he moved to the 4th floor he found them in another stack of papers on a utility table. *Id.* at 163-64; Ex. TTT. He contended that the applications were not the size of normal paper, but were 8.5 x 14 inches and blue. *Id.* at 164.

The appellant recalls Enoka coming into that 7th floor room twice, and he believes the time she

testified about was the second time, and that he was seated at the T in his diagram. Feb. 16 Tr. at 165. He was 50-55 feet from her when she entered. He cannot recall who he was with when she came in. *Id.* at 166. He asserted that it was unusual for a screener to be in that room, and he testified that, when she came up, he was not giving anyone a Jack-in-the-Box application, and he never did so. *Id.* at 167-68. The appellant stated that Enoka was mistaken about the size and color of the applications, and that they were never at his work station in the room. *Id.* at 168. When Enoka came up there were a lot of other papers in the area of the Jack-in-the-Box applications, including screening forms. *Id.* at 170.

The appellant alleges that the agency has never brought to his attention the name of any screener to whom he gave an application. Feb. 16 Tr. at 168. He admits that they joked about Jack-in-the-Box applications at the management meetings, but asserts that it was always meant as a joke, people laughed, and no one complained. *Id.* at 168-69. He could not recall if anyone ever suggested the applications be given to disgruntled screeners, and claimed that no screener or manager ever complained about anything related to Jack-in-the-Box applications. *Id.* at 169-70.

The appellant testified that he first heard about concerns regarding the applications in his interview with Jones and Douglas Rae during the MI. Feb. 16 Tr. at 171. The interview lasted 5 and 1/2 hours, and the first question about the applications was early in the interview. They asked if he had any applications in his possession. *Id.* at 171-72. By the time of the interview, he had moved to the 4th floor, and he had found the Jack-in-the-Box applications at the T on the 7th floor when he moved, at the bottom of a stack of papers, and had thrown them away. *Id.* at 172. The appellant claimed that he never saw the applications after he received them from Kaonohi until he moved to the 4th floor office, but when he was joking about them at meetings he was pointing to a stack of papers at the top of the T in which he believed the applications sat. *Id.* at 219-221. He admitted that Customs may have had dedicated space on the 7th

floor EOC. *Id.* at 221. In explaining the jokes regarding the applications at management meetings, the appellant testified they were joking that if screeners were unhappy they could go work at Jack-in-the-Box. *Id.* at 223. At hearing, he admitted it was inappropriate to joke that way. *Id.* at 224.

The appellant admitted that he has told managers, and maybe supervisors, at management meetings that if a screener was unhappy he or she could seek employment elsewhere. Mar. 1 Tr. at 18-20. He testified that he never made any references to Jack-in-the-Box or anywhere else that the Screeners could work when stating that. *Id.* at 19 He was not sure if he ever told anyone he had Jack-in-the-Box applications in his office, but he did have them up on the 7th floor. *Id.* at 20-21. He never kept them in any other office. *Id.* at 21.

Jocelyn Nakamura was the Administrative Officer in 2002 and was promoted in 2003 to Assistant Federal Security Director for Operations. Mar. 2 Tr. at 5-7. In the former job she had Human Resources functions, and retained those functions in the latter while also adding training and customer service. *Id.* at 7. The appellant was her largest internal customer, as he was in charge of over 700 employees. *Id.* at 8. It never came to her attention that any Screener made a complaint that the appellant had offered him/her a Jack-in-the-Box application. *Id.* at 9-10.

Nakamura was familiar with the appellant's 7th floor office and, referring to the diagram at TTT, she testified that the tables in the middle did not have drawers in them, nor did the tables behind the appellant's work area. Mar. 2 Tr. at 21-22; IAF, Tab 53. She admitted that the room had file cabinets in it, but the file cabinets are owned by the Hawaii State Department of Transportation. *Id.* at 33, 36.

Warren Kadokawa is a Screening Manager hired in June, 2003 at HNL who knew the appellant at AKAL Security. Mar. 2 Tr. at 69-71. The appellant informed him of the opening at TSA and he got the position without interviewing. *Id.* at 104. The appellant was his immediate supervisor at TSA. *Id.* at

Copyright © 2007 LRP Publications

72. Kadokawa supervised 112 screeners, and none ever reported that the appellant offered them a Jack-in-the-Box application. *Id.* at 73. He never saw the appellant do anything he believed was intended to intimidate any of the employees he supervised. *Id.* at 74. Kadokawa was interviewed by Jones during the MI. *Id.* at 76; IAF, Tab 57 (amended exhibit 10, Record of Interview). He testified that he was never given an opportunity to review the Record of Interview until agency counsel gave it to him a month prior to the hearing. *Id.* at 79-80. Kadokawa testified that he never stated to investigator Jones that the appellant once told a screener that if he did not like his job he could go work at Burger King, as the ROI indicates. *Id.* at 81; IAF, Tab 57. And, he never heard the appellant make that remark. Mar. 2 Tr. at 82.

Kadokawa testified that there were quite a few statements in the ROI that were inaccurate, and he highlighted the inaccuracies. Mar. 2 Tr. at 97-99; IAF, Tab 57. He attended Screening manager meetings beginning in June, 2003, and the appellant never referenced any Jack-in-the-Box applications, nor did Kadokawa ever see any such applications. Mar. 2 Tr. at 100-101.

Mark Himenes, hired at same time as Kadokawa as a Screening Manager, also attended the manager meetings on all three floors on which they were held and never saw any Jack-in-the-Box applications, nor did appellant ever make reference to them at any meeting. Mar. 2 Tr. at 108-110. Himenes also heard about the position for which he was hired by the appellant, and he admitted he was hired without being interviewed. *Id.* at 114; Feb. 16 Tr. at 118 (Hayakawa testimony that Himenes brought on non-competitively). Himenes knew the appellant from AKAL and Honolulu PD. *Id.* at 106-07.

Bill Gulledge testified that he was hired as a Supervisory Transportation Security Screener in October, 2002, and he was placed in a detail as an acting Screening Manager after a year and a half. Feb. 16 Tr. at 127. In early 2004, he was promoted to a position as the appellant's Deputy. Prior to his employment with TSA at HNL, he was employed by the Honolulu PD for 38 years. *Id.* at 126. Gulledge visited the appellant when the appellant's office was on the third floor of the inter-island terminal every day and he never saw any Jack-in-the-Box applications on the appellant's desk, nor did he ever witness the appellant giving the applications to any screener. *Id.* at 128. No screener ever reported to him that the appellant gave him or her such an application, and he has no knowledge that the appellant ever did that. *Id.* at 129. He did not recall the appellant ever making reference to Jack-in-the-Box applications in a joking manner. *Id.* at 137.

Danny Cappo is another Screening Manager who was hired non-competitively in June, 2003, and previously worked with the appellant at AKAL and briefly at the Honolulu PD, although he asserted that he and the appellant did not socialize. Mar. 2 Tr. at 56-57; Feb. 16 Tr. at 118 (Hayakawa). Cappo attended screening manager meetings regularly and he never heard the appellant refer to Jack-in-the-Box applications, nor did he see any at TSA work space on any floor. *Id.* 62-64.

Lizette Haneberg testified that she was a Screening Manager at the time in question and she never heard the appellant joke about Jack-in-the-Box applications at meetings or give anyone any applications. Mar. 2 Tr. at 142-44. She knew the appellant before, when he worked at AKAL and she was at the FAA, and she admitted she was hired non-competitively. *Id.* at 136-38; Feb. 16 Tr. at 118 (Hayakawa). Haneberg testified that she does not recall the incident described by Provost in which Cagasan brought a Screener into a meeting and the appellant gave him a Jack-in-the-Box application. She believes she would recall something like that. Mar. 2 Tr. at 142.

Hayakawa testified that he was asked about the allegations regarding the Jack-in-the-Box applications by the investigators and he told them he had not been aware of the allegations, and had never received a complaint about the matter from a Screener. Feb. 16 Tr. at 79-81. He agrees that referring employees to Jack-in-the-Box applications is inappropriate, even in

Copyright © 2007 LRP Publications

a joking manner, and he would have counseled appellant about it. *Id.* at 115-16. He was not aware the appellant was even making such references in a joking manner. *Id.* at 116. He would have counseled the appellant if he had been told the appellant was referring employees to Jack-in-the-Box applications or even joking about it at meetings, before assessing any more serious discipline. *Id.* at 121.

## Findings

First, I find that the agency has failed to prove, by preponderant evidence that the appellant ever offered a Screener or any other employee a Jack-in-the-Box application. I found the appellant's denial that he ever made such an offer to be unequivocal, and largely consistent with his claims since he became aware of the allegations against him. The agency has no evidence from any Screener or other employee that he or she was offered or given a Jack-in-the-Box application by the appellant and, in fact, has not even named any employee who it alleges was the recipient of such an application. To the extent the agency may be claiming that employees were scared to come forward with such allegations, it is undisputed that the MI team received numerous complaints after it was formed and interviewed over 200 people at HNL, and Miyamoto wrote a July 29, 2005 e-mail asking for input from the entire HNL work force that generated a number of complaints and allegations. Moreover, the appellant was reassigned during the inquiry, was later placed on administrative leave, and had been out of the workplace for over six months at the time of the hearing, thus defusing any immediate threat to any employee who could corroborate the agency's claim that the appellant offered Jack-in-the-Box applications to Screeners or others.

As to the specific incident described by Provost, her claim was uncorroborated by any of the individuals who she claimed were at the meeting at which she alleges the appellant offered the unidentified Filipino man the application. While it could be argued that Haneberg is biased toward the appellant because he hired her and was her supervisor, Kaonohi provided testimony that is largely adverse to the appellant and the agency did not even attempt to elicit testimony from him corroborating Provost's claim. The agency did not call Miles (Kasahara) or the other individual Provost claims was at the meeting, Mitch Vasquez, and even Cagasan, who allegedly brought the individual to the appellant for help and who testified for the agency, did not recall the incident that was the subject of Provost's testimony. Mar. 1 Tr. at 298. Finally, while Provost's testimony was largely internally consistent, record evidence indicates that she had not mentioned it previously in her e-mail raising a number of issues, nor did she tell the MI investigator about it.

As to Enoka's claim that she heard the appellant offer a Jack-in-the-Box application to a Screener, again, the agency has not produced any evidence of the identity of that individual, and it is not clear that Enoka was in a position to hear, or even understand, the appellant's conversation. She admitted that she was not entirely in the room when she heard the tail end of the muffled conversation, that it was very brief, and that she entered all the way at the other end from the area in which the appellant and the Screener were talking. Further, she allegedly heard the appellant tell the individual to fill out one of these if he did not like it, and she admitted that the same table on which she alleged she saw the Jack-in-the-Box applications contained other forms, including forms for Screeners. In context, and from the vantage point she described, Enoka could have heard the appellant giving the other individual some sort of TSA paperwork, rather than an application. The only other evidence the agency provided of Enoka's recollection of the incident contains significant inconsistencies. Finally, there is no evidence that the appellant was even aware of the Jack-in-the-Box application allegations until more than two years after this alleged incident, so I cannot find that the fact that he does not have a more specific recollection of this incident impacts his credibility.

With respect to Matsuda's allegations, while the appellant denies that he ever had the Jack-in-the-Box

*cyber*FEDS® Case Report

applications in any of his offices except the office he maintained on the 7th floor and Matsuda claims he referenced the applications in meetings on the second and third floors, the appellant essentially admits that he made jokes about the Jack-in-the-Box applications at manager's meetings that were substantially the same as those claimed by Matsuda. Although a number of the appellant's witnesses who regularly attended such meetings claimed that Jack-in-the-Box applications were not discussed and were not present, I found the fact that the appellant admitted to the joking references to the applications to undercut the credibility of those witnesses, at least with respect to this issue.

While I find that the appellant made reference at managers meetings to offering Screeners Jack-in-the-Box applications if they complained, the question remains whether the comments were inappropriate and whether they were made toward TSA employees. Matsuda attempted to dispute her written admission that the remarks elicited laughter at the meetings, and that she even laughed, but I found her testimony on that point to be extremely equivocal and inconsistent, both internally and with her prior statement. Accordingly, I find that the appellant made the remarks light-heartedly, and in a joking manner. As stated above, however, the appellant admitted that, in retrospect, the comments were inappropriate, and Hayakawa testified similarly. Further, although the appellant did not make the statements directly to the Screeners, they were made in the presence of the managers and about the Screeners, and I therefore find that they were made toward TSA employees. Thus, I find that, solely with respect to the appellant's joking references to Jack-in-the-Box applications at manager meetings, this specification is SUSTAINED.

## Specification Two

In specification two, the agency charged the appellant with stating, during a staff meeting in late 2003, if things didn't start improving here, I know who to get rid of, while pointing his finger at individuals and simulating a gun. AF, Subtab 4D. According to the specification, Screening Manager

Lance Kaonohi heard the statement. *Id.* The agency presented no evidence in support of this specification, and in fact, did not even attempt to elicit testimony from Kaonohi on the issue of the appellant's alleged simulation of a gun while making statements about getting rid of people.[6] Accordingly, specification two is NOT SUSTAINED.

## Specification Three

In specification three, the agency asserted that, according to Lead Transportation Security Screener Earl Yamasaki and former Screener Lauren McMillan, the appellant used his hand to simulate a gun while making statements such as, I will pick off those of you that are becoming a problem, I m loading bullets into a gun, and when I fire I want to make sure they all come out. The agency alleged that these statements were made at various meetings at various times. AF, Subtab 4D.

## Evidence

Lauren McMillan testified that she was a Screener at TSA from December 2002 to December 2004. Feb. 15 Tr. at 61-62. She recalled attending a meeting on the third-level at the inter-island terminal to discuss attendance issues, although she could not recall the date. The appellant and Hayakawa were both there, and she recalls the appellant forming his hand into a gun and stating that there were people who had difficulty showing up and he was going to pick those people off. *Id.* at 63. She recalls that the appellant was standing and she was to the left. She took his remark as threatening, as the appellant seemed frustrated and very serious. *Id.* at 64. People acted shocked, by their expressions and the fact that they got restless. *Id.* at 65. McMillan averred that she had sent a letter to Miyamoto in 2005 regarding the incident and provided a statement about it that she confirmed was accurate. *Id.* at 66; AF, Subtab 4H at 168-69; IAF, Tab 42, Ex. 3. McMillan could not recall who else was at the meeting, but testified that Miyamoto was not at that meeting. Feb. 15 Tr. at 72-73.

Earl Yamasaki is a Lead TSO, and was a TSO at

Copyright © 2007 LRP Publications

9

*cyber*FEDS® Case Report

the time of the incident alleged in this specification. Feb. 15 Tr. at 76. Yamasaki recalled that they were talking about downsizing at the meeting in question, that there were 200 people there, and it was on the 3rd floor of the inter-island terminal. He explained that Karen Kam asked the appellant if there was going to be anything done about sick leave abuse, and the appellant stated that she would be vindicated, that he was loading bullets into his gun, and when he fired it, he was going to make sure it all came out. *Id.* at 77. Yamasaki stated that he was toward the rear, less than 10 feet away from Kam, looking at the appellant. He admitted he did not see anyone else respond, including Kam, although he was surprised by the appellant's choice of words. He made a note on his planner with a question mark to indicate when he thought the meeting had taken place, in order to show that something unusual had occurred. *Id.* at 79-80; IAF, Tab 42, Ex. 6. He identified the Record of Conversation of his interview with the MI team member. Feb. 15 Tr. at 80; AF, Subtab 4H at 195-96. Yamasaki testified that he was looking at the appellant at the time the appellant made the comment, but he did not notice the appellant do anything else. Feb. 15 Tr. at 78.

Yamasaki admitted that, when the appellant made the remarks at issue, he was stating that individuals who were abusing sick leave would be addressed through the disciplinary process. Feb. 15 Tr. at 80. He did not take it as a threat of any kind and did not see the appellant make any hand gesture during the comments. *Id.* at 81, 83.

Nakamura testified that they held town hall meetings to discuss the downsizing process, and that she attended both meetings, one in the morning and one in the afternoon. Mar. 2 Tr. at 13-14. Hayakawa, Miyamoto, and the appellant spoke during the morning meeting and they were all present for the entire meeting, as was she. *Id.* at 14-15. She was at the front of the room with the other three managers, facing the screeners. *Id.* at 15. Nakamura is positive she never heard the appellant make any references to loading a gun during the meeting, nor did she see the

appellant make a gun with his hand and fingers. *Id.* at 15-16. She testified similarly as to the afternoon meeting. Nakamura attended meetings frequently with the appellant, and she never saw him use his hand to make a gun and say he was going to pick people off. *Id.* at 18. He gestures with his hands when he talks. *Id.* at 24.

On cross-examination, Nakamura admitted that one of the appellant's attorneys is her personal attorney, and that she spoke with him about these proceedings two years ago. Mar. 2 Tr. at 24-26. She admitted she has a close professional relationship with the appellant, but contended that they do not socialize. *Id.* at 26-27. During the town hall meetings, she was facing the screeners, but was diagonal, so she could see the appellant as well. *Id.* at 28, 37.

Gulledge testified that he attended the afternoon town hall meeting, and he never heard the appellant make any reference to loading a gun, nor did the appellant make a gesture with his hand to simulate a gun. Feb. 16 Tr. at 129-30. No one complained to him about any such actions after the meeting. *Id.* at 130.

Hayakawa attended the town hall meetings, which he recalls were held in the late part of 2003, and he recalled 150 or 200 screeners were at the meetings. Feb. 16 Tr. 71-72. He was there the entire time the appellant was speaking and the appellant did not say anything that would intimidate the screeners, nor did he make a gesture with his hands as if he was pointing a gun. *Id.* at 73. He noticed no reaction from screeners, no one complained about the appellant making gestures, including Yamasaki, and he is not aware of Miyamoto receiving complaints about the matter. *Id.* at 74-75. The appellant said nothing at the meeting about loading a gun, and no one complained that he did. *Id.* at 75. Hayakawa was next to the appellant, in front of him, in close proximity, at the meeting, and nothing prevented him from observing and hearing the appellant. *Id.* at 75-76. He is not sure if he was asked during the MI about the alleged hand gestures at the town hall meeting. *Id.* at 79. On cross-examination, Hayakawa admitted that he was not facing the appellant during the entire time the

Copyright © 2007 LRP Publications

appellant was talking at the meeting. Feb. 16 Tr. at 114.

The appellant recalled the two meetings, one in the morning and one on the afternoon, and stated that they were called to discuss possible schedule changes and downsizing. Feb. 16 Tr. 183-84. Hayakawa and Miyamoto were there. *Id.* at 184. Hayakawa conducted the meetings and the appellant spoke at both. Hayakawa and Miyamoto were on either side of him, four feet away, at both meetings. *Id.* at 185-86. The appellant denied Yamasaki and McMillen's testimony regarding using his fingers to make a gesture like a gun or making comments about loading a gun or pointing at people, and stated that he frequently uses his hands when talking. *Id.* at 186-87. No one ever told him he had done anything inappropriate after the meeting and he had no intention to intimidate anyone during the meeting. *Id.* at 188-89. Karen Kam never approached him to state any problem with how he responded to her question, nor did Yamasaki. *Id.* at 189-90. The first he heard about this allegation was during the MI. *Id.* At 190.

### Findings

After reviewing all of the evidence pertaining to this specification, I find that the agency has failed to show that the appellant ever made any of the statements attributed to him while simulating a gun with his hand. First, although Yamasaki did testify that the appellant had stated that he was loading bullets into a gun during an August 15, 2003 meeting regarding sick leave abuse, he also specifically stated that he was looking at the appellant while the appellant made the comment and the appellant was not making any hand gesture. Even assuming I credit Yamasaki's account, I construe this specification as requiring proof of both a comment and the appellant's use of his hand to simulate a gun. AF, Subtab 4D (you used your hand to simulate a gun and you made statements such as). Thus, I find that Yamasaki's testimony does not support this specification or charge.[7]

McMillan's testimony that, during one of the meetings to discuss attendance the appellant formed his hand into a gun while making a statement that he was going to pick off people who had difficulty showing up, or something similar, was largely consistent with the Record of Conversation prepared by the MI interviewers and with her August, 2005 e-mail to Miyamoto. Nonetheless, despite the fact that McMillan stated that she spoke with others regarding the alleged incident, and her testimony that there were as many as 200 employees at the meeting, the agency presented no corroboration for this allegation. Hayakawa testified that he was at the meeting and he did not recall the appellant ever making any a remark similar to the remarks charged in this specification, nor did he see the appellant make any gesture simulating a gun. And, all of the other witnesses who were questioned regarding their recollection of the meeting denied that the appellant committed the charged conduct. In addition, although McMillan asserted that Kaonohi and Hanneberg were present, and spoke about the incident, and both testified, the agency did not attempt to elicit testimony from either in support of this charge. While I recognize that a number of the witnesses who testified about the meetings in question are alleged to be biased in favor of the appellant, and in some cases that bias was clear, I find it significant that the agency requested that Kaonohi testify and his testimony with respect to specification five (discussed below) was not particularly favorable to the appellant; thus, it is not clear that he had any bias by the time of the hearing, and the fact that his testimony was not elicited to corroborate the testimony of the only witness the agency presented to prove that the appellant made a gesture like a gun and made a remark the agency deemed inappropriate warrants consideration in assessing McMillan's credibility.[8]

In sum, while McMillan's testimony was consistent with her prior statements, I find that fact outweighed by the fact that her testimony was inconsistent with all of the other witnesses who testified on this point, and was not corroborated by any other witness who she alleges was present during

the meetings. I find it highly likely that, if the appellant had made the remark attributed to him while simulating a gun with his hand, at least one other witness among the numerous present would be available for corroboration.

The specification is NOT SUSTAINED.

### Specification Four

In this specification, the agency alleged that, in May, 2005, Lead TSS Janet Thompson was scheduled to be interviewed for an STSS position by a panel and, just before the interview started, the appellant entered the room and stated that he would observe, and that his presence would have no effect on the interview. AF, Subtab 4D. According to the specification, the appellant remained behind Thompson for ten minutes before leaving the room, and made her very nervous. *Id.*

### Evidence

Allen Willey, currently an employee of the Department of Commerce, National Oceanic and Atmospheric Administration, testified that he was employed with TSA at HNL in the position of Customer Support and Quality Improvement Manager beginning in December, 2002. Feb. 15 at Tr. 127. He served as a panelist in interviews for the supervisory TSO position, and he was on the panel that interviewed Thompson, along with Screening Managers Ed Morin and Danny Cappo, and Annette Kanui, who was the facilitator during the interview process. *Id.*, at 128. The interview took place in what was to become the break room, in April or May, 2005, and lasted for about a half hour. *Id.* at 129. Willey explained that they had a break between the previous interview and Thompson's, and the appellant, Alvin Kahalawai and Bill Gulledge came down and Kahalawai explained that they were there because the room had a moldy odor. *Id.* at 130. The three went into the room, then Gulledge left, and Willey went to the restroom while Kahalawai and the appellant were still in the room. *Id.* When he returned to the room, in five or six minutes, the door was locked, and after he knocked, he was let in. *Id.* at 131.

The appellant was still in the room with Cappo and Morin, while Gulledge was talking outside the room with Kanui. *Id.* Kanui returned, and then went out again and brought Thompson in. The appellant was still in the room, and he did not explain his purpose; Willey believed he was there because of the moldy smell. *Id.*

According to Willey, when Thompson came in the room, the appellant was in the back of the room, toward the window. Tr. 132. When Thompson sat down, she was facing the panel, and Willey was in the middle, Cappo to his right, and Morin to his left. Kanui went over the process, and then the appellant came up and stood directly behind [Thompson's] chair. *Id.* at 133. If she had put her head back, she would have hit him. *Id.* Thompson got red from her neck up to her head, and it threw off her responses because she was nervous, not knowing where the appellant was. *Id.* at 134. She was trying to look without turning her head around, from the corner of her eyes, and after the appellant left, Willey told Kanui that it was not fair, and that she needed to talk with Gulledge about re-interviewing Thompson without the appellant's presence. *Id.* at 134. The room is fairly large, and was able to hold meetings of 30 people. *Id.* at 135. Willey testified that the appellant was only in the room for one question, at which point he left. *Id.* at 135-36. No one asked the appellant why he was there. *Id.* at 136. After appellant left the room, the interview continued, and Thompson was still nervous, which they discussed later. *Id.* at 138-139. Thompson was re-interviewed and she did well. *Id.* at 139-40. Willey participated in approximately eight interview panels, about 50 or 60 interviews, and he was never in the room unless he was on the panel. *Id.* at 141.

Cappo testified that he was on the panel interviewing candidates for a supervisory position, and that there were three interviewers and a facilitator. Mar. 2 Tr. at 58. The room they used was 20 feet wide, 30 to 40 feet long, and the panelists were at one end facing a window, which was close to the door. *Id.* at 59. The panelists faced the door, with

a table in front of them that had a chair for the interviewee. *Id.* at 59-60. The chair was approximately 20 feet from the door. He recalled the incident where the appellant came into the room with Gulledge during a break, and Cappo assumed the appellant was checking how the interviewing was going; Gulledge walked out while the appellant was standing at the window, looking outside. March 2 Tr. at 60-61. Then Kanui, the facilitator, brought in a female interviewee, and before the interview began, the appellant turned around and saw her, so he walked out. *Id.* at 61. He did not stand over the interviewee, nor did he sit down or give any other indication he wanted to stay. *Id.* at 61-62.

On cross-examination, Cappo admitted that, prior to his employment with the agency, the appellant had informed him of TSA job openings and told him if he was interested he should apply online. March 2 Tr. 65. As to this specification, he could not recall the name of the female interviewee, but he was able to describe her. *Id.* at 65-66. Cappo admitted that she was nervous during the interview, and that when she sat down, the appellant was still in the room. *Id.* at 66. He testified that he believes the appellant walked out before the questioning commenced. *Id.* at 66-67. He denied that the appellant walked closer to the panelists when he realized the interview was about to start. *Id.* at 67.

Ed Morin has been a Screening Manager at HNL since June, 2002. March 2 Tr. at 118. He served on two promotions panels, one for Lead and one for Supervisor. *Id.* at 120. The interviews took place in one of the break rooms, or training rooms, and the room was fairly large, with a table in the middle with three panelists facing the interviewee. *Id.* at 120-22. Morin recalled that Willey, Cappo and Alvin Kahalawai served on the panels. *Id.* at 123. He recalled when the appellant was in the room for Thompson's interview, and at first testified that the appellant came in when they were in the middle of the interview, but then stated that he did not believe the interview had started, but that they were in the positions. *Id.* at 124. Morin recalled that the appellant

came up to the table on his right-hand side, and he believed the appellant was there to observe. *Id.* at 125. He agreed that the appellant probably left the room immediately after the start of the interview, and testified that the appellant's presence was a little bit of a distraction, but he believed the appellant sensed that possibility, as after the interview began, the appellant moved to the window. *Id.* at 125-26. The appellant never sat behind Thompson in a chair. *Id.* at 127. Morin asserted that Thompson was already seated in the room when the appellant entered the room, and he testified that he was pretty clear on that point. *Id.* at 127-28.

On cross-examination, Morin agreed that it appeared that the appellant was there to observe the interview. March 2 Tr. at 129. The appellant maneuvered toward the window and stayed there, indirectly observing the process, looking out the window. *Id.* The appellant went from the side of the table to the window, and was not there very long. *Id.* at 129-30. On re-direct, Morin estimated the window to be 7 to 15 feet from the back of the interviewee's chair. *Id.* at 130-31.

Thompson testified that she is a TSO, and she interviewed for a supervisor position. Mar. 1 Tr. at 106. The appellant told her before the interview, while they were outside the room in the foyer, that he was there to observe the process. *Id.* at 106-08. The appellant came into the room after she did, and she knew he was there because she felt him walk behind her, and the interview panel looked up. *Id.* at 108. The appellant was behind her, to the right; she did not recall him saying anything when he walked in the room, nor did the others speak to him. *Id.* at 108-09. Thompson testified that she was nervous coming into the interview, and the appellant's presence increased the feeling. *Id.* at 110. She did not feel she did well, but was given another chance, and she re-interviewed without the appellant being present and was offered the position. *Id.* When given the Record of Conversation memorializing her interview during the MI, Thompson pointed out that her name was misspelled, and that the second page refers to

*cyber*FEDS® Case Report

Screening Manager positions, but should state Screening Supervisor positions. *Id.* at 111-12; IAF, Tab 42, Ex. 12. Those are the only inaccuracies she saw in the document. *Id.*

On cross-examination, Thompson denied that the appellant left the room as soon as the interview started. Mar. 1 Tr. at 113. She did not dispute Willey's testimony, but asserted that the process had started when the appellant left. *Id.* Thompson admitted she was nervous as the interview approached on that day. *Id.* at 115. She denied telling the MI investigators that the appellant entered the room before she did, but admitted that the Record of Conversation does not support her testimony on that point, and that she may have told them the appellant entered the room first. *Id.* at 116; IAF, Tab 42, Ex. 12. She did not recall if anyone else was with the appellant when he entered the room. *Id.* at 121. She was never asked to review and sign the Record by the interviewer, Mr. Jones. *Id.* at 123.

The appellant testified that he had no favorite in the list of interviewees for the position for which Thompson interviewed, that he did not know who was on the list, and had no reason to intimidate anyone. Feb. 16 Tr. 180-81. He agreed with Willey, that he left the room immediately after the interview started; he had no desire to be in the room. *Id.* at 181. He testified that he was in the area and just stopped by to check on things, that when they arrived the door was closed so they waited. Then, he, Gulledge and Kahalawai walked in the room, exchanged pleasantries and he was standing by the window when he heard something, turned around and realized they had started the interview with a female screener. *Id.* at 181-82. The appellant averred that he walked toward the table, heard a question, and left. *Id.* at 182.

The appellant stated that he was behind Thompson as he approached, and that none of the others had told him the interview was starting. Feb. 16 Tr. at 182. The appellant admitted that a facilitator is responsible for the interview logistics. *Id.* at 230. He contended that they did not see Kanui, the facilitator, so he wanted to go in and check on his

own. *Id.* at 231. He did not speak with Kanui or Thompson before entering the room. *Id.*

## Findings

As evidenced by the above summary of testimony by witnesses at the interview in question, there are many discrepancies in the details of what occurred. For example, there was disagreement as to whether the appellant entered the room before the interview with Thompson started (Willey, Cappo, the appellant) or after Thompson had already entered the room and sat down (Morin, Thompson[9]), and whether the appellant stayed for a period after the interview started (Willey, Thompson) or left immediately (Cappo, Morin, the appellant). And, some witnesses believed the appellant was there to observe the interview (Thompson, Cappo, Morin), while Willey testified that the appellant and the others who stopped by were there to check on the reports of a moldy smell. Importantly, however, only Willey testified that the appellant went and stood directly behind Thompson, extremely close to her, in a manner that distracted her. Cappo's testimony does not support a finding that the appellant did anything inappropriate while in the room, and although Morin admitted that he could sense that the appellant's presence made Thompson nervous, from his description -- that the appellant kept his physical distance and left quickly after the interview began -- it was clear that he did not believe the appellant acted improperly. Even Thompson's testimony and prior statement fail to support a finding that the appellant did anything during the interview to make her uncomfortable.

While I do not agree with the appellant's interpretation of the agency's burden to prove this specification -- that is I do not agree that the agency was required to prove that the appellant was in the room for the length of time specified in the proposal letter or that he intended to intimidate Thompson, IAF, Tab 59 -- I do agree that the appellant's mere presence during the interview, by itself, does not constitute Inappropriate Conduct Towards [a] TSA Employee[ ], which is the charge the agency must prove. The agency has presented no evidence that it

Copyright © 2007 LRP Publications

*cyber*FEDS® Case Report

was per se improper or against any agency rule, regulation, or policy for an upper-level manager to observe an interview for a supervisory vacancy for a brief period of time. As the appellant points out, he had managerial responsibility for the staff of screeners and managers, and I find that oversight in hiring of supervisors was clearly within that range of responsibilities. AF, Subtab 4U. Finally, although intent is not an element in this charge, I note that there is no evidence the appellant had any ill motive in briefly observing Thompson's interview, and I conclude that the fact that his presence in the room made her uncomfortable does not render his actions improper.[10]

This specification is NOT SUSTAINED.

### Specification Five

The agency charged the appellant with using derogatory terms such as punk, bully and scum while counseling Screener Melvin Ross on July 7, 2005. AF, Subtab 4D. The agency further alleged that the appellant stated during the counseling that he would put Ross in prison if he had the chance, and he played air violin and cut Ross off when Ross tried to explain his conduct. *Id.*

### Evidence

Gulledge recalled being at the meeting between the appellant and Ross, primarily as a witness. Feb. 16 Tr. at 131-132. He estimated that the meeting took approximately half hour, not two hours. *Id.* at 132. The purpose of the meeting was to resolve the conflict between several Screeners, as one Screener -- Chris Reimers -- felt he was being harassed. *Id.* at 132-33. According to Gulledge, other screeners had been throwing things at Reimers, like nuts and bolts, and making comments to him. The appellant spoke to the two screeners accused of the harassment together initially, then spoke with them separately. *Id.* at 133. Gulledge testified that, during the meeting, the appellant did not throw a pen at Ross so that it struck Ross in the chest. *Id.* at 134.

Gulledge admitted that he could not recall the event sufficiently to differentiate between the two

accused (Ross and Jeffrey Bolosan), but he described them as contrite and apologetic. Feb. 16 Tr. at 134. The appellant was stern, but Gulledge could not recall him acting inappropriately. *Id.* at 135. He testified that the appellant did not call Ross a motherfucker, but he did make a reference during the meeting to putting people away who preyed on weaker people. He agreed that Ross actions -- throwing the items at Reimers -- could have been criminal under Hawaii law. *Id.* at 136. And, an assault on federal property could implicate federal criminal laws; the facility near the airport that the appellant referred to was a federal holding facility. *Id.* Gulledge asserted that it is possible the appellant used the word punk, which he testified was used in the police department to describe a criminal, low life, immature person. *Id.* at 137.

Kaonohi testified that he was at the entire meeting with Ross, but could not recall the date. Mar. 1 Tr. at 193-194. The three Screeners involved (Ross, Bolosan, and Reimers) worked in his sector. *Id.* at 195. Kaonohi recalled different segments of meetings, one with just Ross and Bolosan, which he attended along with Gulledge and the appellant. *Id.* at 195-96. The appellant told them Reimers had complained about Bolosan and Ross conduct, but that Reimers did not want to get them fired. *Id.* at 196-97. The appellant told the Ross and Bolosan they were picking on Reimers because he was weak, that he had seen such actions when he was a Police Officer, and he said that punks like you intimidate and scare people, and that he would take action. *Id.* at 198-99. The appellant told them they needed to know the matter could be turned over to AFSD for law enforcement for criminal investigation and they could be put in the federal detention center across the way, but Reimers did not want to pursue it. *Id.* at 199-200. The appellant pointed to the federal detention center when he made the statement, and he called them fuckin punks. *Id.* at 202. That was the only use of swear words Kaonohi could recall. *Id.* at 203.

Kaonohi testified that the appellant threw a pen at Melvin Ross, toward his direction. Mar. 1 Tr. at 203. Ross was shocked and picked it up off the floor,

Copyright © 2007 LRP Publications

and the appellant told him to throw it back at him, but Ross did not do so, but simply placed the pen on the table. *Id.* at 203-04. During the meeting, Ross disagreed with the claims that they had picked on Reimers, and thought that they were all friends. *Id.* at 204. Kaonohi described Ross as scared and shocked, and testified that his eyes welled up. *Id.* at 206. Kaonohi was instructed to give Ross and Bolosan a counseling and keep them separate from Reimers. *Id.* at 207.

On cross-examination, Kaonohi testified that the meeting lasted approximately 45 minutes, rather than two or three hours. Mar. 1 Tr. at 219. He could not ignore Reimers report of harassment, as it is serious when one screener throws something at another. *Id.* at 220. Reimers told him that two officers had poked him, thrown ball bearings at him, shadow boxed, and called him names. *Id.* at 223. Reimers had a chance to explain it without the others there, and he did not want them fired, but wanted to be assigned away from them. *Id.* at 225-26. Reimers confirmed that there had been multiple incidents of verbal and physical harassment. *Id.* at 227. Kaonohi testified that he was not aware that Ross had been disciplined for touching a female screener's breast, and his recollection of the words spoken at the meeting is from memory. *Id.* at 232, 235. He had never seen the appellant use profanity before in the context of discipline. *Id.* at 235-36.

Kaonohi did not recall the appellant using the words fucking punk in the context of a comparison between Ross and individuals he had dealt with in his prior career as a Police Officer, e.g., a statement that Ross was no better than the fucking punks who end up in the detention center. Mar. 1 Tr. at 237. According to Kaonohi, Ross and Bolosan were upset after the counseling session, and he told them if they had concerns they needed to go through Gulledge, the Employee Assistance Program, or the Ombudsman's office. *Id.* at 238-239. Kaonohi testified that the pen the appellant threw did not strike Ross. *Id.* at 241. He admitted that, in his written statement he said that the appellant had placed the pen on the table. *Id.* at 242.

Kaonohi described himself as shocked at the way the appellant talked during the meeting with Ross, and he described the appellant's method as a scare tactic. Mar. 1 Tr. at 244-245. He did not recall Ross apologizing at the meeting. *Id.* at 246. Kaonohi was not aware of any more misconduct by Ross after the meeting. *Id.* at 248. According to Kaonohi, Ross did not admit at the meeting that the attack on Reimers was unprovoked. *Id.* at 251-53.

Ross, a TSA screener, testified that he was disciplined on July 7, 2005 for throwing BB's at Chris Reimers. Feb. 15 Tr. at 88. The appellant disciplined him verbally, by threats, swear words, taking away overtime, putting him down, and throwing a pen at him. *Id.* at 88-89. He was called into a meeting on the third floor and the appellant, Gulledge, and Kaonohi, were there with him and Bolosan. *Id.* at 89. The appellant swore at him, threatened that he would send them to prison if he had the chance, called them terrorists, punk, scum and threatened to have them arrested by the LEO. *Id.* at 89-90. The appellant's first words were motherfucker, and he used the f word other times. According to Ross, the appellant's voice was strong and demanding and he was waving his hands. *Id.* at 90. Bolosan left the meeting at some point, but was there for the swearing. *Id.* at 91. He described the threats as a threat to send him to federal prison and also the appellant made a motion as if to throw a pen at him. *Id.* at 92. The appellant pointed to the federal prison next door and said he would put him there, but Reimers did not want it. *Id.* at 93. At the time, he believed the appellant could have him locked up.

Ross testified that the appellant faked throwing a pen at him, he flinched, and the appellant smirked, then threw the pen off the table and it hit Ross in the chest and fell to the floor. *Id.* at 94. The appellant told Ross to throw it back at him, but he just put it back on the table. Ross was not sure if Bolosan was there when the pen incident happened. *Id.* at 95.

According to Ross, the appellant gave him two minutes to provide his side of the story, and he tried to apologize but the appellant cut him off while

*cyber*FEDS® Case Report

playing air violin, and told him he had heard it before. Feb. 15 Tr. at 95. He was uncertain if Bolosan was in the room at that point. *Id.* at 96. After he had been in the room without Bolosan, the appellant told him to go out and call in the next jerk, meaning Bolosan. Ross understood that the appellant was calling them both jerks, and that made him feel ashamed, bad, upset. *Id.* at 96-97. Ross felt bad to have his boss call him names, like terrorist. *Id.* at 97. He confirmed his signature on the document memorializing his interview with a member of the MI team. *Id.* at 97; AF, Subtab 4H at 178. He wrote a statement on the day of, or day after, the incident so he could let the bosses know what had happened. *Id.* at 98; 4H at 695-97; IAF, Tab 42, Ex. 4.

On cross-examination, Ross testified that he did not know before the meeting with the appellant that it was wrong to throw a metal object at a co-worker without provocation Feb. 15 Tr. at 100. He admitted he knew that Reimers had complained, and that he had previously been given a one-day suspension for sexual harassment. *Id.* at 101. As to the suspension, Ross contended that the agency did not have evidence against him, but he admitted that he did not appeal. Ross stated that he prepared a written statement describing the meeting because he was trying to build a case against the appellant. *Id.* at 103; IAF, Tab 42, Ex. 4. He admitted that the object he threw had hit Reimers, that it was unprovoked and he had no excuse for throwing it, and that it could have blinded Reimers. *Id.* at 104-06, 109. Reimers did not think it was funny at the time. *Id.* at 110.

Ross admitted that the appellant did ask him questions during the meeting and gave him a chance to answer them, although he could not recall the questions. Feb. 15 Tr. at 108, 114. He further admitted he wrote that the appellant tossed the pen at him in his statement, but now he calls the action a throw. *Id.* at 110. He claimed that the meeting lasted two hours. *Id.* at 110-111. Ross testified that he accepted responsibility for his actions, but also that he wanted to appeal the discipline. *Id.* at 111. He asserted that the ball bearing he threw struck Reimers

back, and that he threw three or four. *Id.* at 117. Ross contended that he was unaware that it was wrong to throw ball bearings at the time he did it, but he became aware when the appellant spoke to him. *Id.* at 119. On re-direct examination, Ross clarified that when he testified he was building a case against the appellant, he meant he wanted to write down what had occurred and give it to investigators so it would not happen again. *Id.* at 123. The appellant informed him he would get no overtime for the meeting, and did not get paid for the time. *Id.* at 125.

The appellant testified that, prior to this incident, he had disciplined Ross for cupping a female screener's breast in the workplace. Feb. 16 Tr. 191. The female complained, Ross denied it at first, and they investigated and obtained video footage. *Id.* at 191. Ross accepted his discipline, for which the appellant was the deciding official, but he felt Ross never accepted responsibility. *Id.* at 192. The appellant explained that Kaonohi had reported the Reimers incident to Gulledge. In turn, Gulledge told him that Ross and Bolosan had thrown metal objects at Reimers. *Id.* at 193. They all went to the third floor, and Reimers told him they had been bullying him, and was teary. Reimers just wanted to be moved, but the matter could have been treated as assault or harassment-criminal activity. *Id.* at 194. The appellant asserted that he was concerned an injury could have occurred. *Id.* at 195.

In addressing the matter, first, he brought Ross and Bolosan in together, then separately. Feb. 16 Tr. at 195. The appellant testified that he never used the term motherfucker to Ross. During the meeting, Ross admitted that he was unprovoked, and the appellant has no recollection of Ross claiming that Reimers also threw BBs. *Id.* at 196. Ross did not seem that he wanted to accept responsibility for his actions during the meeting, unlike Bolosan. *Id.* The appellant admitted he said punk or fucking punk during the meeting, and he explained that he was referring to his time as a Police Officer, and compared Ross and Bolosan to the fucking punks and scum with whom he had dealt. *Id.* at 197; Mar. 1 Tr. at 36. He felt it

Copyright © 2007 LRP Publications

necessary to be stern, and still feels that Ross has not accepted responsibility. Feb. 16 Tr. at 198-99.

The appellant testified that he wanted to use the pen as an example, that he placed it on the table and said to hand it back, and when Ross refused, he pushed it onto the floor and Ross picked it up and put it on the table. Feb. 16 Tr. at 199. He testified that he never hit Ross with the pen. The appellant stated that he told Ross that the consequences of what he had done (picking up the pen) were good, unlike throwing the BBs. *Id.* at 199. The appellant admitted he raised his voice to Ross, and asserted that he felt he had to do so. *Id.* at 200. Kaonohi did not complain to him after the meeting, and Gulledge told him he handled it exceptionally well. *Id.* at 200-01. The appellant averred no knowledge that Ross ever complained to his supervisors after the meeting, and he denied playing air violin or threatening to throw a pen at Ross face. *Id.* at 201- 203. The meeting lasted approximately a half hour. *Id.* at 203. The appellant believes Bolosan was present when he made references to putting punks in prison, and he denied using the term terrorist, but did say bully. Mar. 1 Tr. at 34-35.

### Findings

First, I found Ross to be an extremely incredible witness, in large part because of his frequent equivocation and the many internal inconsistencies in his testimony. Ross was rarely straightforward, and he insistently refused to admit facts supported by other evidence. As a result, I do not credit any of his testimony that is uncorroborated, such as his claim that the appellant hit him with the pen, and that the appellant called him a terrorist or a motherfucker.[11]

Nonetheless, I found Kaonohi's testimony regarding this incident to be credible, as I could discern no significant bias on his part in favor of either party, he testified in a straightforward manner, and he was present and had an opportunity to observe the meeting. I credit Kaonohi's testimony that the appellant referred to Ross and Bolosan as fuckin punks, and that the reference was not in the context of

comparing them to criminals he had placed in jail, as the appellant claims, and that the appellant threw a pen toward Ross, although it did not strike him, as Ross claims. I find that these actions and statements were clearly improper, and are not excused by the fact that the appellant had good reason to give Ross a strongly-worded verbal counseling, at minimum, for his conduct. Although it is also clear from Kaonohi's testimony that the appellant compared Ross and Bolosan to criminals with whom he had dealt in his capacity as a Police Officer, and that he warned them they could be prosecuted while motioning toward the adjacent federal detention center, it is not clear that the content of such assertions was improper, as it is certainly arguable that Ross actions could have led to criminal charges.

Despite the fact that the agency did not prove that the appellant used all of the terms referenced in this specification, or that he committed all of the conduct exactly as charged, I find that the agency has proven the essence of the specification, and has shown that the appellant's actions during the July 7, 2005 verbal counseling were improper, unsuitable, and detracted from the appellant's reputation.

The specification is SUSTAINED.

### Conclusion

In summary, specifications one and five are sustained. Specifications two, three, and four are not sustained.

Charge one is SUSTAINED.

### Charge Two: Lack of Candor During a Management Inquiry

Under the second charge, Lack of Candor During a Management Inquiry, in the first specification the deciding official sustained (specification two), the agency contended that the appellant denied ever having Jack-in-the-Box applications or telling employees that they should seek a job at a fast food restaurant if they did not like their TSA job, in the face of extensive evidence to the contrary. AF, Subtab 4D. In specification three, the agency charged the appellant with evidencing a lack of candor when he

denied that he ever used his finger and hand to simulate a gun. *Id.*

The Board's reviewing court, the U.S. Court of Appeals for the Federal Circuit, has stated that, compared with a charge of falsification, lack of candor is a broader and more flexible concept whose contours and elements depend upon the particular context and conduct involved. *See Ludlum v. Department of Justice,* 278 F.3d 1280, 1284 (Fed. Cir. 2002). It may involve a failure to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete. Although lack of candor necessarily involves an element of deception, intent to deceive is not a separate element of that offense as it is for falsification. *Id.* at 1284-85.

Because I have found that the agency has failed to prove that the appellant ever used his finger and hand to simulate a gun, the appellant's denial cannot support a finding that he lacked candor, and accordingly specification three in the proposal notice is NOT SUSTAINED.

### Evidence

Alan Jones testified that he is the AFSD-Law Enforcement for San Francisco International Airport, and that he was part of the MI team that investigated in Honolulu in 2005. Feb. 16 Tr. At 2. Jones has performed some administrative investigations before the MI. *Id.* at 6. He testified that he asked the appellant if he had ever had Jack-in-the-Box applications in his office or in his possession, or if he had used them to suggest that staff seek employment or apply to Jack-in-the-Box if they were not happy with their TSA positions. *Id.* at 9-10. He described his question as open-ended, and clarified that he had not limited the question to just that one fast food restaurant. *Id.* The question was not time-limited, and referred to any time during the appellant's employment at HNL. *Id.* at 10-11.

According to Jones, the appellant responded that he had never used the applications or suggested that employees seek employment at the establishments,

but he recalled seeing the applications in the Customs area, as TSA had been sharing space with U.S. Customs. Tr. 11. The appellant never stated that he had received the applications from Customs or from Customs through Lance Kaonohi. *Id.* Jones testified that he would have included such a claim in the documentation. *Id.* The appellant also never told them he had found the applications, that he had thrown them away, or that he joked about them. Jones asserted that he would have included that information in the documentation, because it was relevant. *Id.* at 12. Because the meeting was lengthy, and in order to allow the appellant a chance to make a statement on the record, and add anything to address the questions that had been asked, Jones asked the appellant to provide a written statement. *Id.* at 15-16. He did not ask the appellant to address any specific questions, but just wanted a statement responding to the questions in general. He believed the appellant knew what he meant from his 20 years as a Police Officer; Jones stated that he believed the appellant used his own notes when addressing the questions. They received the appellant's statement a couple days after the meeting. *Id.* at 16.

On cross-examination, Jones testified that the appellant had listed the questions in his written statement, and he admitted the interviewers did not tell the appellant he had omitted any questions that had been posed during the interview. *Id.* at 18. Jones prepared the initial draft of the record of interview on September 8, 2005, about a week after he got the appellant's statement *Id.* at 18-19; IAF, Tab 5, Subtab 4H at 424-429. He and Rae made further revisions. Feb. 16 Tr. At 19. He agreed that reviewing his contemporaneous notes of the interview would be best method of recalling what questions were asked and how the appellant responded, but he does not have the notes. *Id.* at 20-21. Jones did not have the appellant review the record of the interview. *Id.* at 21-22. On re-direct, Jones stated that he asked the appellant again, at the end of the interview, about the Jack-in-the-Box applications, and the appellant again denied using the applications in the manner alleged,

and contended that he had not had any in his possession. *Id.* at 36-37.

Douglas Rae testified that he is the AFSD-Screening at Los Angeles International Airport. Feb. 15 Tr. at 142. Rae was also part of the MI team, and explained that the team was looking into approximately five areas of alleged intimidation by the appellant, including the finger pointing/gun allegations, intimidation during an interview, the use of the fast food applications, something about eating pork, and intimidating an employee regarding a federal prison location. *Id.* at 144-146. Other allegations involved whether the appellant was following procedures and processes. *Id.* at 146. Rae explained that they interviewed numerous employees at many levels at HNL, and developed a question pattern for the interview of the appellant. *Id.* The questions included the use of the Jack-in-the-Box applications with employees. *Id.* at 147.

Rae testified that he typed the appellant's responses to the queries on a laptop and Jones used longhand. Feb. 15 Tr. At 147. Both took notes while interviewing the appellant, as did the appellant. *Id.* Then, Jones and he collaborated to ensure they correctly recorded the appellant's responses. *Id.* at 148. Rae could not recall the order of questions, but believes the questions regarding the Burger King application were near the beginning of the interview. *Id.* He and Jones alternated asking the appellant questions. *Id.* at 149. Rae could not recall if he or Jones asked the questions regarding the Jack-in-the-Box applications, but he recalled that they asked if the appellant had ever used Jack-in-the-Box applications to advise employees that if they needed a different job, he could get them an application. *Id.* at 149. The questions were not limited to the present tense, but rather they asked have you ever used those items. The appellant responded no. *Id.* at 149-150 They asked a second time during the interview, which lasted about two and one half hours, and again the appellant said no, but stated that he had seen the applications in another building on the 7th floor, which belonged to Customs and Border Protection.

The question was all-encompassing, not specific to any level or category of employee. *Id.* at 150-151. The appellant did not claim he had referred to Jack-in-the-Box applications in a joking manner. *Id.* at 151. According to Rae, Jones told the appellant to do a written statement and they asked the appellant if he had enough information to do so, and he said that he did, and asked if he could provide it to them the next day. They received the statement, and he believes that it referenced Jack-in-the-Box applications on the 7th floor in a CBP-occupied building. *Id.* at 152.

In cross-examination, Rae admitted he had no training in conducting MIs or MAs, and that they decided not to tape the interview with the appellant. Feb. 15 Tr. at 152-53, 157. He stated that the question they asked was whether the appellant had ever given or offered fast food applications to employees when telling them they could work elsewhere. *Id.* at 153. He admitted he could not recall the exact terms used in questioning the appellant. *Id.* at 157. No officer ever came forward and alleged that the appellant had given him or her an application, and they never identified anyone offered an application by name. *Id.* at 153-54. Rae asserted that they did not give the appellant specific questions to answer in his written statement. Rae looked for his laptop with the notes from the interview, but he did not find it. *Id.* at 154-155. The appellant was not shown the notes from the interview, and they never had the appellant review the record of his interview. *Id.* at 158-59. All of Rae's documents were turned over to Mr. Fetters. *Id.* at 158-59.

Rae testified that, after the appellant provided the written statement, he did not tell the appellant that he had missed a few questions. Feb. 15 Tr. at 165. The record of the appellant's interview was drafted seven or eight days later. *Id.* at 166. They searched the appellant's desk in the office the appellant occupied at the time of the interview for Jack-in-the-Box applications but found none. *Id.* at 167, 171. Rae asserted that he could not recall the appellant offering any witness names to support his version of events. *Id.* at 167. Rae identified the list of questions he and

Jones prepared to ask the appellant. *Id.* at 168; IAF, Tab 41, Ex. XX at 810.[12] The list included the question, Have you ever kept employment applications for Jack-in-the-Box in your office, but Rae admitted he could not recall if they posed the question as it was written, and recalled it being rather encompassing, including if he had ever used the applications. *Id.* at 169.

The appellant testified that he told Jones and Rae during the interview that he did not have any Jack-in-the-Box applications in his possession, which to his knowledge was truthful. Feb. 16 Tr. at 173-74. A couple of hours later they again asked him if he had any fast food applications in his possession at any time and if he ever gave them to screeners. *Id.* at 174. He told them he did have them at one time, but he never gave them to a screener. *Id.* at 175. The appellant contended that the total time spent on the two questions was ten minutes, and he did not view it as a major topic. He testified that he never told Rae and Jones that he shared the office with Customs, as they put in their report; that was an error. *Id.* at 176.

According to the appellant, Jones and Rae never offered to tape the interview, and they never gave him a chance to review the record and sign it. Feb. 16 Tr. at 176. At the end of the meeting, they asked him to answer six questions which he wrote down verbatim, and which are in the record. *Id.* at 177. AF, Subtab 4H at 430-434. Neither of the interviewers told him the questions he had written were wrong, incomplete, or non-responsive. *Id.* at 178-79. The appellant stated that Jones did not ask him to report back on the Jack-in-the-Box application incident in the questions they posed. *Id.* at 202. They never asked him if he had made joking references to the Jack-in-the-Box applications. *Id.* at 224. He admitted he knew he was the subject of the MI when he was being interviewed, and that he could be disciplined if any allegations were found to be true, and that he never told the investigators that he found the Jack-in-the-Box applications when he was moving his office to the 4th floor. *Id.* at 225-227. The appellant could not recall who asked the questions regarding the

Jack-in-the-Box applications, but he recalled that the second question was more encompassing than the first. *Id.* at 227. He admitted he attached additional pages to his response to the investigators questions. *Id.* at 228; AF, Subtab 4H at 436-41. He further admitted that he had experience with investigative techniques both as a law enforcement agent and from taking part in an MI as a TSA employee. *Id.* at 228. The appellant testified that when he denied possessing Jack-in-the-Box applications to be offered to screeners with complaints against TSA, his denial included all employees, up to and including supervisors. Mar. 1 Tr. at 17.

### Findings

As stated above, in the discussion under charge one, specification one, I have found that the agency failed to prove that the appellant ever offered a Jack-in-the-Box application to any TSA employee. Thus, to the extent the appellant may have answered in the negative when asked such a question by Rae and/or Jones, there is no evidence that such a response was untruthful or lacking in candor. The agency charged the appellant, however, with lacking candor both in denying that he had possessed the applications and denying that he had made statements about them, and the appellant has admitted, and I have found, that he joked about giving screeners Jack-in-the-Box applications during management meetings. Thus, I must determine whether the interviewers questions should have elicited such an admission regarding the joking references.

First, I agree with the appellant that the interviewers disposal of their notes taken during the interview of the appellant, coupled with the fact that they did not tape the interview, did not have the appellant review and sign the Record of Interview they prepared, and their admission that they waited approximately one week before preparing the Record, casts doubt on the accuracy of the Record. Furthermore, I note that Rae admitted, as the record shows, that the list of questions prepared for the interview of the appellant includes only one question on the subject of the fast food applications, and that

Copyright © 2007 LRP Publications

*cyber*FEDS® Case Report

question asked only if the appellant had kept the applications in his office. Finally, while both Rae and Jones testified that they asked the appellant about the applications twice once toward the end of the interview and each testified that the questions were broader than that in the list they had prepared, Rae testified that the questions focused on the appellant's use of the applications while Jones testified that the questions included use and possession.

Despite the aforementioned weaknesses in the agency's evidence, I found Jones and Rae credible, as their accounts of the interview and the questions posed were largely consistent (with the exception noted above) with each other, were consistent with the Record of Interview they prepared, and both testified in a straightforward manner, and admitted in some cases when they could not recall specifics. I find that, more likely than not, Jones and Rae asked the appellant a broad question that included whether he had ever possessed Jack-in-the-Box applications in his work space, or something similar, and whether he had ever offered any applications to any TSA employees. Although it is apparent from the Record of Interview that the questions regarding the applications constituted only a small portion of the subject matter covered during the interview, at the time of the interview there were specific allegations against the appellant regarding the use of the applications and I find it highly unlikely that both Jones and Rae neglected to note the appellant's admission that he had once possessed the applications, that neither recalled the admission when preparing the ROI, and that neither recalled it at hearing. Moreover, I find that, although it is undisputed that the interviewers did not ask the appellant if he had joked with other managers about using Jack-in-the-Box applications with disgruntled screeners, he was, or should have been, aware that they sought information regarding his use of the applications and he should have explained to them the manner in which he had referred to the applications. Taken together, I find that his failure to admit possessing and joking about the applications

evidenced a lack of candor.

The specification is SUSTAINED.

The charge is SUSTAINED.

### Affirmative Defenses

The appellant alleged that the agency's action was affected by discriminatory stereotypes related to his race, color, and national origin, such as his size and stature. IAF, Tab 47. He further asserts that the agency committed harmful procedural errors in reaching its decision. IAF, Tabs 40, 45, 47.[13] The appellant has the burden to prove his defenses by preponderant evidence.

### Discrimination

Insofar as the record is complete, it is unnecessary to follow the traditional, burden-shifting order of analysis set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802-04 (1973). Rather, the inquiry shifts from whether the appellant has established a prima facie case to whether he has demonstrated by a preponderance of the evidence that the agency's reason for its action was a pretext for discrimination; i.e., that in effecting his removal, the agency intentionally discriminated on the basis of his race, color, or national origin. *Cf. Jackson v. U.S. Postal Service,* 79 M.S.P.R. 46, 52 (1998).

After reviewing all of the record evidence having any bearing on the appellant's claim that the agency's action was discriminatory, as explained below, I find that the appellant has failed to prove his discrimination defenses.

Jones, one of the officials who interviewed the appellant during the MI, admitted that he asked the appellant at the end of the interview if some of the allegations of intimidation could be related to his large stature. Feb. 16 Tr. at 13. Jones explained that he did not intend the comments to be taken negatively, but rather simply sought to question whether the appellant might be unaware of the effect his size could have on the screeners. *Id.* According to Jones, the appellant zeroed in on the question, and asked if he was insinuating that the appellant's size

Copyright © 2007 LRP Publications

was bad, to which Jones responded in the negative. *Id.*

The appellant testified that he was offended by Jones question, and even after Jones clarified that he was referring to the possibility that screeners may have been intimidated by the appellant's size when they were in proximity with him, he was offended because Polynesians tend to be big boned, and that is part of who I am. Feb. 16 Tr. at 204-05. In Hawaii, according to the appellant, large people are commonly associated with Polynesian race. *Id.* at 205. The appellant further testified that he is aware that Mr. Gomez told Mr. Hayakawa that it was possible screeners were intimidated by the appellant because of his size. *Id.* at 206. The appellant testified that possibly 80% of screeners are Asian, and they tend to be smaller in stature. *Id.* The appellant also testified that Miyamoto once mentioned to him that screeners were saying they were intimidated by him, and he asked the appellant if the appellant thought it was because of his size. *Id.* at 207.

Clark, the deciding official, admitted that his decision referred to the fact that the appellant had raised race in his rebuttal. Feb. 15 Tr. at 210; AF, Subtab 4B. Clark confirmed that he had considered the appellant's reference to race as an attempt to deflect attention from the misconduct, but explained that the issue of the appellant's race never entered [his] mind, and was not a factor in his reason for sustaining the lack of candor charge, or his decision to terminate the appellant. *Id.* at 211-212.

While several agency officials clearly raised the possibility that the appellant's large size and stature may have played a role in the reports by some of the screeners that they were intimidated by the appellant, and the appellant's testimony that large size is associated with his race was unrebutted, his claim that his race, color, or national origin played any role in the agency's action, or even in the allegations against him by others, amounts to a bare allegation, and is unsupported by any evidence. I found Clark's testimony that he did not consider the appellant's race in making his decision credible, and the fact that he considered the appellant's assertions regarding race in

the appellant's response to the proposed removal to be an attempt to deflect attention from the charges does not support a finding to the contrary.

I conclude that the appellant has not shown, by preponderant evidence, that his race, national origin, or color was a motivating factor in the agency's decision to remove him.

### Harmful Procedural Error

The appellant argues that the agency committed numerous procedural errors in conducting its investigation into the alleged misconduct. IAF, Tabs 40, 59. More specifically, the appellant alleges that the agency failed to follow its procedures for conducting a Management Inquiry, set out in Management Directive (MD) 700.2, Informal Administrative Inquiries. *Id.;* AF, Subtab 4O. He alleges that, because the Professional Review Board and the deciding official relied almost exclusively on the statements gathered by the MI Team and the Team's conclusions in proposing and effecting the action against the appellant, the procedural errors were harmful, and warrant reversal of the action. IAF, Tab 59.

To prove harmful procedural error, the appellant must prove, by preponderant evidence, that the agency committed an error in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. See 5 U.S.C. § 7701(c)(2)(A); 5 C.F.R. § 1201.56(c)(3). The burden is upon the appellant to show that the agency committed an error and that the error was harmful, i.e., that it caused substantial prejudice to his rights. *Stephen v. Department of the Air Force,* 47 M.S.P.R. 672, 681, 685 (1991) (harmful error cannot be presumed; an agency error is harmful only where the record shows that the procedural error was likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error).

In his prehearing submission, the appellant claimed that the agency and the MI Team committed

the following errors: (1) Failure of the Office of Internal Affairs and Program Review (OIAPR) to conduct the review; (2) involvement of some of the inquiry officers in the events at issue without justification of exigent circumstances; (3) investigators jumped to conclusions and used leading questions; (4) they made initial findings before talking to the appellant; (5) witnesses were not instructed to avoid discussing the matter with others; (6) leads and evidence favorable to the appellant were ignored, or not sufficiently followed up; (7) statements of witnesses who provided information favorable to the appellant were omitted; (8) the report was biased and reached unsupported conclusions; (9) hearsay was relied upon without an attempt to use more direct sources; and (10) witnesses were not asked to read, correct, and sign final statements. IAF, Tab 40 at 11. In his post-hearing brief, the appellant asserted additional errors, including (11) failure by the MI Team investigators to preserve their notes taken during the interviews, and (12) the agency's actions blocking the appellant's access to evidence before and after his removal. *Id.* Tab 59.[14]

After careful consideration of the appellant's argument and review of the evidence he cites, as explained below, I find that he has failed to show that the agency committed harmful procedural error in taking the action against him. First, I note that, the appellant is correct that MD 700.2 requires allegations of non-criminal conduct against employees at the K band level or higher, like the appellant, to be referred to TSA OIAPR for investigation. AF, Subtab 4O. Here, the record reflects that, on July 25, 2005, Hayakawa had a telephone conversation and then sent an e-mail to OIAPR, pursuant to existing procedures in his words, setting out a number of issues and concerns at HNL and suggesting a Management Review. AF, Subtab 4H at 69-71. The issues in the e-mail were wide-ranging, but included several that involved the appellant, including time and attendance matters, concerns that he made inappropriate comments to subordinates and that he created a hostile work environment and retaliated against staff

who disagreed with him. *Id.* On July 29, 2005, OIAPR sent an e-mail stating that it did not believe the issues presented warranted OIAPR action and should be handled by the management team in the Western Area. *Id.;* Feb. 16 Tr. at 86 (Hayakawa). The individual who sent the e-mail offered to revisit the assessment if findings indicated additional reasons for OIAPR attention. *Id.* Subsequently, the agency conducted the MA and the MI, but the matter was not referred back to OIAPR between the Assessment and the Inquiry. *Id.* at 86. After the MI Report was issued, OIAPR conducted a review of the issues raised, interviewed certain individuals, and issued its own report. AF, Subtab 4F.

Christopher Santoro, currently Deputy Director for Investigations for TSA's Office of Inspection, explained that he was counsel to the Assistant Administrator for TSA's OIAPR from August, 2005 to April, 2006. Feb. 15 Tr. 35. OIAPR is now the Office of Inspections. *Id.* Santoro stated that, when allegations of misconduct are referred to the investigations division, a determination is made whether the allegations must go to DHS Inspector General, and if not, his office determines if it will open an investigation. *Id.* at 36. If investigations decides to investigate, the case goes to a team of agents; if not, it is returned to the appropriate management official. *Id.*

Santoro contended that MD 700.2 does not control the determination of whether the matter will be referred to DHS OIG, and that the Directive that does control is binding on all DHS components, including TSA. Feb. 15 Tr. at 37. MD 700.2 is a mechanism for ensuring that TSA complies with the DHS directive, in that it requires certain allegations to be referred to his office so that a determination can be made whether the matter must be sent to DHS OIG. *Id.* Santoro confirmed receipt of Hayakawa's July, 2005 e-mail by his office and he further confirmed that his office was given the MI Report and was asked to determine if there were issues not adequately addressed in the Report that his office should address. *Id.* at 38-40. They determined that the office did not

---

Copyright © 2007 LRP Publications

*cyber*FEDS® Case Report

need to investigate issues regarding the appellant that were not already contained in the Report. *Id.* at 41-42. They reviewed the MI Report and the evidence for the limited purpose of determining whether sufficient evidence existed to sustain the findings, which Santoro described as a standard similar to that of an appellate tribunal. *Id.* at 42. Santoro testified that the nature of the allegations against the appellant in the MI Report were generally the same as those that had been brought to the attention of his office previously, but the facts had been fleshed out a bit more. *Id.* at 43.

On cross-examination, Santoro admitted that, under MD 700.2, it is mandatory for certain types of misconduct, including non-criminal conduct by employees in K band or higher, to be reported to the Office of Inspection prior to any investigation by TSA management. Feb. 15 Tr. 44-45. He asserted that the allegations in the MI Report regarding Jack-in-the-Box applications appeared to be related to the allegations in Hayakawa's e-mail that the appellant told subordinates, If you don't like it, quit. *Id.* at 49. He admitted that some of the statements made by witnesses in the MI investigation were not signed, and that it is important for investigators to follow procedure, but that his office did not make a determination whether the MI investigators here did so. *Id.* at 52. Santoro contended that his office could have referred any new matter discovered during the MI to the IG when it reviewed the Report and evidence, but he stated his view was not based on MD 700.2, which he considered a procedural guide for how management is to conduct management inquiries. *Id.* at 55. He admitted that the allegations regarding the appellant making a gun with his hand and fingers accompanied with certain remarks were not in the referral to his office, nor were the incidents involving Thompson and Ross part of the e-mail referral. *Id.* at 56-58. Santoro testified that after his office became aware of the specific allegations against the appellant, however, they determined that no investigation was necessary, nor was it necessary to refer the matter to the IG. *Id.* at 60.

Based on the record evidence, it is clear that new, or more specific, allegations against the appellant arose after Hayakawa referred the matter to OIAPR in July, 2005, and those matters had not been specifically referenced in his e-mail. Feb. 16 Tr. at 87 (Hayakawa); compare AF, Subtab 4H at 1-31 (MI Report) with 69-70 (e-mail). There is no evidence, however, to contradict Santoro's interpretation that MD 700.2 requires nothing more than a referral, and that OIAPR has the authority to decide whether to conduct an investigation. Here, OIAPR had an opportunity to review the results of the MI and all of the allegations, and thus had the opportunity to perform an investigation before the agency even proposed action. I find that this substantially satisfies the purpose of the Directive.

With respect to a number of the other errors the appellant alleges the agency made in conducting its investigation, he has failed to point to any specific agency rule, regulation, or procedure that the agency was required to follow. For example, while I agree with the appellant that the failure of the agency investigators to preserve the notes they took during interviews is not insignificant, is a deviation from normal investigative practice, and is relevant in assessing the credibility of the investigators testimony, MD 700.2 requires the Reports of Inquiry to be retained, not notes taken by team members. AF, Subtab 4O at 7. Neither the Appendix to MD 700.2, entitled General Guide for Informal Administrative Inquiries, (hereafter Guide) which will be followed according to MD 700.2, nor any other source I found in this record requires investigators to preserve their notes. *Id.,* Subtab 4O.

The appellant is correct that MD 700.2 and the Guide require that inquiry officers be of rank at least equal to the subject, absent operational exigencies or special expertise, and must not be involved in the situation under inquiry. AF, Subtab 4O. He has not specified exactly how the MI violated this requirement, or if it did, how the violation had any effect on the MI. As to the specific questions the investigators asked, the witnesses they chose to interview, and the subjects they covered during

Copyright © 2007 LRP Publications

interviews, it is unquestionable that they made numerous choices that reflect the fact that they are not trained in investigation techniques. A review of the Records of Interviews and Conversations introduced as evidence at hearing appears to support a finding that the investigators failed to follow leads in some cases, failed to corroborate allegations, and often simply failed to obtain sufficiently precise information. The General Guide, however, suggests an approach to interviewing witnesses, and from my review of the record, it is not clear that the investigators determination as to which witnesses to interview, what questions to ask, and how to pose those questions during the MI at issue here diverged from the suggestions to such a degree that the appellant's rights were substantially prejudiced.[15]

In reviewing all of the appellant's claims of improper investigative techniques employed by the agency, I consider his assertion that the investigators violated proper procedure in memorializing the witness interviews/conversations the most significant. The appellant correctly points out that MD 700.2 requires that care must be taken to ensure that the statement is phrased in the words of the witness, and that [t]he witness should be asked to read, correct, and sign the final statement. AF, Subtab 4O at 5. Here, it is undisputed that, with few exceptions, the interviewers did not ask witnesses interviewed to read the Records of Interview and Conversation generated, and therefore did not obtain corrections or signed versions. And, it is apparent that a number of the Records contained inaccuracies,[16] and Clark admitted that he relied upon the accuracy and findings in the MI and the reports of the interviews in making his decision. Feb. 15 Tr. at 191-194.[17]

Despite the errors committed by the agency's investigators, which I did not find insignificant, Board precedent generally supports a finding that such errors are not harmful where, as here, the appellant had an opportunity to examine the witnesses in question, and to testify on his own behalf. *See, e.g., Vakili v. Department of Agriculture*, 35 M.S.P.R. 534, 538-39 (1987); *Antonucci v. Department of Justice*, 8

M.S.P.R. 491, 493 (1981). I recognize precedent, cited by the appellant, holding that an opportunity to rebut charges underlying a removal after the fact does not necessarily cure errors made earlier in the process. IAF, Tab 59 *(citing Mercer v. Department of Health & Human Services*, 772 F.2d 856, 859 (Fed. Cir. 1985)). Nonetheless, here, after considering all of the alleged errors made during the MI and at other points in the process prior to the proposal, I find that the appellant has not shown that it is more likely than not that the errors could have changed the result.

## Nexus and the Penalty

The agency must show that there is a nexus between the sustained charges and either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest that promotes the efficiency of the service. *See Merritt v. Department of Justice*, 6 M.S.P.R. 585, 596 (1981), *modified, Kruger v. Department of Justice*, 32 M.S.P.R. 71, 175 n.2 (1987); *Owens v. Department of the Air Force*, 8 M.S.P.R. 580, 583 (1981).

Although I have found that the agency failed to prove a number of specifications, I sustained two specifications under the first charge and one under the second. It is clear that the agency has a legitimate interest in having its high-level supervisors act appropriately toward other TSA employees, and that includes a reasonable expectation that they will not joke in meetings about offering fast food applications to employees with whom they have problems, will not use abusive language and toss items toward subordinates while disciplining them, and will exhibit candor when answering questions during official interviews. Thus, I find that a nexus exists between the sustained misconduct and the efficiency of the service.

Where, as here, the Board sustains the agency's charge, but not all of the specifications of the charge, it will review the agency-imposed penalty to determine whether it is within the parameters of reasonableness. *Groeber v. U.S. Postal Service*, 84

M.S.P.R. 646, ¶ 14 (2000), *aff'd* 13 Fed. Appx. 973 (Fed. Cir.), *petition for cert. filed,* No. 01-6209 (2001); *Payne v. U.S. Postal Service,* 72 M.S.P.R. 646, 650-51 (1996). The Board's function is not to displace management's responsibility or to decide what penalty it would impose, but to assure that management's judgment has been properly exercised and that the penalty selected by the agency does not exceed the maximum limits of reasonableness. *Stuhlmacher v. U.S. Postal Service,* 89 M.S.P.R. 272, ¶ 20 (2001); *Douglas v. Veterans Administration,* 5 M.S.P.R. 280, 306 (1981). Thus, the Board will modify a penalty only when it finds that the agency failed to weigh the relevant factors or that the penalty the agency imposed clearly exceeded the bounds of reasonableness. *Stuhlmacher,* 89 M.S.P.R. 272, ¶ 20. If the agency's penalty is beyond the bounds of reasonableness, the Board will mitigate only to the extent necessary to bring it within the parameters of reasonableness. *Groeber,* 84 M.S.P.R. 646, ¶ 14; *Payne,* 72 M.S.P.R. at 650-51. Where fewer than all of the specifications are sustained, the Board will look for evidence that the agency would have imposed the same penalty for the sustained specifications. *See Groeber,* 84 M.S.P.R. 646, ¶ 14.

First, I note that deciding official Clark did not testify whether he would have removed the appellant if only specifications one and five in the first charge and one of the two specifications in the second charge were sustained. While I note that Clark stated in the decision letter and testified generally that he believed either charge by itself, warranted removal, AF, Subtab 4B; Feb. 15 Tr. 178, there is no evidence in this record upon which to determine what penalty he would have deemed appropriate if a number of the specifications were found not to be proven.

Despite the fact that a number of specification were not sustained, I am aware of the Board's well-settled precedent that proof of one specification under a given charge is sufficient to prove that charge, and that where all of the agency's charges have been sustained, as here, the Board will review an agency-imposed penalty only to determine if the agency considered all of the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Crawford,* 56 M.S.P.R. at 231; *Douglas,* 5 M.S.P.R. at 306. Further, I recognize that the Board's function is not to displace management's responsibility but to insure that management discretion has been properly exercised. *See, e.g., Brown v. Department of the Treasury,* 91 M.S.P.R. 60, ¶ 7 (2002).

Nonetheless, as stated above, even when all charges are sustained, where an agency failed to weigh the relevant factors, the Board may modify the agency's choice of penalty. In *Douglas,* the Board noted that not every factor will be pertinent in every case. 5 M.S.P.R. at 306. Here, the appellant argues that Clark failed to review a number of *Douglas* factors, IAF, Tab 59 at 14-15, and, although I do not agree that all of the factors listed are relevant in this case, or that Clark neglected consideration of as many factors as the appellant argues, I do agree that he failed to consider certain factors that he clearly should have. For example, Clark admitted that he did not consider whether the appellant had acted for financial gain in any of the specifications. Feb. 15 Tr. at 198; 5 M.S.P.R. at 305 (whether offense was committed maliciously or for gain). He did not consider the appellant's dependability during his four years of service with TSA. Feb. 15 Tr. at 203; 5 M.S.P.R. at 305 (consideration of employee's work record includes dependability). And, Clark admitted that, although he considered the appellant's outstanding performance reviews to be a factor in his favor, he did not ask Hayakawa if he still had confidence in the appellant. Feb. 15 Tr. 212-13; 5 M.S.P.R. at 305 (effect of offense upon supervisors confidence in employee's ability to perform assigned duties is a factor). As to the last factor, although it appears that Clark was in the appellant's supervisory chain as the Western Area Director, the agency did not elicit testimony on this point or otherwise explain that relationship, and there is no evidence that Clark had any contact with the appellant in the appellant's performance of his duties; I note that Hayakawa, the

appellant's second-line supervisor and the Federal Security Director at HNL, testified that he had confidence in the appellant at the time of the conduct at issue, and still did at the time of the hearing. Feb. 16 Tr. at 101.

Based on the aforementioned, I find that Clark failed to afford proper consideration to several relevant *Douglas* factors, and therefore the agency's penalty determination is not entitled to deference and I must independently weigh the relevant factors to evaluate the reasonableness of the penalty. *See, e.g., Wiley v. U.S. Postal Service*, 102 M.S.P.R. 535, ¶ 15 (2006); *Stuhlmacher*, 89 M.S.P.R. 272, ¶ 24. In addition, Clark testified specifically that the specification charging the appellant with making certain statements while simulating a gun was a factor in the decision to terminate the appellant, Feb. 15 Tr. 196-97, and I have found that the agency failed to prove either of the two specifications charging the appellant with that conduct. Finally, because other specifications -- in fact a majority of the specifications at issue in this appeal -- were not sustained, I must review the agency's penalty determination to determine whether it is within the parameters of reasonableness.

In evaluating the penalty, the Board will consider, first and foremost, the nature and seriousness of the misconduct and its relation to the employee's duties, position and responsibilities, including whether the offenses were intentional or frequently repeated. *See Rackers v. Department of Justice*, 79 M.S.P.R. 262, 282 (1998), *aff'd*, 194 F.3d 1336 (Fed. Cir. 1999) (Table). Other factors to consider are: the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; his potential for rehabilitation; the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties; his past disciplinary record; his past work record, including length of service, performance on the job, ability to get along with fellow workers and dependability; and consistency of the penalty with the applicable table of penalties. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306 (1981).

First, I find it important to summarize the total of what the agency has proven: (1) that the appellant joked during meetings with other managers and supervisors about giving Jack-in-the-Box applications to Screeners; (2) that the appellant acted inappropriately while verbally counseling Screener Ross, including the use of expletives and throwing a pencil in Ross direction; and, (3) that the appellant evidenced lack of candor in his interview with Jones and Rae when he failed to admit that he had possessed Jack-in-the-Box applications and had joked about giving them to Screeners at management meetings. While I do not find the appellant's joking about the Jack-in-the-Box applications to be trivial, in the absence of persuasive evidence that he intended any of the managers at the meetings to actually offer the applications, or that he offered any himself, which would clearly have been demeaning and would merit significant discipline, I do not find the sustained specification particularly serious. In addition, although the agency correctly points out that the Board has found that lack of candor strikes at the heart of the employer-employee relationship, *see Jackson v. Department of the Army*, 99 M.S.P.R. 604, ¶ 6 (2005), I cannot ignore the fact that the appellant's failure to fully explain the circumstances surrounding his possession and use of the Jack-in-the-Box applications occurred during an extremely lengthy interview with Rae and Jones, that it is clear the interview covered numerous subjects that more directly involved operational considerations and were a more obvious focus of the interview, and that both interviewers admitted the appellant was cooperative and even promptly provided additional information at their request. Thus, while the appellant's failure to exhibit full candor with respect to the Jack-in-the-Box applications was serious, I find that under the aforementioned circumstances, it was not as severe as in many other cases involving a similar charge.[18]

Copyright © 2007 LRP Publications

Of the three specifications sustained, I found the appellant's misconduct during the verbal counseling of Ross to be the most serious. Considering Ross hearing testimony, and his obvious refusal to take responsibility for his improper, and dangerous, actions, I found the appellant's testimony that Ross adopted a similar stance during the disciplinary meeting credible. Under the circumstances, I agree with the appellant that a very strong counseling was warranted, and that it was not improper to warn Ross that his conduct could lead to criminal charges. I find it significant in assessing the seriousness of the conduct in this specification that the appellant's actions were intended to correct Ross behavior. Nonetheless, the appellant very clearly crossed the line from legitimate warning intended to correct improper behavior to abuse, and in doing so he set an extremely poor example in front of the other managers and employees present. Even considering Ross recalcitrance, the appellant's conduct at the meeting was highly inappropriate, and warrants substantial discipline.

The conduct underlying both sustained specifications in the first charge is related to the appellant's duties and responsibilities as a high-level manager; indeed, holding management meetings to address Screener issues and disciplining Screeners were primary duties of his position. Feb. 16 Tr. at 94. While the appellant's conduct in those specifications cannot be said to be accidental, however, I do not find that he intended to act improperly. And, only the conduct in the first, and least serious, sustained specification was repeated.

As to the clarity with which the appellant was on notice of any rules that his conduct violated, the record contains a copy of the agency's HRM Letter 735-1 Interim Policy on Employee Responsibility and Conduct, which the appellant acknowledged receiving and reading on January 23, 2003. AF, Subtabs 4R, 4S. As set out in the proposal notice, the HRM Letter required employees to exercise courtesy and tact in dealing with fellow workers, supervisors, contract personnel, and the public, and to support and assist in creating a productive and hospitable model work environment. AF, Subtabs 4D, 4S. I find that the appellant was on notice that the sustained conduct in both specifications in charge one violated the aforementioned policy in the HRM Letter.[19] I further find, however, and it appears to be undisputed, that the appellant was not previously warned regarding any of the conduct with which he was ultimately charged.

The appellant was in his position for less than four years, a relatively short period that does not weigh in favor of mitigation. Other than the charges at issue in this appeal, the record does not contain any evidence that he was unable to get along with his fellow workers, and his performance appraisals and other record evidence, including Hayakawa's testimony, support a finding that the appellant was viewed as a dependable employee. It is well-settled, however, that supervisory employees, such as the appellant, are held to a higher standard of conduct for purposes of determining an appropriate penalty. *See, e.g., Leatherbury v. Department of the Army,* 105 M.S.P.R. 405, ¶ 24 (2007).

As referenced above, Clark concluded that the appellant had no potential for rehabilitation, as he had determined that the appellant's intimidating management style could not be changed. Feb. 15 Tr. at 178. Again, I find that Hayakawa's testimony that he had confidence in the appellant at the time he was employed by the agency and still had such confidence after the removal was effected outweighs Clark's testimony on this point, and supports a finding that the appellant's supervisor had confidence in his ability to perform his duties. Feb. 16 Tr. at 101. The appellant had no prior discipline, and an exemplary past work record/performance record, including positive performance appraisals and a number of cash awards. IAF, Tab 41, Exs. D-F, I, J, L, M, P, R. These factors weigh heavily in favor of mitigating the penalty.

After reviewing the numerous cases the appellant cites in his post-hearing brief in support of his claim that any penalty assessed should be mitigated, I find

---

that there are significant differences when comparing the charged conduct and/or applicable *Douglas* factors in many of those cases to that in the instant case. IAF, Tab 59 at 15. For example, in most of the cases, the charged employee was not a supervisor, and in many cases, the employee had many more years of service than the appellant did. *Id.* Nonetheless, the result in two of the cited cases supports the appellant's argument.

In *Armstrong v. U.S. Postal Service,* 28 M.S.P.R. 45, 49-50 (1985), the Board mitigated the demotion of a Supervisor to a 60-day suspension where the appellant was found to have used profanity, acted rudely, and was argumentative during a required sexual harassment training session. The Board noted that the conduct was serious, but that, among other factors that weighed in favor of mitigation, the appellant had not been on notice that his conduct was inappropriate. *Id.* In *Sublette v. Department of the Army,* 68 M.S.P.R. 82, 89-90 (1995), the Board sustained nine specifications of improper conduct against the appellant, a GS-12 supervisor, including violations of the agency's policies on sexual harassment, obscene language, discrimination, and offensive conduct, but mitigated the penalty from removal to a demotion to the next highest non-supervisory level. The sustained conduct included touching an employee's bra strap and referring to other employees as nigger. *Id.* at 89.

After a careful balancing of all of the aforementioned factors, and considering Board precedent, I find that removal is outside the bounds of reasonableness for the sustained misconduct. I conclude that although the appellant has potential for rehabilitation, in light of the seriousness of the sustained misconduct, a significant penalty is warranted. Accordingly, I MITIGATE the agency's removal to a 90-day suspension.

## Decision

The agency's action is MITIGATED to a 90 calendar day suspension.

## Order

I ORDER the agency to cancel the removal and substitute in its place a 90 calendar-day suspension. This action must be accomplished no later than 20 calendar days after the date this initial decision becomes final.[20]

### Interim Relief

If a petition for review is filed by either party, I ORDER the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2)(A). The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B). If the appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance. If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that basis.

[1]During the February 15-16, 2007 portion of the hearing, I was in Honolulu, Hawaii with the parties, and some witnesses testified by video-conference. On March 1-2, 2007, the parties and all witnesses were in Honolulu, and I was linked to the conference room in which the hearing was held by video from Washington, D.C.

[2]Clark sustained all five specifications of the first charge, neither of the two specifications in the second charge, and specifications two and three of the third charge. AF, Subtab 4B.

[3]Contrary to appellant's argument, I do not read the agency's charge as requiring proof that he intended to intimidate or threaten the individuals named in the specifications, or employees in general, or that his conduct violated a specific written policy.

Copyright © 2007 LRP Publications

IAF, Tab 45 (Summary of Telephonic Prehearing Conference), Tab 47 (appellant's response to summary or prehearing conference), Tab 59 (Appellant's Post-Hearing Brief *citing LaChance v. Merit Systems Protection Board*, 147 F.3d 1367, 1371 (Fed. Cir. 1998)).

[4]Cagasan testified that she heard someone who she identified as the appellant by voice, hand something that she did not see to someone else who she also could not identify and the first individual told the second individual to write his concerns down on this. Mar. 1 Tr. at 274-78. She did not see what the individual she identified as the appellant was referring to, and later that day an unidentified supervisor informed Cagasan that a Screener, who Cagasan could not name, had been given a Jack-in-the-Box application when expressing a problem with his schedule. *Id.* at 280-86. Cagasan could not recall if the unidentified supervisor told her that it was the appellant who offered the unidentified Screener the application. *Id.* at 286. The agency offered no corroboration for this incident and I found this hearsay evidence so unreliable that I granted the appellant's motion to strike, *Id.* at 287-88, and I will not further discuss the alleged incident in this decision.

[5]The entire MI Report and attachments is at Subtab 4H of the agency file, but I informed the parties that I would only accept into evidence those portions of the Report that were referred to during the hearing. IAF, Tab 58.

[6]The agency did not attempt to introduce the Record of Conversation or Record of Interview that purportedly memorialized Kaonohi's two conversations with members of the MI, and I note that the latter actually directly contradicts the conduct alleged in this specification. AF, Subtab 4H at 153-159.

[7]Even if I construed the specification to require only proof of either the comment or the gun simulation, it is arguable that the comment alone would not be sufficient to support the charge, as it is not clear that it was inappropriate. Although the use

of a gun metaphor certainly exhibits questionable judgment, Yamasaki stated only that the comment surprised him, and he agreed that the comment was not threatening, and meant only that those abusing sick leave would be subjected to discipline.

[8]Again, although the Record of Interview for Kaonohi was not introduced, and I have not considered it, Kaonohi's recollection at that time did not support this specification. AF, Subtab 4H at 159.

[9]The Record of Conversation indicates that Thompson told the interviewers that the appellant entered the room before she did. IAF, Tab 42, Ex. 12.

[10]It is undisputed that when it was reported to the appellant that his presence had made Thompson nervous, she was re-interviewed.

[11]I note that, although some of Ross testimony is consistent with his prior hand-written statements, he did not specifically allege in either statement that the appellant called him either terrorist or motherfucker. AF, Subtab 4H at 178, 695-97; IAF, Tab 42, Ex. 4

[12]This cite is to the handwritten numbers on the bottom right of Exhibit XX.

[13]In his prehearing submission, the appellant raised the issue of retaliation for opposing, challenging, or reporting discriminatory conduct. IAF, Tab 40. I included retaliation for protected activity as a defense in my summary of the telephonic prehearing conference, but the appellant objected to my characterization of his legal theory supporting his discrimination and retaliation defenses. IAF, Tabs 45, 47. The appellant did not further explain his theory of retaliation, adduced no evidence at hearing that would support a finding that the agency took action against him for any form of protected activity, and did not refer to the issue in his post-hearing brief. *Id.,* Tab 59. To the extent he may be claiming that the agency's decision to remove him was in some way related to, or affected by, his objection to the suggestion that employees might be intimidated by him because of his size on the ground that such a suggestion was inherently discriminatory, I find that he has failed to prove by preponderant evidence that the agency's

decision was affected by his opposition to what he perceived to be discrimination.

[14]Some of the additional claims of errors by the appellant in his post-hearing brief appear duplicative of his earlier argument and/or examples of the errors previously claimed. Compare IAF, Tab 59 at 2 with Tab 40 at 11. His claim that Miyamoto interfered with the MI investigation even after being told to cease soliciting complaints is not an allegation of an agency procedural error, and even assuming it is, he has not shown that it had any effect on the content of any of the evidence collected by the MI Team.

[15]The appellant has pointed to no procedure the agency violated by blocking him from access to evidence at any point since the allegations arose, and even assuming the truth of his claim, I cannot find that it was improper for the agency to instruct him not to talk to employees regarding allegations of misconduct against him during the investigation into those allegations. To the extent the appellant is including in his argument his allegation that the agency improperly ordered management employees not to speak with his counsel after he filed his Board appeal, his claim does not fall within the rubric of harmful procedural error, as the agency had already issued its decision letter.

[16]Although the appellant is correct that some witnesses specifically testified that the record memorializing their statements were inaccurate, and some inaccuracies are apparent even in the absence of the testimony, in other cases, witness testimony is simply inconsistent with the prior statement taken by investigators, which is, of course, not unusual, and not indicative of any investigatory errors.

[17]The appellant argues that Miyamoto's July 29, 2005 e-mail to the entire HNL work force, which was apparently distributed in hard copy form, was a violation of rules or procedures and tainted the MI and led to false allegations against the appellant. IAF, Tabs 40 at 9-10, 59 at 2, n.2. While Miyamoto's decision to solicit information from employees regarding specified allegations was unauthorized by Hayakawa and was arguably a violation of policy, I note that the e-mail did not specifically mention the appellant by name, that Hayakawa had already sent his referral to OIAPR at the time, and that Miyamoto's e-mail did not encourage employees to make false claims, as the appellant appears to be arguing. AF, Subtab 4H at 57-58 (Miyamoto e-mail); Feb. 16 Tr. at 93-94. I find that the e-mail does not support a finding that the agency committed harmful procedural error in deciding to remove the appellant.

[18]In *Jackson*, for example, the two appellants were found to have lacked candor when questioned about their role in falsification of firearm training test results. 99 M.S.P.R. 604, ¶¶ 2, 6. In *Ludlum*, the appellant was determined to have lacked candor when he provided an incomplete response during an investigation into allegations that he had misused a government vehicle. 87 M.S.P.R. at 60-68.

[19]The appellant has argued that some of the misconduct with which he was charged was alleged to have occurred prior to the issuance of the HRM Letter, and therefore he could not have been on notice that his conduct violated the Letter or any specific agency policy. IAF, Tab 40. He alleges that he had disposed of the Jack-in-the-Box applications by March, 2003, *id.,* but I found credible Matsuda's testimony that the meetings she attended at which the appellant made the jokes occurred during the period she was acting Screening Manager in 2003, after the HRM Letter had been issued.

[20]Under *Mitchell v. Department of Homeland Security,* 104 M.S.P.R. 682 (2007), the Board lacks authority to order the agency to pay the appellant back pay.

Copyright © 2007 LRP Publications